No. 24-1039

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

RUSSELL FOUTS, ET AL.,

*Plaintiffs-Appellees,*

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant-Appellant.*

———————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:19-cv-01662-BEN-JLB
The Honorable Roger T. Benitez, Judge

———————————

## APPELLANT'S OPENING BRIEF

———————————

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*

CHRISTINA R.B. LÓPEZ
KATRINA UYEHARA
*Deputy Attorneys General*
JOHN D. ECHEVERRIA
*Supervising Deputy Attorney General*

CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3479
John.Echeverria@doj.ca.gov
*Attorneys for Defendant and Appellant*

May 8, 2024

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................1

Jurisdictional Statement ...............................................................................3

Statement of the Issues.................................................................................3

Addendum of Statutory Provisions ..............................................................3

Statement of the Case...................................................................................4

    A.    History of the Development and Regulation of Billies.........................4

    B.    California's 106-Year-Old Restrictions on Billies............................9

    C.    Procedural History........................................................13

Summary of the Argument..........................................................................17

Standard of Review.....................................................................................20

Argument.....................................................................................................20

I.    Plaintiffs Have Failed to Establish that Billies Are Presumptively Protected by the Second Amendment........................................................21

    A.    "Common Use for Self-Defense"........................................22

    B.    "Dangerous and Unusual"...............................................27

II.    California's Restrictions on Billies Are Consistent with the Nation's Tradition of Weapons Regulation..................................................31

    A.    The Record Reflects a Robust Tradition of Regulating Particular Weapons that Threaten Public Safety................................32

    B.    California's Restrictions on Billies Are Relevantly Similar to These Historical Analogues .............................................43

    C.    The District Court's Historical Analysis Was Deeply Flawed ..........47

Conclusion ..................................................................................................53

Statement of Related Cases ........................................................................54

Certificate of Compliance ..........................................................................55

Certificate of Service ..................................................................................56

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Antonyuk v. Chiumento*
  89 F.4th 271 (2d Cir. 2023) ...............................................49, 50, 51, 52

*Bevis v. City of Naperville* (*Bevis I*)
  657 F. Supp. 3d 1052 (N.D. Ill. 2023)........................................*passim*

*Caetano v. Massachusetts*
  577 U.S. 411 (2016)............................................................26

*Chiafalo v. Washington*
  591 U.S. 578 (2020)............................................................52

*City & Cnty. of San Francisco v. Garland*
  42 F.4th 1078 (9th Cir. 2022) .................................................20

*Clark v. Cmty. for Creative Non-Violence*
  468 U.S. 288 (1984)............................................................21

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*
  (*DSSA*)
  664 F. Supp. 3d 584 (D. Del. 2023)...........................................*passim*

*District of Columbia v. Heller*
  554 U.S. 570 (2008)...........................................................*passim*

*Duncan v. Bonta*
  19 F.4th 1087 (9th Cir. 2021) .................................................25

*Ezell v. City of Chicago*
  651 F.3d 684 (7th Cir. 2011) .................................................51

*Fouts v. Bonta*
  561 F. Supp. 3d 941 (S.D. Cal. 2021).........................................*passim*

*Fyock v. Sunnyvale*
  779 F.3d 991 (9th Cir. 2015) .................................................28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Hartford v. Ferguson*
676 F. Supp. 3d 897 (W.D. Wash. 2023) ...................................................45, 46

*Herrera v. Raoul*
670 F. Supp. 3d 665 (N.D. Ill. 2023)......................................................43

*Koon v. United States*
518 U.S. 81 (1996).........................................................................29

*McCullen v. Coakley*
573 U.S. 464 (2014)........................................................................43

*McDonald v. City of Chicago*
561 U.S. 742 (2010)............................................................42, 43, 50

*Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*)
__ F. Supp. 3d __, 2023 WL 4975979 (D. Conn. Aug. 3, 2023) .....27, 28, 42, 45

*New York State Rifle & Pistol Ass'n v. Bruen*
597 U.S. 1 (2022)....................................................................*passim*

*Or. Firearms Fed'n v. Kotek*
682 F. Supp. 3d 874 (D. Or. 2023) .........................................28, 34, 40

*People v. Alonzo*
2023 WL 7125257 (Cal. Ct. App. Oct. 30, 2023) ............................................12

*People v. Ambroziac*
2022 WL 10357522 (Cal. Ct. App. Oct. 18, 2022) ...........................................46

*People v. Baugh*
20 Cal. App. 5th 438 (2018) ...............................................................11

*People v. Bell*
49 Cal. 3d 502 (1989) ......................................................................9

*People v. Brite*
9 Cal. 2d 666 (1937) .......................................................................5

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*People v. Canales*
12 Cal. App. 2d 215 (1936) ...................................................................10, 22, 46

*People v. Davis*
214 Cal. App. 4th 1322 (2013) ............................................................10, 31, 45

*People v. Garcia*
2023 WL 3167450 (Cal. Ct. App. May 1, 2023).............................................46

*People v. Grubb*
63 Cal. 2d 614 (1965) ..............................................................................*passim*

*People v. King*
38 Cal. 4th 617 (2006) ......................................................................................9, 11

*People v. Leffler*
2018 WL 3974150 (Cal. App. Aug. 20, 2018) ................................................4, 5

*People v. Makovsky*
3 Cal. 2d 366 (1935) ..............................................................................................6

*People v. Martinez*
2023 WL 5928094 (Cal. Ct. App. Sept. 12, 2023) ...........................................46

*People v. Mayberry*
160 Cal. App. 4th 165 (2008) .............................................................................10

*People v. Mercer*
42 Cal. App. 4th Supp. 1 (1995) ......................................................................4, 11

*People v. Mulherin*
140 Cal. App. 212 (1934) .......................................................................*passim*

*People v. Ocasio*
28 N.Y. 3d 178 (2016) ..........................................................................................7

*People v. Twiford*
2018 WL 1444560 (Cal. Ct. App. Mar. 23, 2018) ...........................................46

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Rupp v. Bonta*
    2024 WL 1142061 (C.D. Cal. Mar. 15, 2024)...................................50

*S.D. Myers, Inc. v. City & Cnty. of San Francisco*
    253 F.3d 461 (9th Cir. 2001) ...............................................22

*Schaffer ex rel. Schaffer v. Weast*
    546 U.S. 49 (2005).........................................................21

*Teter v. Lopez*
    76 F.4th 938 (9th Cir. 2023) ..............................................28

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023) .............................................23

*United States v. Fairlamb*
    535 F. Supp. 3d 30 (D.D.C. 2021).........................................30

*United States v. Henry*
    688 F.3d 637 (9th Cir. 2012) ..............................................29

*United States v. Perez-Garcia*
    96 F.4th 1166 (9th Cir. 2024) ........................................*passim*

*United States v. Sabol*
    534 F. Supp. 3d 58 (D.D.C. 2021).........................................30

*United States v. Wood*
    299 U.S. 123 (1936).......................................................33

**STATUTES**

**<u>Federal</u>**

United States Code, Title 28
    § 1291......................................................................3
    § 1331......................................................................3

v

# TABLE OF AUTHORITIES
## (continued)

Page

**Alabama**

1837 Ala. Acts 7, No. 11, § 2...................................................................41

**California**

California Business and Professions Code
§ 7585.9(a) ...................................................................................13

California Penal Code
§ 12020...........................................................................................11
§ 16590(m) ....................................................................................11
§ 22210.....................................................................................*passim*
§ 22215...........................................................................................13
§ 22290...........................................................................................11
§ 22295...........................................................................................13
§ 22295(a) .....................................................................................12
§ 22295(b) .....................................................................................12
§ 22295(c) .....................................................................................13
§ 22295(e) .....................................................................................12

1917 Cal. Stat. 221, ch. 145, § 2...........................................................9, 42

1923 Cal. Stat. 695-696, ch. 339, § 1...................................................10, 42

**Florida**

1868 Fla. Stat., ch. 1637, *reprinted in* Blount et al., The Revised
Statutes of the State of Florida 783, tit. 2, art. 5, § 2425 (1892) .................38, 40

**Georgia**

1837 Ga. Acts 90, § 1...........................................................................41

**Illinois**

1881 Ill. Laws 73, § 1 .........................................................................40

# TABLE OF AUTHORITIES
## (continued)

**Page**

**Kansas**

C. B. Pierce, *Charter and Ordinances of the City of Leavenworth,
with an Appendix* 45 (1863), § 23.........................................................37

**Kentucky**

1855 Ky. Acts 96, ch. 636, § 1...............................................................40

**Maryland**

1872 Md. Laws 56-57, An Act to Add an Additional Section to
Article Two of the Code of Public Local Laws, Entitled "Anne
Arundel County," Sub-title "Annapolis," to Prevent the Carrying
of Concealed Weapons in Said City, § 1 ........................................38, 39

John Prentiss Poe (Editor), *Maryland Code: Public Local Laws,
Adopted by the General Assembly of Maryland March 14, 1888,
Including Also the Public Local Acts of the Session of 1888
Incorporated Therein* 468-469 (Vol. 1, 1888), art. 27, ch. 375, § 30 ...............38

**Massachusetts**

1750 Mass. Acts 544, ch. 17, § 1 ...........................................................35

1786 Mass. Acts 87, ch. 38 ....................................................................35

1850 Mass. Gen. Stat. ch. 194, § 2 .........................................................40

**Michigan**

1887 Mich. Pub. Acts 144, An Act to Prevent the Carrying of
Concealed Weapons, and to Provide Punishment
Therefore, § 1..............................................................38, 39, 41, 42

**Missouri**

Everett Wilson Pattison, The Revised Ordinance of the City of St.
Louis, Together with the Constitution of the United States, and of
the State of Missouri; the Charter of the City 491-492 (1871),
Ordinances of the City of St. Louis, Misdemeanors, § 9....................38

vii

# TABLE OF AUTHORITIES
## (continued)

Page

**Nebraska**

Gilbert B. Colfield, Laws Ordinances and Rules of Nebraska City,
Otoe County, Nebraska 36 (1872), Ordinance No. 7, An Ordinance
Prohibiting the Carrying of Fire Arms and Concealed
Weapons, § 1 ........................................................................................39

**New Jersey**

An Act Against Wearing Swords (1686), *reprinted in The Grants,
Concessions, and Original Constitutions of the Province of New
Jersey* 289-290 (1881) ..........................................................................35

1763-1775 N.J. Laws 346, ch. 539, § 10 ..................................................34

An Act to Describe, Apprehend and Punish Disorderly Persons § 2
(1799), *reprinted in* Laws of the State of New Jersey 474
(Nettleton ed., 1821) ........................................................................35, 39

Ordinances of Jersey City, Passed By The Board Of Aldermen since
May 1, 1871, under the Act Entitled "An Act to Re-organize the
Local Government of Jersey City," Passed March 31, 1871, and
the Supplements Thereto 41 (1874), § 1..............................................38

**New York**

1772 N.Y. Laws at 683 .............................................................................34

1849 N.Y. Laws 403-404, ch. 278, §§ 1-2................................................39

George R. Donnan, Annotated Code of Criminal Procedure and Penal
Code of the State of New York as Amended 1882-85, at 172
(1885), Carrying, Using, Etc., Certain Weapons, § 410......................38

1866 New York Rev. Stat. ch. 716, §§ 1-2, *reprinted in* Throop,
Revised Statutes of the State of New York, Vol. 3, at 2512 (1882)..................37

1908 N.Y. Laws 242-243, ch. 93, § 1 .....................................................41

## TABLE OF AUTHORITIES
### (continued)

**Page**

1911 N.Y. Laws 442-443, An Act to Amend the Penal Law in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, § 1 ...................................................................41

1913 N.Y. Laws 1627-1630, An Act to Amend the Penal Law Generally, in Relation to the Carrying, Use and Sale of Dangerous Weapons, ch. 608, § 1, .............................................41

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1 ................................42

**North Dakota**

1877 N.D. Laws 794, § 455 ...................................................40

**Ohio**

1788-1801 Ohio Laws 321, 323..............................................35

**Oklahoma**

1890 Okla. Laws 495, art. 47, § 2..........................................38

**Oregon**

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order 259 (1898), An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.........................................................39

**Pennsylvania**

1875 Pa. Laws 33, ch. 38, § 1 ...............................................38

**Rhode Island**

1893 R.I. Pub. Laws 231-232, An Act Prohibiting the Carrying of Concealed Weapons, ch. 1180, § 1....................................38

**Tennessee**

1837-1838 Tenn. Pub. Act 200, ch. 137, § 1 ..........................41

ix

# TABLE OF AUTHORITIES
## (continued)

**Page**

### <u>Vermont</u>

1849 Vt. Acts & Resolves 26, No. 36, §§ 1-2 .......................................39

### <u>West Virginia</u>

1882 W. Va. Acts 421-422, § 1 ..........................................38, 48

### <u>England</u>

7 Rich. 2, ch. 13 (1383)...................................................29, 33

33 Hen. 8, ch. 6, §§ 1, 18 (1541) .......................................29, 33

1 Wm. & Mary, ch. 2, § 7 (1689) ...........................................33

### CONSTITUTIONAL PROVISIONS

United States Constitution
    Second Amendment ....................................................... *passim*
    Fourteenth Amendment .......................................37, 50, 51

### COURT RULES

Ninth Circuit Rule 28-2.7 ....................................................3

### OTHER AUTHORITIES

*Arrest Made After Tourist Struck in Head While Biking Central Park*,
    ABC News, Oct. 7, 2023, https://tinyurl.com/yjwchf7b ....................................29

ASP, Inc., About Us, https://tinyurl.com/mvskndnk ................................9

Blackstone, *Commentaries on the Laws of England* (1769) ...........................28, 33

Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys
    in the Constitution*, 102 Va. L. Rev. 687, 688 (2016) ......................................27

65 Cal. Att'y Gen. 120 (1982) ................................................12

x

# TABLE OF AUTHORITIES
## (continued)

**Page**

Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic*
(1999) ...................................................................................................35

Emma Colton, *Would-Be Burglars Armed with Billy Club" Pick the
Wrong Farmer to Try to Rob: "I Try to Rob: "I Will Shoot,"*
FoxNews, Sept. 25, 2023, https://tinyurl.com/yc6h495r .............................29, 30

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013)..................................52

Press Release, U.S. Dep't of Justice, Leader of Oath Keepers and 10
Other Individuals Indicted in Federal Court for Seditious
Conspiracy and Other Offenses Related to U.S. Capitol Breach
(Jan. 13, 2022), *available at* https://tinyurl.com/bdfa6vut ................................30

Robert J. Spitzer, *Understanding Gun Law History After Bruen:
Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57
(2023) ...................................................................................................34

Schwoerer, *Gun Culture in Early Modern England* (2016) ....................................34

Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of
National Defence, by a Free Militia* (1782) ........................................................33

*Tonya Harding Says She Was Scared After Infamous 1994 Baton
Attack on Nancy Kerrigan*, ABC News, Jan. 9, 2018,
https://tinyurl.com/5t4558ns ................................................................29

U.S. Dep't of Homeland Sec., Tactics Used to Breach the US Capitol
Building on 6 January 2021 Highlight Advanced Preparations 3
(2021), https://tinyurl.com/3ezss5k4 ...................................................30

## INTRODUCTION

California has long prohibited the civilian possession of "any instrument or weapon of the kind commonly known as a billy."  Cal. Penal Code § 22210.  A billy is a weighted club, capable of being carried on the body and deployed as a less-than-lethal impact weapon.  The billy first appeared in the United States around the mid-1800s, about the same time that cities and counties began to form police departments, and the weapon soon gained a reputation as a weapon of the rogue or gangster.  From Reconstruction through the early twentieth century, numerous States and localities, including California, responded to the criminal use of billies by enacting various laws limiting their possession and use to law enforcement.  As a result, billies never came into common use among law-abiding civilians for self-defense.

Plaintiffs, who wish to acquire and possess police batons prohibited by Section 22210, assert a Second Amendment challenge to Section 22210's restrictions on billies.  The district court previously upheld Section 22210's restrictions on billies, concluding that "[t]he weapon known as a billy has been the subject of regulation in at least twenty states" "beginning in the 1800's and continuing to the present."  *Fouts v. Bonta*, 561 F. Supp. 3d 941, 958 (S.D. Cal. 2021), *vacated on other grounds*, 2022 WL 4477732, at *1 (9th Cir. Sept. 22, 2022).  At the Attorney General's request, this Court remanded the case to the

1

district court to apply the Second Amendment framework announced in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). On remand, the district court reversed course and struck down Section 22210 as applied to billies.

The Supreme Court has recognized that the "right secured by the Second Amendment is not unlimited." *Bruen*, 597 U.S. at 21 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). It is not "a right to keep and carry any weapon whatsoever." *Id.* (quoting *Heller*, 554 U.S. at 626). Certain weapons and instruments are not presumptively protected by the Second Amendment and "may be banned." *Heller*, 554 U.S. at 627. And even assuming a weapon is presumptively protected, the government may regulate that weapon in ways that are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. That analogical inquiry is not meant to impose a "straightjacket" on the States, and instead "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30.

Properly analyzed, Section 22210's longstanding restrictions on billies are constitutional under *Bruen*. At the threshold stage of the inquiry, plaintiffs have not established that billies are presumptively protected by the Second Amendment. But even if they were presumptively protected, the restrictions are consistent with a range of historical analogues throughout American history that imposed restrictions on certain dangerous weapons, including billies after they appeared in

2

the nineteenth century. The district court's contrary approach conflicts with Supreme Court and Circuit precedent and would hinder government efforts to protect the public, consistent with the Second Amendment right to armed self-defense. This Court should reverse.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal from the district court's final judgment under 28 U.S.C. § 1291. On February 23, 2024, the district court issued a decision declaring California Penal Code Section 22210 unconstitutional as applied to a billy and entered a final judgment. 1-ER-2–27. The Attorney General timely appealed the decision and judgment on February 26, 2024. 7-ER-1212–1213. The Court has subject matter jurisdiction over plaintiffs' federal constitutional claims under 28 U.S.C. § 1331.

## STATEMENT OF THE ISSUES

Whether California's restrictions on the manufacture, importation, sale, transfer, and possession of the weapon commonly known as a billy under California Penal Code Section 22210 comport with the Second Amendment to the United States Constitution.

## ADDENDUM OF STATUTORY PROVISIONS

An addendum of pertinent statutory provisions has been filed with this brief. Ninth Cir. R. 28-2.7.

3

## STATEMENT OF THE CASE

### A.   History of the Development and Regulation of Billies

A billy is a specialized impact weapon capable of being carried on the person that has been widely adopted by law enforcement as a compliance tool.  Generally speaking, the term "billy" refers to "a policeman's club."  *People v. Mulherin*, 140 Cal. App. 212, 216 (1934); *see also People v. Mercer*, 42 Cal. App. 4th Supp. 1, 5 (1995) ("Webster's New World Dictionary defines a 'billy' as 'a club or heavy stick; truncheon, esp. one carried by a policeman.'" (citation omitted)); *People v. Leffler*, 2018 WL 3974150, at \*2 (Cal. App. Aug. 20, 2018) (noting that a "billy" or "billy club" is also known as "a policeman's truncheon"); 7-ER-1199 (Compl. ¶ 35).  The term "billy" in reference to a weapon did not appear in the English language until the 1840s.  5-ER-767.

In the mid- to late-nineteenth century, local American jurisdictions began organizing police departments, including Boston in 1839, New York City in 1845, and Los Angeles in 1889.  *Fouts*, 561 F. Supp. 3d at 951-952.  The "police officer's club, mace, truncheon, nightstick, or baton" "is as old as the [law-enforcement] profession itself," and in the nineteenth and twentieth centuries,

became "the signature tool of early police officers" in the United Kingdom and, later, the United States.  6-ER-993–994.

Billies were made of a variety of materials and varied in size and shape.  They were usually wooden.  *See Leffler*, 2018 WL 3974150, at *2 (describing a "billy" as "a heavy, usually wooden weapon for delivering blows; a short, stout stick used mainly by police officers to defend themselves when necessary, and which may also be known as a baton or truncheon" (internal citations omitted)).  The following image depicts an assortment of wooden nineteenth-century policeman's billies from the United Kingdom:



6-ER-996.  Billies could also be constructed with other materials, including leather, rattan, lead shot, plastic, and metal.  *See People v. Brite*, 9 Cal. 2d 666, 681 (1937) (describing the billies of two police officers as "flexible and made of soft

leathern material," with one end shaped like a bulb and containing shot); 6-ER-825 (describing a billy as a "heavy, hand-held rigid club, usually made of wood, plastic, or metal" (internal footnote omitted)). They could also incorporate mechanical innovations. *See* 3-ER-328–335 (describing development of a pepper spray billy).

During the nineteenth century, billies became a symbol of the peace officer's government-sanctioned power, which had a deterrent effect. *See* 5-ER-774 ("[T]he 'billy' symbolized a stereotypical tool of law and order."). For example, early police officers in Baltimore were known to twirl their billies while walking their beats, an "implied threat of violence [that] would often stop a fight before it even started." 6-ER-1033. However, in the mid-1800s and early 1900s, billies also fell into the hands of criminals, gaining a reputation for illicit use and—along with other weapons such as blackjacks, saps, and slingshots—became part "of the arsenal of the 'public enemy,' the 'gangster.'" *Mulherin*, 140 Cal. App. at 215; *see also People v. Makovsky*, 3 Cal. 2d 366, 368 (1935) (describing undercover operation to procure blackjacks and billies from store operator). This criminal arsenal threatened public safety and law-enforcement officers. 3-ER-295 (1874 illustration of "standard array of burglar equipment"); 3-ER-304 (depicting a "hooligan brawl with various pocket clubs"). By the 1850s, newspaper references to billies associated the weapon with both police and criminal activity. *See* 5-ER-

774–780.  With criminals coopting the billy and related tools for use in crime, many States and localities imposed restrictions on billies, along with other concealable weapons.  By 1900, fourteen States had restrictions on billies.  6-ER-826; 6-ER-883–885.

Over time, improvements in weapons technology led to the development of modern police batons.  *See People v. Ocasio*, 28 N.Y. 3d 178, 181 (2016) (noting that "technological advances throughout the years have resulted in modifications to the traditional wooden billy," including the development of metal or synthetic batons); 6-ER-1033–1034 (describing development of side-handle and expandable batons).  Fixed-length and expandable police batons are used by peace officers in California as a compliance tool for law enforcement.  6-ER-975–976 (depicting examples of fixed-length and expandable police batons).

Fixed-length batons were introduced to American law enforcement in the early 1970s, including the side-handle Monadnock PR-24 that was widely adopted by the Los Angeles Police Department.  6-ER-975.  Such batons are capable of offensive and defensive uses and can be used to control a suspect.  6-ER-975; 6-ER-1033.  Expandable batons were also introduced to American law-enforcement agencies in the 1970s, most notably the expandable batons developed by ASP, Inc.  6-ER-1033.  The ASP expandable baton is discrete and easily concealable in its "closed," collapsed position, but can be quickly extended and

7

deployed to engage or control a subject. 6-ER-976–977. Expandable batons can be set to different lengths to serve different purposes, as illustrated in the image below:



6-ER-976.

The "expandable metal baton is perhaps the most popular version of the baton for law enforcement today," and ASP "is one of the oldest and most well-known manufacturers of expandable batons in American law enforcement." 6-ER-1033. The ASP expandable baton is marketed specifically for law-enforcement use: "For more than forty years, ASP has had a single-minded focus on providing law

enforcement officers with the finest tools for the safe performance of their duties, and industry-leading training in the use of those tools."[1]

### B.    California's 106-Year-Old Restrictions on Billies

In 1917, the California Legislature enacted the Dangerous Weapons Control Act to "limit as far as possible the use of instruments commonly associated with criminal activity."  *People v. Bell*, 49 Cal. 3d 502, 544 (1989) (citing Stats. 1917, ch. 145, § 1).  The original law prohibited the manufacture, sale, giving, or possession of "any instrument or weapon of the kind commonly known as a blackjack, slungshot, *billy*, sandclub, sandbag, bludgeon, metal knuckles, a dirk or a dagger."  7-ER-1159 (emphasis added); *see also People v. King*, 38 Cal. 4th 617, 624 (2006) (citing Stats. 1917, ch. 145, § 1).  The statute was a "partial inventory of the arsenal of the 'public enemy,' the 'gangster,' and a prohibition against owning anything 'of the kind.'"  *Mulherin*, 140 Cal. App. at 215 (internal citation omitted).  In enacting the Dangerous Weapons Control Act, the Legislature sought "to condemn weapons common to the criminal's arsenal," "to outlaw instruments which are ordinarily used for criminal and unlawful purposes," and to "check[] the possession of objects subject to dangerous use."  *People v. Grubb*, 63 Cal. 2d 614, 620 (1965) (citation omitted), *superseded on other grounds by statute*.

---

[1] ASP, Inc., About Us, https://tinyurl.com/mvskndnk.

The weapons listed in the original 1917 law generally "belong to a certain species of weapon having so many characteristics in common that their slight differences are unimportant," and they all are "short, easily concealed upon the person and so weighted as to constitute effective and silent weapons of attack." *Mulherin*, 140 Cal. App. at 215.  The statute defined "the prohibited instruments or weapons not in specific terms, but as being of a kind commonly known as a black-jack or billie," a "purposely broad" definition that was likely adopted to address the "difficulties of nomenclature" in distinguishing the different types of instruments and weapons.  *People v. Canales*, 12 Cal. App. 2d 215, 217 (1936).[2]

California's restrictions on billies have been in continuous effect for over a century.  They were reenacted in 1923, Stats. 1923, ch. 339, § 1, and recodified as

---

[2] California Penal Code Section 22210's restrictions on billies have been interpreted to apply to "ordinarily harmless objects," but only if "the circumstances of possession demonstrate an immediate atmosphere of danger."  *Grubb*, 63 Cal. 2d at 621.  An ordinarily harmless object will not qualify as a prohibited billy absent evidence that the defendant "would use the object for a dangerous, not harmless, purpose," based on a consideration of the time, place, and manner of possession, including any "alteration of the object from standard form."  *People v. Davis*, 214 Cal. App. 4th 1322, 1327 (2013) (a modified baseball bat with drilled holes and a leather wrist strap qualified as a billy); *see also, e.g.*, *People v. Mayberry*, 160 Cal. App. 4th 165, 171-172 (2008) (a "standard workout glove containing a small amount of sand, even when used as a weapon," was not prohibited under Section 22210).  A defendant may rebut evidence that an ordinarily harmless object was a billy prohibited under Section 22210 with evidence of "innocent usage."  *Davis*, 214 Cal. App. 4th at 1327.

10

former California Penal Code Section 12020 in 1953. *See People v. King*, 38 Cal.
4th 617, 624 (2006). In 2010, the provisions were recodified without substantive
change as Section 22210. *See People v. Baugh*, 20 Cal. App. 5th 438, 443 n.2
(2018). Currently, Section 22210 prohibits any person from manufacturing,
importing, keeping, selling, transferring, or possessing "any leaded cane, or any
instrument or weapon of the kind commonly known as a *billy*, blackjack, sandbag,
sandclub, sap, or slungshot." Cal. Penal Code § 22210 (emphasis added).[3] A
"billy" is a "generally prohibited weapon," *id.* § 16590(m), and a "nuisance"
subject to confiscation and destruction by law enforcement, *id.* § 22290.

Under California law, a police baton falls within the scope of Section 22210.
*See Mercer*, 42 Cal. App. 4th Supp. at 6. Though not expressly mentioned in
Section 22210, a police baton or collapsible baton is an "'instrument or weapon of
the kind' or class commonly known as a billy club or blackjack and falls within the

---

[3] There are substantial similarities between billies, blackjacks, sandbags,
sandclubs, saps, and slungshots—all of these weapons are "short, easily concealed
upon the person and so weighted as to constitute effective and silent weapons of
attack" and "would properly [be] described by the general term, a 'sap.'" *See
Mulherin*, 140 Cal. App. at 215; *see also* 3-ER-344 (defining a blackjack as a
"short bludgeon consisting, at the striking end, of an encased piece of lead or some
other heavy substance and, at the handle end, a strap or springing shaft that
increases the force or impact when a person or object is struck," including a "billy
club, sand club, sandbag, or slapjack"); 3-ER-345 (defining slungshot as a "type of
blackjack").

proscription." 65 Cal. Att'y Gen. 120 (1982) at 2; 7-ER-1189.[4]  But Section

22210's restrictions are subject to certain exceptions.  Under California Penal Code

Section 22295(a), peace officers may be authorized to carry a wooden club or

baton that would otherwise be prohibited by Section 22210.  Before they are

authorized to carry a police baton, peace officers are trained in the safe and

effective use of batons, based on minimum standards set by the California

Commission of Peace Officer Standards and Training (POST Commission).  6-ER-

977–978; 6-ER-1087–1094.  In addition, registered security guards may be

authorized to carry a wooden club or baton subject to certain conditions, including

completion of an instruction course certified by the California Department of

Consumer Affairs.  Cal. Penal Code § 22295(b).[5]  The Department of Consumer

Affairs coordinates with the POST Commission to "develop standards for a course

---

[4] The district court did not decide whether a collapsible police baton—one of the weapons that plaintiffs seek to acquire and possess (*see* 7-ER-1201–1202)—qualifies as a "billy" under Section 22210.  1-ER-7.  The district court enjoined Section 22210 only as to billies, without affecting other weapons listed in the statute (1-ER-27), and certain collapsible police batons may have characteristics of other weapons listed in Section 22210.  *See, e.g.*, *People v. Alonzo*, 2023 WL 7125257, at *1-2 (Cal. Ct. App. Oct. 30, 2023) (noting that illegal possession of a collapsible metal baton in a pickup truck was charged as "possession of a blackjack" under Section 22210).

[5] In addition to peace officers and registered security guards, animal control officers, humane officers, and illegal dumping enforcement officers may be authorized to carry a wooden club or baton in the scope of their official duties if they have completed the POST-certified baton training course.  Cal. Penal Code § 22295(e).

in the carrying and use of a club or baton." *Id.* § 22295(c).  Consistent with its

statutory obligations, the Department of Consumer Affairs issues a Baton Training

Manual covering a range of topics, including "[m]oral and legal aspects of baton

usage," "[b]aton familiarization and uses," "[f]irst aid for baton injuries,"

"[d]efensive techniques," and "[a]rrest and control techniques."  Cal. Bus. & Prof.

Code § 7585.9(a); *see, e.g.*, 6-ER-1096–1112.

Section 22210's prohibitions do not apply to the manufacture for, sale to, or

lending of wooden clubs or batons to special police officers or uniformed security

guards authorized to carry a wooden club or baton under Section 22295.  Cal.

Penal Code § 22215.

### C.   Procedural History

Plaintiffs filed this lawsuit in 2019, asserting a Second Amendment challenge

to Section 22210's restrictions on billies on their face and as-applied to plaintiffs.

7-ER-1192–1211; Dkt. 1.[6]  Plaintiffs seek to acquire and possess "the same type of

baton/billy [that] policemen are usually issued and an expandable baton for self-

defense."  7-ER-1201–1202.  Plaintiffs pray for an injunction of Section 22210

"and any other relevant California law which bans the acquisition, possession,

---

[6] Unless otherwise noted, "Dkt." refers to the district court docket below in No. 19-cv-1662-BEN-JLB, and "C.A. Dkt." refers to the docket in this Court in No. 21-56039.

carrying or use of billies as applied to plaintiffs and additionally against other similarly situated law abiding persons." 7-ER-1204.

In September 2021, the district court granted the Attorney General's motion for summary judgment, holding that Section 22210's billy restrictions do not violate the Second Amendment. *Fouts*, 561 F. Supp. 3d 941; Dkt. 41. That decision applied the Ninth Circuit's pre-*Bruen* framework for adjudicating Second Amendment claims, which asked whether the challenged law burdens conduct protected by the Second Amendment and, if so, whether it satisfies the applicable level of constitutional scrutiny. *Fouts*, 561 F. Supp. 3d at 947-948. The district court upheld the law at the first step of the prior framework. *Id*. at 949. The court noted that Section 22210 was enacted more than 100 years ago in 1917 and, further, that numerous States enacted other types of restrictions on billies "beginning in the 1800's and continuing to the present." *Id.* at 958. The court concluded that "government regulation of a billy has long been accepted by the public." *Id.* Because the law did not burden conduct presumptively protected by the Second Amendment, the district court did not proceed to apply any constitutional scrutiny at the second step of the prior framework. *Id.* The court entered judgment for the Attorney General, and plaintiffs appealed. Dkt. 42, 43; *Fouts v. Bonta*, C.A. No. 21-56039.

14

While that appeal was pending, the U.S. Supreme Court issued its decision in *Bruen*, setting forth a new standard for Second Amendment claims "centered on constitutional text and history." 597 U.S. at 22. Under *Bruen*, the initial inquiry is whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If so, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* After the Supreme Court issued that decision, the Attorney General requested that the Ninth Circuit vacate the district court's previous judgment and remand the case to allow the parties to develop a record responsive to the new *Bruen* standard. C.A. No. 21-56039, Dkt. 29. On September 22, 2022, the previous judgment was vacated and the case was remanded. C.A. Cir. No. 21-56039, Dkt. 34.

On remand, the Attorney General submitted declarations of expert witnesses and a survey of relevant historical laws addressing the constitutionality of Section 22210's restrictions on billies under both stages of the *Bruen* standard. Dkt. 51, 60, 63, 64. On February 23, 2024, the district court issued a decision striking down Section 22210 as it applies to a billy. 1-ER-3–27.

At the threshold stage of the *Bruen* inquiry, the district court held that plaintiffs "met their burden" of showing that billies are covered by the plain text of the Second Amendment. 1-ER-7. The court held that billies are "arms" that are

"commonly-owned" and not "unusual." 1-ER-7. The court placed the burden on the Attorney General to show that billies are "not commonly possessed by law-abiding citizens for lawful purposes" at the historical stage of the *Bruen* inquiry. 1-ER-9 & n.17. According to the district court, because the Second Amendment covers the acquisition, possession, carrying, and use of a billy, the "burden shif[ed] fully onto the shoulders of the government" to justify the law. 1-ER-8.

At the historical stage of the *Bruen* inquiry, the district court held that California's restrictions on billies are not consistent with the Nation's historical regulatory tradition. 1-ER-19. Despite holding previously that "government regulation of a billy has long been accepted by the public" based on restrictions dating back to the nineteenth century, *Fouts*, 561 F. Supp. 3d at 958, the district court determined that *Bruen* "chang[ed] the relevant time period," which in turn "change[d] the outcome," 1-ER-7. The court rejected any need for "more nuanced reasoning" that would allow the State to rely on "historical analogues," requiring the State to identify a "historical twin." *See* 1-ER-9–10. Because "both the weapon and the societal ill existed in early America," the court determined that "analogical reasoning is not necessary" and "[o]nly straightforward historical prohibitions on possessing billy clubs are relevant." 1-ER-11. Finding no bans on the possession of a billy between the years 1791 and 1868— which the district court described as the "most important period of history" for the *Bruen* analysis

16

(1-ER-16)—the court held that the law was not constitutional. 1-ER-15–16. The court rejected as "too late" any analogues that were enacted after 1868. 1-ER-16. It disregarded any analogues that regulated billies in a manner other than banning "[s]imple possession" or that regulated other melee weapons, like slungshots and Bowie knives. 1-ER-15. The court acknowledged that the "case could go a different direction" if prohibitions on other weapons, like slungshots, were considered. 1-ER-10.

Ultimately, the court severed the restrictions on billies and declared that the "prohibition on a billy unconstitutionally infringes the Second Amendment rights of American citizens." 1-ER-27. The court entered summary judgment for plaintiffs and issued a permanent injunction, enjoining enforcement of "California Penal Code § 22210 as it applies to a billy." 1-ER-27. The district court then entered final judgment. 1-ER-2. On February 26, 2024, the Attorney General appealed the decision and injunction. 7-ER-1212–1213.

## SUMMARY OF THE ARGUMENT

Under *New York State Rifle & Pistol Ass'n v. Bruen*, the threshold inquiry requires plaintiffs to show that the Second Amendment presumptively protects a right to manufacture, sell, give, or possess any instrument or weapon of the kind commonly known as a billy. 597 U.S. 1 (2022). Plaintiffs have not met their burden. Billies may be bearable weapons, but plaintiffs have not separately

17

established that they are in "'common use' today for self-defense." *Id.* at 32. They have failed to present evidence that billies are typically possessed by law-abiding citizens for self-defense, let alone that billies bear the objective characteristics of a self-defense weapon. The district court held that plaintiffs met their threshold burden simply because billies are bearable "arms" and are not (in its view) "unusual." The court placed the common use for self-defense inquiry at the historical stage of the *Bruen* inquiry and assigned the burden to the State to prove that billies are *not* in common use for self-defense. But that approach contradicts *Bruen*'s clear guidance and binding Circuit precedent. And the court's passing reference to billies being "commonly owned" and not "unusual weapon[s]" (1-ER-7) is not based on any evidence in the record. Because plaintiffs have failed to establish that billies are in common use today for self-defense, billies are not presumptively protected by the Second Amendment, and plaintiffs' claim fails at the threshold stage.

Even if billies were entitled to presumptive protection under the Second Amendment, California's restrictions on them are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. The State has demonstrated a robust tradition of restricting particularly dangerous weapons, including billies and other impact and edged weapons, throughout American history. The district court rejected the State's

18

reliance on analogues, requiring historical *twins* to justify Section 22210's restrictions on billies, but that approach cannot be reconciled with *Bruen* and is inconsistent with Circuit precedent.  *See Bruen*, 597 U.S. at 27 (noting that a "*more nuanced approach*" may be required where a law addresses "unprecedented societal concerns or dramatic technological changes" (emphasis added)); *United States v. Perez-Garcia*, 96 F.4th 1166, 1181 (9th Cir. 2024) (explaining that the "central question" in any Second Amendment case is whether the modern law is "relevantly similar" to "historical laws and traditions" and that the court "must uphold a modern regulation if the government identifies a 'well-established and representative historical analogue'").

In its pre-*Bruen* decision, the district court properly determined that California's billy restrictions were sufficiently longstanding not merely because they were originally enacted in 1917, but because they can be traced back to restrictions on billies enacted during Reconstruction.  *Fouts*, 561 F. Supp. 3d at 958.  *Bruen* did nothing to undermine that historical analysis; if anything, *Bruen* clarified that historical analogues need not be "historical twin[s]" or "dead ringer[s]" for modern regulations.  *Bruen*, 597 U.S. at 30 (emphasis omitted).  The district court's "divide-and-conquer approach" to historical restrictions on billies and other melee weapons "misses the forest for the trees."  *Perez-Garcia*, 96 F.4th at 1191.  Because California's restrictions on billies are consistent with the

19

Nation's tradition of weapons regulation, they do not violate the Second Amendment.

## STANDARD OF REVIEW

The district court entered summary judgment for plaintiffs. 1-ER-2. The Court reviews "the legal conclusions supporting declaratory judgments and permanent injunctions granted at summary judgment de novo." *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022).

## ARGUMENT

The Second Amendment "codified a *pre-existing* right." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). "[L]ike most rights, the right secured by the Second Amendment is not unlimited.'" *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *Heller*, 554 U.S. at 626). It has never been understood as "a right to keep and carry any weapon whatsoever." *Id.* (quoting *Heller*, 554 U.S. at 626). Under *Heller*, certain weapons and instruments "may be banned." *Heller*, 554 U.S. at 627. The analytical framework announced in *Bruen* did not change that: the Court did not "decide anything about the kinds of weapons that people may possess." *Bruen*, 597 U.S. at 72 (Alito, J., concurring). A proper application of that framework confirms that California's longstanding restrictions on billies fully comport with the Second Amendment as originally understood.

20

## I.  Plaintiffs Have Failed to Establish that Billies Are Presumptively Protected by the Second Amendment

The threshold question under the *Bruen* framework is whether plaintiffs have carried their burden to establish that "the Constitution presumptively protects" their proposed course of conduct.  *Bruen*, 597 U.S. at 24; *United States v. Perez-Garcia*, 96 F.4th 1166, 1180 (9th Cir. 2024); *cf. Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56-57 (2005); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).  To answer that question, the Court addresses whether "the Second Amendment's plain text covers" plaintiffs' proposed course of conduct. *Bruen*, 597 U.S. at 24.  That inquiry considers "the normal and ordinary meaning of the Second Amendment" informed by its "historical background."  *Id.* at 20 (internal quotation marks omitted).

The Second Amendment's text protects "the right of the people to keep and bear Arms."  The meaning of the term "Arms" is broad.  *See Heller*, 554 U.S. at 581.  The term is "fixed according to its historical understanding," *Bruen*, 597 U.S. at 28, and includes "'[w]eapons of offence, or armour of defence,'" *Heller*, 554 U.S. at 581; *see id.* ("'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another'").  But that is not the end of the threshold inquiry.  The Supreme Court has emphasized that not every "*type of weapon*" is "eligible for Second Amendment protection."  *Id.* at 622.  In determining what types of weapons fall within the scope of the Second

21

Amendment right, as originally understood, the Supreme Court has clarified that only "weapons 'in common use' today for self-defense" are eligible for protection. *Bruen*, 597 U.S. at 32. Relatedly, the Second Amendment does not protect "'dangerous and unusual weapons,'" which governments "may ban" "because the Second Amendment does not guarantee an unlimited right to possess every kind of weapon." *Perez-Garcia*, 96 F.4th at 1177 (citing *Heller*, 554 U.S. at 627). Plaintiffs failed to establish that billies are presumptively protected by the Second Amendment.[7]

## A.   "Common Use for Self-Defense"

Even assuming that billies qualify as "arms," that alone would not establish that they are presumptively protected by the Second Amendment at the threshold stage of the *Bruen* inquiry. The Supreme Court has emphasized that "individual

---

[7] The district court acknowledged that plaintiffs assert a "facial challenge" against Section 22210's restrictions on billies. 1-ER-9. But the court did not properly analyze that claim. Not all billies are the same. Even if a typical "wooden stick" kept for defensive purposes might be presumptively protected (*see* 1-ER-26), other billies, like the club at issue in *Canales* with a weighted end and "nails driven into the larger end and covered with tape," may not be. 12 Cal. App. 2d at 217. Plaintiffs failed to establish that Section 22210's restrictions on billies are unconstitutional in all applications. *See S.D. Myers, Inc. v. City & Cnty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (explaining that a plaintiff asserting a facial challenge to a law "must meet a high burden of proof" of "'establish[ing]' that no set of circumstances exists under which the [law] would be valid'" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))).

self-defense is 'the *central component*' of the Second Amendment." *Bruen*, 597

U.S. at 32. Courts must therefore assess whether a weapon is "'in common use'

today for self-defense" in determining whether it is presumptively protected. *Id.*;

*see id.* at 81 (Kavanaugh, J., concurring) (emphasizing this "important limitation");

*Heller*, 554 U.S. at 624. In *United States v. Alaniz*, this Court followed *Bruen*'s

clear guidance in explaining that part of the "*Bruen* step one" inquiry is "whether

the weapon at issue is "'in common use" today for self-defense.'" 69 F.4th 1124,

1128 (9th Cir. 2023).[8] The district court's attempt to shoe-horn the common use

for self-defense inquiry into the historical stage of the *Bruen* analysis (*see* 1-ER-9)

is inconsistent with *Alaniz*.[9]

In assessing common use for self-defense, the Supreme Court in *Heller* did

not simply consider the *prevalence* of handguns (which was undisputed). Instead,

---

[8] Recently, a panel of this Court suggested that "presumptive protections of the Second Amendment may be rebutted as to arms not in common use today for self-defense." *Perez-Garcia*, 96 F.4th at 1181 (internal quotation marks omitted). To the extent that passage might be interpreted to require the government to prove that a particular weapon is not in common use for self-defense, it would be non-binding dicta, in conflict with *Alaniz* and *Bruen*, which extended presumptive protection only if the weapon at issue is in common use for self-defense. Regardless, whether the Court requires plaintiffs to demonstrate that billies are presumptively protected, *Alaniz*, 69 F.4th at 1128, or the Attorney General to "rebut[]" any such presumptive protection, *Perez-Garcia*, 96 F.4th at 1181, the result is the same. Billies are not presumptively protected at the threshold stage of the *Bruen* analysis because there is no evidence that they are in common use for self-defense.

[9] This Court is addressing the common use for self-defense inquiry and related issues in *Duncan v. Bonta*, C.A. No. 23-55805 (en banc).

23

it examined the *objective features* of a handgun to explain why it is a "self-defense weapon." 554 U.S. at 629. The Court explained that handguns are "easier to store in a location that is readily accessible in an emergency" due to their small size. *Id.* They are also "easier to use for those without the upper-body strength to lift and aim a long gun"; they "can be pointed at a burglar with one hand while the other hand dials the police"; and they "cannot easily be redirected or wrestled away by an attacker." *Id.* In the same opinion, the Court recognized that some types of weapons fall outside the scope of the Second Amendment—"such as short-barreled shotguns," and "M-16 rifles and the like"—without *any* discussion of their popularity or prevalence. *Id.* at 625, 627. What mattered to the Court was an "examin[ation]" of "the character of the weapon." *Id.* at 622; *see id.* at 623 ("[T]he Second Amendment right, whatever its nature, extends only to certain types of weapons.").

Here, plaintiffs have not presented evidence demonstrating that billies are self-defense weapons. They have not presented any evidence of the prevalence of billies in civilian possession. The district court suggested that billies and batons are "commonly-owned" (1-ER-7), but there is no evidence whatsoever in the record to support that assertion. To the contrary, in its previous ruling, the district court observed that billies "are *not* commonly owned for lawful purposes," *Fouts*, 561 F. Supp. 3d at 958, and it is unclear what in *Bruen* or the post-remand

24

proceedings caused the district court to change its view.  But even common

ownership would not be enough.  The record is devoid of evidence that billies have

the character of self-defense weapons—that they have been widely used in

ordinary self-defense or are well suited to that purpose.

The district court (*see* 1-ER-8) read the word "use" out of the inquiry into

whether billies are "'in common use' today for self-defense."  *Bruen*, 597 U.S. at

32.  The court found it significant that the phrase "common use" does not appear in

the text of the Second Amendment and indicated that "[u]se is not required for

Second Amendment protection."  1-ER-8.  But the court ignored the Supreme

Court's repeated use of the phrase "common *use* for self-defense" in describing the

types of weapons that are protected.  *See Bruen*, 597 U.S. at 32 (emphasis added);

*see also id.* at 70 ("The Second Amendment guaranteed to 'all Americans' the

right to bear commonly used arms . . . .");  *Heller*, 554 U.S. at 636 (holding that the

government could not impose an "absolute prohibition of handguns held *and used*

for self-defense" (emphasis added)).  While a weapon does not necessarily need to

be "commonly used" to qualify for presumptive protection under the Second

Amendment, evidence of actual use and suitability for ordinary self-defense are

relevant considerations.  *Duncan v. Bonta*, 19 F.4th 1087, 1127 (9th Cir. 2021)

(Berzon, J., concurring) (noting that *Heller* "focused not just on the prevalence of a

weapon, but on the primary use or purpose of that weapon"), *vacated and remanded on other grounds by Bruen*, 597 U.S. 1 (2022).[10]

Plaintiffs have presented no evidence that billies are commonly used or even suitable for ordinary self-defense needs. The district court surmised that a billy could be used in self-defense, but the only instance of a defensive use of a billy in the decision is an "allegory" of a "hypothetical school girl" walking with a billy through a "dangerous part of town." 1-ER-4–5. That a billy "may be used for self-defense" (1-ER-26) proves too much. Any weapon could conceivably be used for self-defense—from slungshots and metal knuckles to machine guns and bazookas—but the constitutionally relevant question is whether the weapon is in "*common* use" for self-defense. *Bruen*, 597 U.S. at 32 (emphasis added).

The evidence in the record does not show that billies are self-defense weapons. 5-ER-772 (noting that a search of historical dictionaries and newspaper databases failed to identify the billy "as a common self-defense weapon in use by

---

[10] The district court cited *Caetano v. Massachusetts*, 577 U.S. 411 (2016), to claim that mere possession of a weapon is sufficient to establish common use. 1-ER-5. Contrary to the district court's characterization of that case, *Caetano* did not hold that the plaintiff's "use of the stun gun was protected by the Second Amendment for her self-defense." 1-ER-5. The concurrence of Justices Alito and Thomas viewed stun guns as protected, but the Court's per curiam opinion simply held that the Supreme Judicial Court of Massachusetts failed to apply *Heller* and remanded the case for further proceedings. *Caetano*, 577 U.S. at 412 (per curiam).

26

ordinary citizens"). Instead, they were adopted by law enforcement for official duties and criminals for nefarious purposes. 5-ER-772; *see Grubb*, 63 Cal. 2d at 620 (noting that the State's regulation of billies "obviously sought to condemn weapons common to the criminal's arsenal").[11] The historical use of billy clubs was more typically associated with offensive and criminal use, as opposed to use for lawful self-defense. 5-ER-808, 818–819. Because plaintiffs have failed to demonstrate that billies are in common use for lawful self-defense, their claims fail at the threshold stage of the *Bruen* inquiry.

## B. "Dangerous and Unusual"

In discussing "limit[s] on the right to keep and carry arms," the Supreme Court has also pointed to the long "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *see Bruen*, 597 U.S. at 21.[12] Such weapons "fall outside of the Second Amendment's protections"

---

[11] Widespread adoption of billies by law enforcement agencies for official purposes as a compliance tool does not demonstrate that billies are in common use for ordinary self-defense by law-abiding citizens. *See Bruen*, 597 U.S. at 60.

[12] The phrase "dangerous and unusual" in describing this historical tradition is a hendiadys: a rhetorical device where "two terms separated by a conjunction work together as a single complex expression." Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688 (2016). In "dangerous and unusual," "unusual" conveys some heightened "level of lethality or capacity for injury" that makes a particular type of weapon "especially dangerous," *Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*), __ F. Supp. 3d __, 2023 WL 4975979, at *16 (D. Conn. Aug. 3, 2023), not a numerical limit that bars

at the threshold stage of the *Bruen* inquiry.  *Or. Firearms Fed'n v. Kotek*, 682 F.

Supp. 3d 874, 922 (D. Or. 2023) (citing *Bruen*, 597 U.S. at 21); *see also Perez-*

*Garcia*, 96 F.4th at 1180 (noting that the "Second Amendment may not protect [an

individual's] right to bear or keep 'dangerous and unusual weapons'").[13]

Blackstone elaborated on that tradition in the leading historical treatise cited by

*Heller* on this point.  He explained that "[t]he offence of riding or going armed,

with dangerous or unusual weapons, is a crime against the public peace . . . and is

particularly prohibited."  4 Blackstone, *Commentaries* 148 (1769).  In accordance

with that tradition, and without interfering with the public carry of other weapons

for self-defense, *see Bruen*, 597 U.S. at 44, the Crown restricted particular

---

prohibitions on a weapon as soon as a minimum number are in circulation.  But
even if the "dangerous and unusual" inquiry requires a separate showing that the
weapon in question is not "commonly possessed," *Fyock v. Sunnyvale*, 779 F.3d
991, 997 (9th Cir. 2015), *abrogated by Bruen*, 597 U.S. 1, there is no evidence in
the record that billies are commonly possessed by law-abiding citizens for ordinary
self-defense.  *See supra* pp. 24-27.

[13] In placing the dangerous and unusual inquiry at the historical stage of the *Bruen*
analysis (*see* 1-ER-9 & n.17), the district court relied on the vacated panel opinion
in *Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023), *reh'g en banc granted,
opinion vacated*, No. 20-15948, 2024 WL 719051 (9th Cir. Feb. 22, 2024).  The
*Teter* panel's view was not the best understanding of Second Amendment
precedent.  In *Heller*, the Supreme Court discussed this principle as part of its
threshold discussion of what "sorts of weapons [are] protected" by the Second
Amendment.  554 U.S. at 627; *see also Bruen*, 597 U.S. at 21.  That inquiry occurs
before addressing whether the government has adequately justified a restriction of
a type of weapon that is presumptively protected by reference to historical
analogues.  *See Alaniz*, 69 F.4th at 1128; *see also NAGR*, 2023 WL 4975979, at
*17 (conducting "dangerous and unusual" inquiry at the threshold stage).

dangerous weapons like crossbows and launcegays to preserve the public order, *id.* at 42; *see, e.g.*, 7 Rich. 2, ch. 13 (1383); 33 Hen. 8, ch. 6, §§ 1, 18 (1541).

Consistent with this limitation on the right to keep and bear arms, billies fall outside the scope of the Second Amendment because they are particularly dangerous weapons. Billies are "likely to cause serious bodily harm" when deployed against a human target. *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012); 3-ER-303 (noting that the nightstick, a "catch all term" for "a hefty 24 inch baton," had been banned by New York City "as an overly brutal tool"); 6-ER-1085 (noting "risk of causing serious injury" with a baton); 6-ER-977; 5-ER-816–817 (describing risk of harm due to weighted tip of a collapsible baton); 5-ER-815 ("[S]tandard billy clubs were dangerous enough to warrant several attempts to circumvent their use." (quoting 3-ER-419-423)); *cf.* 3-ER-338–339 (quoting a police instructor's description of blackjacks as "very dangerous" because "you can never be sure" if you might "beat someone to death" when using one). Due to their concealability and striking power, billies pose a serious public safety risk today.[14]

---

[14] *See, e.g.*, *Koon v. United States*, 518 U.S. 81, 86-87 (1996) (describing assault of Rodney King with police batons), *superseded by statute on other grounds*; *Tonya Harding Says She Was Scared After Infamous 1994 Baton Attack on Nancy Kerrigan*, ABC News, Jan. 9, 2018, https://tinyurl.com/5t4558ns; *Arrest Made After Tourist Struck in Head While Biking Central Park*, ABC News, Oct. 7, 2023, https://tinyurl.com/yjwchf7b (describing use of collapsible baton in attack); Emma Colton, *Would-Be Burglars Armed with "Billy Club" Pick the Wrong Farmer to*

Police batons, in particular, have featured prominently in recent civil unrest and organized crime. *See* 6-ER-1073–1074 (describing civilian use of batons in clashes between political protesters in Portland, Oregon); 6-ER-1076 (describing "brutal baton attack" at political protest in Portland, Oregon, which resulted in a nearly six-year prison sentence for the civilian attacker); 6-ER-1081 (describing baton attacks perpetrated by civilian during protest in Berkeley, California). During the January 6, 2021 attack on the U.S. Capitol, armed protesters used police batons to confront law enforcement. *See, e.g.*, *United States v. Sabol*, 534 F. Supp. 3d 58, 63 (D.D.C. 2021) (describing use of police baton to drag a police officer "face-first down the steps and into the mob"); *United States v. Fairlamb*, 535 F. Supp. 3d 30, 39 (D.D.C. 2021) ("the indictment alleges that the defendant carried a dangerous weapon (the baton) while committing seven felonies" during the January 6 attack); U.S. Dep't of Homeland Sec., Tactics Used to Breach the US Capitol Building on 6 January 2021 Highlight Advanced Preparations 3 (2021), https://tinyurl.com/3ezss5k4 (discussing use of concealed batons as a tactic used during breach of the Capitol). And members of the Oath Keepers brought batons to the Capitol as part of their "paramilitary gear, weapons and supplies." Press Release, U.S. Dep't of Justice, Leader of Oath Keepers and 10 Other Individuals

_____

*Try to Rob: "I Will Shoot,"* FoxNews, Sept. 25, 2023, https://tinyurl.com/yc6h495r (describing use of billy club in attempted robbery).

Indicted in Federal Court for Seditious Conspiracy and Other Offenses Related to

U.S. Capitol Breach (Jan. 13, 2022), *available at* https://tinyurl.com/bdfa6vut.

The district court discounted the dangers posed by billies as covert melee

weapons and suggested, without evidence, that billies are not "unusual." 1-ER-7.

While "it is often a gun" and "not a billy, sap, or blackjack" that is used in violent

crime today, billies are still uniquely dangerous due to their concealability and

striking power and, in private hands, "are also instruments which are 'ordinarily

used for criminal and unlawful purposes.'" *Davis*, 214 Cal. App. 4th at 1333

(quoting *Grubb*, 63 Cal. 2d at 620); *see also Grubb*, 63 Cal. 2d at 620 (noting that

the State's anti-billy legislation "obviously sought to condemn weapons common

to the criminal's arsenal"). Billies are dangerous and unusual weapons that fall

outside the protective scope of the Second Amendment.

## II.   California's Restrictions on Billies Are Consistent with the Nation's Tradition of Weapons Regulation

Even if the Court holds (or assumes) that billies are presumptively protected

by the Second Amendment, California's restrictions on them are constitutional

because they are consistent with the Nation's regulatory tradition. Modern laws

that are "relevantly similar" to historical regulations, in the sense that they "impose

a comparable burden on the right of armed self-defense" that "is comparably

justified," are constitutional. *Bruen*, 597 U.S. at 29. There is no need to identify

"a historical *twin*" or "a dead ringer" for purposes of *Bruen*'s "analogical inquiry."

31

*Id.* at 29-30.  As this Court recently explained, analogical reasoning is required even when the modern law addresses a societal concern that existed at the ratification of the Second or Fourteenth Amendments.  *See Perez-Garcia*, 96 F.4th at 1181 (concluding that firearm dispossession for criminal defendants released but awaiting trial is "consistent with how and why our nation has historically disarmed criminal defendants facing serious charges while awaiting trial").  Applying the *Bruen* framework here, California's restrictions on billies are constitutional.

### A.    The Record Reflects a Robust Tradition of Regulating Particular Weapons that Threaten Public Safety

As the Supreme Court has recognized, the Second Amendment does not protect just "any weapon whatsoever."  *Heller*, 554 U.S. at 626.  And there is a robust tradition—pre-dating the founding—of regulating and even banning weapons with features that make them particularly dangerous or susceptible to criminal misuse, especially after those weapons have proliferated in the commercial market to the point that they present a substantial threat to public safety.

1.  In ratifying the Second Amendment, the founding generation "codified a right inherited from our English ancestors."  *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 599).  That "*pre-existing* right" was "not unlimited."  *Id.* at 20-21 (quoting *Heller*, 554 U.S. at 592, 626).  As Blackstone described it, the right was understood as "a public allowance"—subject to "due restrictions" necessary to

32

protect the peace.  1 Blackstone, *Commentaries on the Laws of England* 139

(1769).[15]  The English Bill of Rights—"the predecessor to our Second

Amendment"—guaranteed a right for certain subjects to "'have Arms for their

Defence suitable to their Conditions, *and as allowed by Law*.'"  *Heller*, 554 U.S. at

593 (quoting 1 Wm. & Mary, ch. 2, § 7 (1689)) (emphasis added); *see also*

1 Blackstone, *Commentaries* 139.  The phrase "as allowed by law" authorized

governments to "restrain the use of *some particular sort of arms*."  Sharp, *Tracts,*

*Concerning the Ancient and Only True Legal Means of National Defence, by a*

*Free Militia* 17-18 (1782).

For example, as noted above, the Crown banned possession of especially

dangerous weapons like launcegays, pocket pistols, and crossbows to preserve the

public order.  *Bruen*, 597 U.S. at 41-42; *see, e.g.*, 7 Rich. 2, ch. 13 (1383); 33 Hen.

8, ch. 6, §§ 1-2, 18 (1541).  The focus on launcegays in medieval England "ma[de]

sense" given that "lances were generally worn or carried only when one intended

to engage in lawful combat or—as most early violations of the Statute [of

Northampton] show—to breach the peace."  *Bruen*, 597 U.S. at 41.  And Henry

VIII's ban on crossbows and pocket pistols sought "to protect the public" from the

---

[15] *See also United States v. Wood*, 299 U.S. 123, 138 (1936) ("Undoubtedly, as we
have frequently said, the framers of the Constitution were familiar with
Blackstone's Commentaries.").

proliferation of those weapons and their use in "detestable and shameful murders, robberies, felonies, riot and route." Schwoerer, *Gun Culture in Early Modern England* 59 (2016) (internal quotation marks omitted); *see also id.* at 55 (noting Henry VIII's concern with "the newfangled and wanton pleasure that men now have in using of crossbows and handguns" (cleaned up)).

2. That English tradition continued in America throughout each of the periods that *Bruen* identified as relevant to its historical inquiry. *See Bruen*, 597 U.S. at 46-70. During the colonial and founding era, most violent crimes were committed with weapons such as clubs, dirks, and daggers. 2-ER-41–52; *Bevis v. City of Naperville* (*Bevis I*), 657 F. Supp. 3d 1052, 1070 (N.D. Ill. 2023) ("As early guns proved unreliable, many citizens resorted to clubs and other blunt weapons.").[16] States and colonies "responded to the proliferation of these weapons." *Bevis I*, 657 F. Supp. 3d at 1070. In 1686, for example, after a period

---

[16] During the colonial and founding period, governments also heavily regulated certain firearms and firearm accessories when those items posed heightened dangers to public safety. In 1771, for instance, New Jersey prohibited the keeping of firearms configured as trap guns, which used string or wire so that a loaded firearm would discharge automatically when a trap was sprung. *See* 1763-1775 N.J. Laws 346, ch. 539, § 10 ("Penalty for setting loaded Guns"). That "most dangerous" (*id.*) weapon configuration "[i]nevitably . . . wound up hurting or killing innocent[]" bystanders who set off the trap. Robert J. Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 101 (2023). Colonies and early States also heavily regulated gunpowder to prevent mass fatalities as a result of explosions or fires. *See Kotek*, 682 F. Supp. 3d at 929; *e.g.*, 1772 N.Y. Laws at 683.

34

of internal "strife and excitement," *Bruen*, 597 U.S. at 48 (internal quotation marks

omitted), East New Jersey prohibited the concealed carrying of "pocket pistol[s],

skeins, stilladers, daggers or dirks, or other unusual or unlawful weapons," An Act

Against Wearing Swords (1686), *reprinted in The Grants, Concessions, and*

*Original Constitutions of the Province of New Jersey* 289-290 (1881).  Other

colonies and early States prohibited the carrying of clubs and similar weapons

increasingly used as fighting instruments.  6-ER-825–828; *see Bevis I*, 657 F.

Supp. 3d at 1070 (detailing restrictions).[17]

As the nineteenth century progressed, States began to regulate new types of

"melee weapons" as they became prevalent and imperiled public safety.  *Del. State*

*Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), 664 F. Supp.

3d 584, 600-601 (D. Del. 2023); 6-ER-825–828.  In response to rising murder

rates, governments enacted restrictions on the specific types of weapons that were

being used in crime.  2-ER-49–51; *see* Clayton E. Cramer, Concealed Weapon

Laws of the Early Republic 62-65 (1999) (discussing role of anti-dueling laws in

---

[17] *See*, *e.g.*, 1750 Mass. Acts 544, ch. 17, § 1 (prohibited the carry of "clubs or
other weapons" in a group of 12 or more); 1786 Mass. Acts 87, ch. 38 (same);
1788-1801 Ohio Laws 321, 323 (prohibited the carry of any "dangerous weapon"
while committing a burglary); An Act to Describe, Apprehend and Punish
Disorderly Persons § 2 (1799), *reprinted in* Laws of the State of New Jersey 474
(Nettleton ed., 1821) (prohibited the carry of any pistol, hanger, cutlass, bludgeon,
or other "offensive weapon" with intent to commit assault).

the South in contributing to rise in ambushes and fights with concealed weapons, prompting the regulation of those weapons).  State and local governments enacted a range of restrictions on the keeping and bearing of those weapons, including possession bans, carry restrictions, manufacturing bans, and sales taxes.

Among other melee weapons regulated during the nineteenth century, States and localities began to regulate billies during Reconstruction.  The billy was first referred to by name in the 1840s, and it rose to prominence as a particularly dangerous impact weapon.  5-ER-760.  Newspaper accounts of criminal activity during the 1850s through 1900 noted the prevalence of billies and clubs used for criminal purposes and in violent skirmishes.  5-ER-775–780.  One newspaper database—listing 447 references to "billy club" between 1865 and 1900—noted the term's common association "as a criminal's or brawler's weapon."  5-ER-779.  And popular culture discussions of urban street gangs from the similar time period often include illustrations of billy clubs used for intimidation and gang warfare.  5-ER-818; 3-ER-295–297 (discussing use of clubs, blackjacks, and saps by members of organized crime, including the gangs of New York, and noting the high demand for these weapons "both in New York and throughout the country at this time"); 5-ER-818 (noting that a billy "was much more likely to be held by a criminal, rioter or ruffian than anyone else in the old world" and that "depictions of street

36

gang activity in the United States between the 1850s and 1870s showed the common use of billy clubs as a preferred criminal weapon").

In 1862, the city of Leavenworth, Kansas became the first jurisdiction to regulate billies by name, prohibiting their concealed carry.  C. B. Pierce, *Charter and Ordinances of the City of Leavenworth, with an Appendix* 45 (1863), § 23. Four years later, in 1866—just two years before the ratification of the Fourteenth Amendment—New York prohibited any person from "secretly conceal[ing] on his person" or "furtively possess[ing]" any one of eight enumerated weapons, including a billy.  1866 New York Rev. Stat. ch. 716, §§ 1-2, *reprinted in* Throop, Revised Statutes of the State of New York, Vol. 3, at 2512 (1882).[18]  Several States followed New York in regulating the concealed carry of a billy, among other concealable weapons, during the nineteenth century:  Pennsylvania in 1875;

---

[18] The district court mischaracterized this law as criminalizing only the misuse of a billy (and not concealed carry or possession more generally) because the law applied to any person acting "with the intent to use [it] against a person."  1-ER-15 (emphasis omitted).  That is not accurate.  Though the first section of the statute does refer to criminal intent, the next section makes clear that simply "having possession of any of the [listed] weapons," by a person "other than a public officer," "willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the [weapon] with the intent to use [it] in violation of the provisions of this act."  1866 New York Rev. Stat. ch. 716, §§ 1-2, *reprinted in* Throop, Revised Statutes of the State of New York, Vol. 3, at 2512 (1882); 3-ER-249.

Maryland in 1886; and Michigan in 1887. *Fouts*, 561 F. Supp. 3d at 956-957.[19]

West Virginia banned all carry (concealed or open) of a billy, along with other

listed weapons, in 1882, followed by the territory of Oklahoma in 1890 and Rhode

Island in 1893. *Fouts*, 561 F. Supp. 3d at 956-957.[20]  During this time, several

local governments restricted the concealed carry of a billy, including New Jersey

City in 1871; St. Louis, Missouri in 1871; Annapolis, Maryland in 1872; Sioux

City, Iowa in 1882; and Oregon City in 1898.[21]  Nebraska City prohibited all carry

---

[19] 1875 Pa. Laws 33, ch. 38, § 1; John Prentiss Poe (Editor), *Maryland Code: Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888, Including Also the Public Local Acts of the Session of 1888 Incorporated Therein* 468-469 (Vol. 1, 1888), art. 27, ch. 375, § 30; 1887 Mich. Pub. Acts 144, An Act to Prevent the Carrying of Concealed Weapons, and to Provide Punishment Therefore, § 1.  New York recodified its furtive-possession ban in 1885.  *See* George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-85, at 172 (1885), Carrying, Using, Etc., Certain Weapons, § 410.  In addition, in 1868, Florida made it a criminal offense to be armed with a billy, or other listed weapon, including a slung-shot or metallic knuckles, when arrested for a crime or disturbance of the public peace.  *See* 1868 Fla. Stat., ch. 1637, *reprinted in* Blount et al., The Revised Statutes of the State of Florida 783, tit. 2, art. 5, § 2425 (1892).

[20] 1882 W. Va. Acts 421-422, § 1; 1890 Okla. Laws 495, art. 47, § 2; 1893 R.I. Pub. Laws 231-232, An Act Prohibiting the Carrying of Concealed Weapons, ch. 1180, § 1.

[21] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto 41 (1874), § 1; Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City 491-492 (1871), Ordinances of the City of St. Louis, Misdemeanors, § 9 (required a permit to concealed carry); 1872 Md. Laws 56-57, An Act to Add

of a billy in 1872.[22]  By the beginning of the twentieth century, almost half of all

States and numerous municipalities had laws regulating billies.  *Bevis I*, 657 F.

Supp. 3d at 1070.

Another impact weapon regulated during this period was the slungshot (or

life-preserver)—a hand-held impact weapon with a weighted object at the end of a

flexible strap.  3-ER-287; 6-ER-826.  Originating as a maritime tool for casting

lines, 3-ER-351, the slungshot was developed as a weapon in the 1840s and soon

became "widely used by criminals and street gang members."  6-ER-826 (internal

quotation marks omitted).  New York and Vermont passed laws in 1849

prohibiting the manufacture, sale, and possession of slungshots.[23]  Massachusetts

banned the manufacture or sale of slungshots in 1850, followed by Kentucky in

---

an Additional Section to Article Two of the Code of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," to Prevent the Carrying of Concealed Weapons in Said City, § 1; S. J. Quincy, Revised Ordinances of the City of Sioux City, Iowa 62 (1882), Public Safety, § 4; The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order 259 (1898), An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

[22] Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska 36 (1872), Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.

[23] 1849 N.Y. Laws 403-404, ch. 278, §§ 1-2; 1849 Vt. Acts & Resolves 26, No. 36, §§ 1-2.

1855, Florida in 1868, and the Dakota Territory in 1877.[24]  Illinois banned the

possession and sale of slungshots in 1881.[25]  In all, forty-two States and the District

of Columbia enacted anti-slungshot laws by the end of the nineteenth century.

6-ER-826, 883–885.

    Another melee weapon that that rose to prominence during this period was the

"Bowie knife," a weapon used by Jim Bowie in a duel in 1827 that became

widespread in the 1830s.  *See DSSA*, 664 F. Supp. 3d at 600.  Bowie knives were

"designed expressly for fighting":  they had "longer blades than ordinary knives,"

"crossguards to protect the combatants' hands," and "clip points to make it easier

to cut or stab opponents."  2-ER-50–51.  The Bowie knife "gained notoriety as a

'fighting knife.'"  *Bevis I*, 657 F. Supp. 3d at 1068; *see also Kotek*, 682 F. Supp. 3d

at 930-931.  By 1840, at least five States or territories had enacted laws restricting

the carrying of Bowie knives or other fighting knives.  *Bevis I*, 657 F. Supp. 3d at

1068-1069; *see, e.g.*, 6-ER-951 (1838 Tennessee statute); 6-ER-887 (1839

Alabama statute).  A 1837 Georgia law made it unlawful "to sell, or offer to sell" a

"Bowie" knife, "or to keep, or have [such a knife] about their person or

---

[24] 1850 Mass. Gen. Stat. ch. 194, § 2; 1855 Ky. Acts 96, ch. 636, § 1; 1868 Fla. Stat., ch. 1637, *reprinted in* Blount et al., The Revised Statutes of the State of Florida 783, tit. 2, art. 5, § 2425 (1892); 1877 N.D. Laws 794, § 455.

[25] 1881 Ill. Laws 73, § 1.

elsewhere."[26]  Other laws substantially restricted the use of Bowie knives, such as a Tennessee law that banned their sale, and an Alabama law that taxed them at a prohibitive rate.[27]  Nearly every State enacted a law restricting Bowie knives by the end of the nineteenth century, whether by outlawing their possession, carry, or sale; enhancing criminal penalties; or taxing their ownership.  *See Bevis I*, 657 F. Supp. 3d at 1069; *DSSA*, 664 F. Supp. 3d at 601-602 (Bowie knife regulations were "extensive and ubiquitous" after such knives "proliferated in civil society" (internal quotation marks omitted)).

Restrictions on these melee weapons continued into the twentieth century, with a growing number of states and localities banning the manufacture, sale, carry, and possession of those weapons.  *See Fouts*, 561 F. Supp. 3d at 957 (citing billy restrictions enacted in the early 1900s by North Dakota, Missouri, the Territory of Hawaii, and Illinois); 6-ER-826.  In 1908, New York banned the use, carry, or possession of "any instrument or weapon of the kind commonly known as a slungshot, billy, sandclub or metal knuckles."[28]  And in 1917, California enacted

---

[26] 1837 Ga. Acts 90, § 1.

[27] *See* 1837-1838 Tenn. Pub. Act 200, ch. 137, § 1; 1837 Ala. Acts 7, No. 11, § 2.

[28] 1908 N.Y. Laws 242-243, ch. 93, § 1; *see also* 1911 N.Y. Laws 442-443, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, § 1; 1913 N.Y. Laws 1627-1630, An Act to Amend the Penal Law Generally, in Relation to the Carrying, Use and Sale of Dangerous Weapons,

41

its restrictions on the manufacture, sale, and possession of any instruments or weapons of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles.[29]

These legislative responses to emerging weapons that posed exceptional dangers to society were not identical. But this pattern of regulation represents a robust tradition of governments imposing significant restrictions on certain weapons, including billies, ranging from carry restrictions to sale restrictions and possession bans. A uniform response is neither realistic nor desirable in a federal system where "[s]tate and local" governments may "experiment[]" with reasonable weapons restrictions. *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion). States routinely "respond[ed] to growing rates of violence and lethality caused by modern innovations in technology and changing patterns of human behavior by regulating the particular kinds of weapons or modes of carry that were most often employed by those causing the violence, while leaving open alternative avenues for lawful possession" of a wide range of permissible weapons "for purposes of self-defense." *NAGR*, 2023 WL 4975979, at *33; *see DSSA*, 664

---

ch. 608, § 1; 1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

[29] 1917 Cal. Stat. 221, ch. 145, § 2; *see also* 1923 Cal. Stat. 695-696, ch. 339, § 1.

F. Supp. 3d at 602; *Herrera v. Raoul*, 670 F. Supp. 3d 665, 675-676 (N.D. Ill. 2023).

### B. California's Restrictions on Billies Are Relevantly Similar to These Historical Analogues

The operative historical inquiry under *Bruen* is whether California's restrictions on the manufacture, sale, and possession of billies are "relevantly similar" to our Nation's long historical tradition of regulating dangerous weapons that present emerging threats to public safety. *Bruen*, 597 U.S. at 29. *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." *Id.* The "goal of *Bruen*'s analogical exercise" is to "delimit the outer bounds of the right to keep and bear arms." *Perez-Garcia*, 96 F.4th at 1182 (cleaned up). *Bruen* does not demand spot-on "historical precursors" to justify modern weapons restrictions, and the "analogical reasoning under the Second Amendment" is not a "regulatory straightjacket," inhibiting state experimentation with reasonable regulations responding to new and changing threats to public safety. *Bruen*, 597 U.S. at 30; *see McDonald*, 561 U.S. at 785 (plurality opinion); *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (governments do not "regulate for problems that do not exist").

Under *Bruen*, the "*central* considerations" for the analogical inquiry are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified."

43

*Bruen*, 597 U.S. at 29 (internal quotation marks omitted). In both respects, California's restrictions on "any instrument or weapon of the kind commonly known as a billy" are consistent with the Nation's regulatory tradition. *See Fouts*, 561 F. Supp. 3d at 958 (concluding that "government regulation of a billy has long been accepted by the public" because "[t]he weapon known as a billy has been the subject of regulation in at least twenty states" "beginning in the 1800's and continuing to the present").

As to burden, ever since the founding, governments have heavily restricted or prohibited particularly dangerous arms. In the early days, when the "use of guns in homicides" was "infrequent," 2-ER-44, many of those regulations focused on certain blunt instruments and especially lethal knives often used in fights, murders, and other criminal activities, *see supra* pp. 37-41. But even before the founding there were restrictions and prohibitions on especially dangerous weapons. *See supra* pp. 28-29, 33-34. The specific approaches varied as different concerns arose in different regions, but the common theme is that governments restricted or prohibited weapons that had proven to be especially lethal and prone to criminal misuse—while preserving access to knives, long guns, handguns, and other weapons and items suitable for "ordinary self-defense." *Bruen*, 597 U.S. at 60.

The law challenged here imposes a comparable burden on the "right to armed self-defense." *Bruen*, 597 U.S. at 29; *see, e.g.*, *DSSA*, 664 F. Supp. 3d at 602;

44

*Hartford v. Ferguson*, 676 F. Supp. 3d 897, 907 (W.D. Wash. 2023); *NAGR*, 2023 WL 4975979, at \*33. The Second Amendment does not protect a right to any particular arm, but instead protects a more general "right to armed self-defense." *Bruen*, 597 U.S. at 29; *see also Heller*, 554 U.S. at 603. Here, the law prohibits possession of a particular impact weapon that has—along with the slungshot, blackjack, and sap—been historically viewed as dangerous and unusual. *See supra* pp. 36-40. And unlike the handgun at issue in *Heller*—"the quintessential self-defense weapon," 554 U.S. at 629—billies have *never* been in common use for self-defense. *See supra* pp. 22-27; *Grubb*, 63 Cal. 2d at 620 (explaining that the billy, in private hands, is "common to the criminal's arsenal"); *cf. Fouts*, 561 F. Supp. 3d at 958 (noting that billies "are *not* commonly owned for lawful purposes"). Section 22210 thus does not appreciably burden the right to armed self-defense. *See Davis*, 214 Cal. App. 4th at 1332 (noting that California's baton possession restrictions "do[] not deprive persons of their ability to defend themselves or their homes, because there are alternative means to do so"). Indeed, plaintiffs' own witness testified that a law-abiding civilian could use a baton for self-defense "just as well as they could with any household item." 6-ER-989.

While it is true that many of the historical analogues regulated the carrying of certain weapons (*see* 1-ER-15), nothing in *Bruen* requires a historical regulation to use the same mode of regulation to qualify as an analogue; it need only "impose a

45

comparable burden on the right of armed self-defense" that is "comparably justified." *Bruen*, 597 U.S. at 29.  Indeed, the Supreme Court has indicated that historical restrictions on the carrying of certain weapons can support limits on what arms may be possessed, provided the burdens are comparable:  the "important limitation" on the "right to *keep* and carry" weapons "is fairly supported by the historical tradition of prohibiting *the carrying* of 'dangerous and unusual weapons.'"  *Id.* at 81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 627) (emphasis added).  Moreover, while a dead ringer is never required under *Bruen* (*see* 597 U.S. at 30), California's prohibition on the possession of a billy operates, in many circumstances, in a similar manner as the historical carry restrictions; Section 22210 applies to the concealed transportation of a billy inside of a vehicle or on one's person.[30]

Any modest burden on the right to armed self-defense arising from California's restrictions on billies is comparably justified to historical analogues. *See, e.g.*, *Hartford*, 676 F. Supp. 3d at 907; *DSSA*, 664 F. Supp. 3d at 602.

---

[30] *See, e.g.*, *People v. Ambroziac*, 2022 WL 10357522, at *2 (Cal. Ct. App. Oct. 18, 2022) (possession of a baton "out on the street"); *People v. Twiford*, 2018 WL 1444560, at *1 (Cal. Ct. App. Mar. 23, 2018) (possession of a billy in a backpack); *People v. Martinez*, 2023 WL 5928094, at *1 (Cal. Ct. App. Sept. 12, 2023) (possession of collapsible baton discovered during traffic stop); *Canales*, 12 Cal. App. 2d at 220 (possession of a billy inside a car); *People v. Garcia*, 2023 WL 3167450, at *1 (Cal. Ct. App. May 1, 2023) (possession of a billy inside a car).

Restrictions on billies and other melee weapons were enacted to address the use of those weapons in certain forms of crime, including interpersonal violence. 5-ER-808, 818–819 (noting that billies were historically used for criminal purposes, and not for self-defense); *see also* 5-ER-787 (noting that laws banning offensive weapons in the American colonies and the United States singled out billies as weapons used for criminal purposes). As with the historical dangerous weapons laws, Section 22210 promotes public safety interests in reducing the opportunity for such dangerous or unusual weapons to be used for criminal purposes or to cause unintended physical harm.

### C. The District Court's Historical Analysis Was Deeply Flawed

The district court's myopic view of the historical record failed to comport with *Bruen* or this Court's precedents. The district court improperly required the State to identify bans on the possession of a billy at the founding. 1-ER-9. But that would require the State to identify a "historical *twin*" or "dead ringer" that is not called for under historical "analogical reasoning." *Bruen*, 597 U.S. at 30. And while blunt weapons and batons existed at and before the founding, *see* 1-ER-14–15; 5-ER-817, billies were not known as a type of weapon until around the 1840s. 5-ER-760; *see Fouts*, 561 F. Supp. 3d at 950 ("the weapon known as a billy apparently did not exist at the time of the founding"). The fact that "there were no state restrictions in any of the states or territories on possessing or carrying a billy"

47

at the founding is thus unsurprising and not, as the district court viewed it, "persuasive evidence that the original understanding of the Second Amendment protects a person's right to keep and carry a billy." 1-ER-14. To the extent that the district court considered the availability of other clubs and impact weapons at the founding, the court ignored numerous founding-era restrictions on the carrying of those weapons that were enacted to address the public safety risks posed by those weapons at the time. *See supra* p. 35 n.17; 2-ER-64; 6-ER-825. And while the district court took into account the regulation of other types of impact weapons during the founding era, the court did not afford the State similar leeway in analogizing to restrictions on other blunt or covert weapons, like slungshots and Bowie knives—which the district court acknowledged could have changed the "direction" of this case. *See* 1-ER-10.

The district court required the State to identify a "national historical tradition of prohibiting the simple possession, or the open carrying, of a billy." 1-ER-19. But the State did identify restrictions on the carrying of a billy (concealed or otherwise), *see, e.g.*, 1882 W. Va. Acts 421-422, § 1, as well as numerous laws banning the manufacture, sale, and possession of melee weapons, *see supra* pp. 39-41. State and local governments also regulated the possession of certain dangerous items during the colonial and founding eras, such as trap guns and gunpowder. *See supra* pp. 34 n.16. Under the district court's approach, it appears that no state

48

regulation banning "simple possession" of *any* weapon would be constitutional. *See* 1-ER-16 ("Even if three states did prohibit simple possession of a billy (they did not), three states are insufficient to demonstrate a history and tradition of regulation."). That is exactly the kind of "regulatory straightjacket" that the Supreme Court forswore. *Bruen*, 597 U.S. at 30.

The district court also imposed unwarranted temporal constraints on the historical record. The district court ignored English analogues that banned the possession of specific weapons, even though *Bruen* "saw particular relevance in "'English history dating from the late 1600s.'" *Perez-Garcia*, 96 F.4th at 1182 (quoting *Bruen*, 597 U.S. at 20). The district court also rejected any analogues enacted after 1868—which the court considered the "State's strongest evidence"— because those analogues were enacted "too late" to provide insight into the meaning of the Second Amendment when it was ratified in 1791. 1-ER-16. But the historical evidence is to be examined "as a whole." *Perez-Garcia*, 96 F.4th at 1191. Even twentieth century historical evidence can be considered under *Bruen* if it does not "contradict[] earlier evidence." *Bruen*, 597 U.S. at 66 n.28; *see also Antonyuk v. Chiumento*, 89 F.4th 271, 319 n.32 (2d Cir. 2023) ("[W]hen laws which otherwise might be too recent when considered in isolation nonetheless reflect previously settled practices and assumptions, they remain probative as to the existence of an American tradition of regulation.").

49

The district court identified 1791 as "the most significant historical evidence," with evidence from 1868 only "secondarily" providing evidence of the meaning of the right to keep and bear arms.  1-ER-11.  But the period before and after ratification of the Fourteenth Amendment is critical to understanding the right that was made applicable to the States in 1868.  *See Heller*, 554 U.S. at 605 (addressing the interpretation of the Second Amendment "through the end of the 19th century" and authorities "in the century after its enactment").  The Supreme Court has placed significant weight on the views of those who ratified the Fourteenth Amendment.  *See McDonald*, 561 U.S. at 778 ("the Framers *and ratifiers of the Fourteenth Amendment* counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." (emphasis added)).  It would be "incongruous" to then ignore their understanding of the Second Amendment right and "define its scope and limitations exclusively by 1791 standards."  *Antonyuk*, 89 F.4th at 305; *accord McDonald*, 561 U.S. at 770 (considering Reconstruction-era history in understanding the meaning of the arms right incorporated by the Fourteenth Amendment).  Indeed, if Reconstruction-era practices were irrelevant, it would have to be assumed that "states in 1868 made a promise not to 'infringe' on the right to 'keep and bear arms' while being poised to immediately breach that promise—by already having possession, manufacture, and sale bans on the books or soon adopting such laws."  *Rupp v. Bonta*, 2024 WL

1142061, at *31 (C.D. Cal. Mar. 15, 2024).  The fact that States and local

governments banned the possession, manufacture, and sale of certain particularly

dangerous weapons before and after ratification of the Fourteenth Amendment is

compelling evidence that those types of restrictions are consistent with the right to

keep and bear arms.

The scope of the states' police powers "depends on how the right [to keep and

bear arms] was understood when the Fourteenth Amendment was ratified." *Ezell*

*v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).  The district court faulted

the State for identifying "[o]nly two state laws" specifically addressing billies

enacted before 1868, both of which "came after the Civil War" (as if the Civil War

had some special significance under *Bruen*).  1-ER-13.  But the Court ignored the

growing body of state and local analogues enacted after 1868 that evidence the

relevant regulatory tradition.  *See Bruen*, 597 U.S. at 35-36 ("'a regular course of

practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms

& phrases' in the Constitution" (citation omitted)); *Heller*, 554 U.S. at 605

(explaining that an inquiry into post-ratification evidence "is a critical tool of

constitutional interpretation").  Just as it is "implausible that the public

understanding" of the right to keep and bear arms "would arise" only in 1791, it is

equally "implausible" that it "would promptly dissipate whenever [the founding

era gave way to another." *Antonyuk*, 89 F.4th at 304.  Reconstruction-era and late

51

nineteenth century laws are especially relevant here, as they were enacted soon after billies began to be known as a weapon and became associated with widespread criminal misuse.  5-ER-767.

The district court also skewed its historical record by discounting any analogues enacted by local governments, including the first-ever regulation of billies in 1863.  1-ER-19 ("[C]ity ordinances shed very little light on whether a national tradition of regulation existed.").  Firearm regulation at the local level is highly probative of America's regulatory traditions and the types of burdens on the Second Amendment right that were historically permitted and viewed as consistent with that right.  *See* Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 90 (2013) (noting that "firearm localism" "has always been part of our legal tradition")).  While a "one-off and short-lived" "local law" would not "carry the day if it contradicts the overwhelming weight of other evidence," local restrictions are "no doubt relevant" and are part of "'our whole experience as a Nation.'" *Antonyuk*, 89 F.4th at 301 (quoting *Chiafalo v. Washington*, 591 U.S. 578, 593 (2020)).  Viewing the historical record "as a whole," *Perez-Garcia*, 96 F.4th at 1191, California's restrictions on billies are consistent with the Nation's regulatory tradition.

## CONCLUSION

The judgment of the district court should be reversed, and this Court should

remand for entry of judgment in favor of the Attorney General.

Dated:  May 8, 2024                          Respectfully submitted,


     *s/ John D. Echeverria*
_____


ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
CHRISTINA R.B. LÓPEZ
KATRINA UYEHARA
*Deputy Attorneys General*
JOHN D. ECHEVERRIA
*Supervising Deputy Attorney General*
*Attorneys for Defendant and Appellant*

53

## STATEMENT OF RELATED CASES

The Attorney General is not aware of any related cases.

Dated:  May 8, 2024                         *s/ John D. Echeverria*
                                  _____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-1039

I am the attorney or self-represented party.

**This brief contains** | 12,901 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ John D. Echeverria | **Date** | May 8, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                          55                          *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on May 8, 2024, I electronically filed the foregoing document

with the Clerk of the Court of the United States Court of Appeals for the Ninth

Circuit by using the court's Appellate Case Management System (ACMS).  I

certify that all other participants in this case are registered ACMS users and that

service will be accomplished by the Appellate Case Management System.

Dated:  May 8, 2024                                    *s/ John D. Echeverria*