No. 24-1039

# In the United States Court of Appeals
## for the Ninth Circuit

RUSSELL FOUTS AND TAN MIGUEL TOLENTINO
*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY
GENERAL OF THE STATE OF CALIFORNIA
*Defendant-Appellant*.

**Appeal from a Judgment of United States District Court
For the Southern District of California
Civ. No. 3:19-cv-01662-BEN-JLB
United States District Court Judge Roger T. Benitez**

### Appellees' Answering Brief

ALAN ALEXANDER BECK
2692 Harcourt Drive
San Diego, California 92123
Telephone: (619) 905-9105
alan.alexander.beck@gmail.com

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

*Attorneys for Appellees Russell Fouts and Tan Miguel Tolentino*

# TABLE OF CONTENTS

Introduction……………………………………………………….……….…..1

I.    California Law Bans the Ownership and Possession of Batons in the Home……………………………………………………………...……….3

II.    Procedural History

    A.    Plaintiffs' Constitutional Challenge to California's Baton Ban……..…4

    B.    The District Court's Grant of Defendant's Motion for Summary Judgment and Entry of Judgment…………………………………….5

        1.    Summary of the District Court's Order………………………...6

        2.    The District Court's Judgment……………………….……….6

SUMMARY OF THE ARGUMENT……………………………………………7

ARGUMENT

I.    Legal Standard…………………………………………………………8

    A. Controlling Principles……………………………...………………9

II.    California's Ban on Billies Violates the Second Amendment………..….14

III.    There is No Historical Tradition of Banning Clubs………………………..23

    A. Billies are not Dangerous and Unusual……………………………...…29

IV.    The District Court's Opinion is Not "Deeply Flawed"……………………34

    A. The Trial Court's Analysis is in Line With this Circuit's Precedent…..38

V.    California's Reliance on Bowie Knife Laws is Deeply Flawed……………39

    A. California's Other Historical Evidence Is Not Analogous……………41

    B. California's Colonial History……………………………………......50

CONCLUSION……………………………………………………………...56

i

# TABLE OF AUTHORITIES

**Constitutional Provisions**

U.S. Const. amend. II ..............................................................................7

**Cases**

*Apodaca v. Oregon*, 406 U.S. 404 (1972) ...........................................37

*Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) ...................34

*Aymette v. State*, 21 Tenn. 154 (1840) .................................................39

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023)............................... 10, 15

*Bevis v. City of Naperville, Illinois*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023), aff'd, 85 F.4th 1175 (7th Cir. 2023) ............................................................... 50, 51

*Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252 (9th Cir. 1999)...................9

*Brown v. Entm't Merchs. Ass'n,* 564 U.S. 786 (2011) .............................16

*Cadena v. Customer Connexx LLC*, 51 F.4th 831 (9th Cir. 2022) ...........................8

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ........................ 15, 29

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)..9

*City of Akron v Rasdan*, 663 NE2d 947 (Ohio Ct. App., 1995) .............................34

*District of Columbia v. Heller,* 554 U.S. 570 (2008)…………….………..passim

*English v. State*, 35 Tex. 473 .................................................................41

*Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020) .......................... 12, 37

*Firearms Policy Coalition, Inc. v. McCraw*, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) ........................................................................................11

*Fouts v. Bonta*, 2022 U.S. App. LEXIS 26648 (9th Cir. Sep. 22, 2022)...................5

*Fouts v. Bonta*, 2024 U.S. Dist. LEXIS 31528 (S.D. Cal. Feb. 23, 2024) ...............6

*Fouts v. Bonta*, 561 F. Supp. 3d 941 (S.D. Cal. 2021), vacated by, remanded by *Fouts v. Bonta*, 2022 U.S. App. LEXIS 26648 (9th Cir. Cal., Sept. 22, 2022)......5

*Gamble v. United States*, 139 S. Ct. 1960 (2019).....................................37

*Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014)...........55

*Kennedy v. Louisiana*, 554 U.S. 407 (2008).............................................12

*Koons v. Platkin*, 673 F. Supp. 3d 515 (D.N.J. 2023) ..............................13

*Lara v. Comm'r Pa. State Police*, 91 F.4th 122 (3d Cir. 2024)...............11

*Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581 (1993)............18

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ................................................36

ii

*Maloney v. Singas*, 351 F. Supp. 3d 222 (S.D.N.Y. 2018) .....................................34

*McDonald v. City of Chi.*, 561 U.S. 742 (2010) ................................................. 37, 38

*New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022)….…..passim

*New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015).. 20, 31

*Nunn v. State*, 1 Ga. 243 (1846) ...............................................................................40

*O'Neil v. Neronha*, 594 F. Supp. 3d 463 (D.R.I. 2022) ...........................................34

*People v. Canales*, 55 P.2d 289 (Cal. App. 3d Dist. 1936) .......................................4

*People v. Fannin*, 91 Cal. App. 4th 1399 (2001)......................................................55

*People v. Grubb*, 63 Cal. 2d 614 (1965) ..................................................................23

*People v. Mercer*, 49 Cal. Rptr. 2d 728 (Cal. Super. App. Dept. 1995)....................4

*People v. Webb*, 2019 IL 122951 .............................................................................34

*People v. Williams*, 100 Cal. App. 149 (1929) .........................................................55

*Powell v. Alabama*, 287 U.S. 45 (1932) ...................................................................38

*Ramirez v. Cmmw*., 94 N.E.3d 809 (Mass. 2018) ...................................................34

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ...........................................................37

*State v. Duke*, 42 Tex. 455 ........................................................................................41

*State v Griffin*, 2011 WL 2083893, 2011 Del Super LEXIS 193, (Del Super Ct, May 16, 2011)........................................................................................................34

*State v. Blocker*, 291 Ore. 255 (1981).......................................................................33

*State v. Deciccio*, 105 A.3d 165 (Conn. 2014) .........................................................34

*State v. Delgado*, 692 P.2d 610 (1984) ........................................... 28, 31, 32, 33, 34

*State v. Herrmann*, 2015 WI App 97 ........................................................................34

*State v. Kessler*, 289 Or. 359, 614 P.2d 94 (1980) ..................................... 26, 28, 33

*State v. Montalvo*, 162 A.3d 270 (2017)...................................................................34

*State v. Reid*, 1 Ala. 612 (1840)................................................................................40

*Timbs v. Indiana*, 586 U.S. 146 (2019)....................................................................37

*U.S. v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024)............................. 8, 12, 38, 39

*United States v. Alaniz*, 69 F.4th 1124  (9th Cir. 2023)............................. 16, 17, 18

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024)............................. 38, 39, 54

*United States v. Harrison*, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023)...............11

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012) ................................. 24, 29, 32

*United States v. Miller*, 307 U.S. 174 (1939) ...........................................................31

*United States v. Pedregon*, 520 F.App'x 605 (9th Cir. 2013) .................................18

*United States v. Pinjuv*, 218 F.3d 1125 (9th Cir. 2000)...........................................18

*United States v. Stevens*, 559 U.S. 460 (2010) ........................................................16

*Virginia v. Moore*, 553 U.S. 164 (2008) ................................................36

*Worth v. Harrington,* 2023 WL 2745673 (D. Minn. Mar. 31, 2023) .....................11

*Young v. Hawaii*, 896 F.3d 1044, 1065 (9th Cir. 2018), on reh'g en banc, 992 F.3d 765 (9th Cir. 2021), cert. granted, judgment vacated, 142 S. Ct. 2895 (2022)......
......................................................................................... 42, 44

*Zaitzeff v. City of Seattle*, 484 P.3d 470 (Wash. App. Div. 1 2021) .......................34

**Statutes**

1860 Terr. of N. M. Laws §§1-2 ...............................................................41

1871 Tex. Gen. Laws ch. 34, §1 ...............................................................41

1882 W. Va. Acts 421-422, § 1 ...............................................................35

33 Hen. 8, ch. 6, §§ 1-2, 18 (1541) .........................................................43

Act of Parliament (7 Richard II 1383 cp. 13) ............................................46

*Acts Passed at the Annual Session of the General Assembly of the State of Alabama* (Tuscaloosa: Hale & Eaton, 1838 [1839]), chap. 77 .............................40

California Penal Code § 22290 .................................................................1

California Penal Code § 22210 ................................................. 1, 3, 6, 18

California Penal Code § 16590(m) ...........................................................1

California Penal Code § 18010(b) ...........................................................1

Metropolitan Police Act 1829 (10 Geo.4, c.44)..........................................24

Statute of Winchester of 1285 (13 Edw. I, St. 2).......................................24

Statutes of the Realm, 3rd Henry VIII, c. 3, p. 25 ...................................44

The Gaming Act 1845 (8 & 9 Vict. c. 109) ................................................45

The Unlawful Games Act 1541 (33 Hen. 8. c. 9) ........................................44

**Other Authorities**

1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1 ...............................................54

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.....................52

1799 Miss. Laws 113, A Law For The Regulation Of Slaves ...............................52

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 .....................................53

1816 Offences Against the Public Peace, (1816) § 19 ...................................53

2 The Writings of Samuel Adams 119 (1904)................................................26

Archibald MacGregor's Lecture upon the Art of Defence (1791) ...........................25

Assize of Arms of 1181 ................................................................ 24, 50

Assize of Arms of 1252 ................................................................ 24, 49

Black's Law Dictionary 1102 (8th ed. 2004) ...........................................18

Brief Instructions on my Paradoxes of Defence (c.1605 )......................................25

COMMENT: SECOND AMENDMENT DECISION RULES, NON-LETHAL WEAPONS, AND SELF-DEFENSE, 97 Marq. L. Rev. 853, 862 (Spring 2014) ..................................................................................30

Cotton Titus Ms. (British Museum, MS Titus A. xxv, f. 105) ...............................25

D. Kopel, 'The Second Amendment in the Nineteenth Century,' 1998 BYU L. Rev. 1359 .............................................................. 28, 31

Donald MacBane's The Expert Swordsman's Companion (1728) ........................25

Frederick MacKenzie, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON 37 (Allen French ed., 1926) ................................................................26

George Silver's Paradoxes of Defence (1599) ...........................................25

Harbinson, Michael John. "7. The Lancegay and Associated Weapons." Journal of Medieval Military History: Volume XX, edited by Kelly DeVries, Clifford J. Rogers, John France, David S. Bachrach, Daniel Bertrand, Peter Burkholder, Ekaitz Etxeberria Gallastegi, Michael John Harbinson, Steven Isaac, Donald J. Kagay, Tomaž Lazar and Mamuka Tsurtsumia, Boydell and Brewer: Boydell and Brewer, 2022........................................................................47

James Raine (ed.), Testamenta Eboracensia: A Selection of Wills from the Registry at York, II, Surtees Society, 30 (Durham, 1855) .................................................49

Joseph Swetnam's The Schoole of the Noble and Worthy Science of Defence (1617)..........................................................................25

Kopel, David B. and Greenlee, Joseph, This History of Bans on Types of Arms Before 1900 (April 25, 2023). Journal of Legislation, Vol. 50, No. 2, 2024, U Denver Legal Studies Research Paper ........................................... 50, 54

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022, https://bit.ly/3CMSKjw ...10

N.Y.C.P.D. (1993). History of the New York City Police Department .................27

O. Hogg, Clubs to Cannon 19 (1968) ................................................ 23, 28

R. G. Allanson-Winn and C. Phillipps-Wolley Broadsword and Singlestick with chapters on Quarterstaff, Bayonet, Shillalah, Walking-Stick, Umbrella and Other Weapons of Self Defence (1890)........................................................26

Records of the Borough of Nottingham, 9 vols (London, 1882–1956), II (1883) ..48

Scott-Macnab, David: Sir John Fastolf and the Diverse Affinities of the Medieval Lancegay, S.A. Journal of Medieval and Renaissance Studies, 19 (2009) ..........48

Speidel, Michael (1993), The fustis as a soldier's weapon. Antiquités africaines. 29. 137-149. 10.3406/antaf.1993.1216......................................................................24

Stephen P. Halbrook, The Founders' Second Amendment 25 (2008) ....................26

Symposium: The Second Amendment and the Right to Bear Arms After *D.C. v. Heller*: Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443 ..........30

The Colonial Laws of New York from the Year 1664 to the Revolution (1894) ...51

The History of New York City Police Department 145539 (1993) .......................27

Thomas McCarthy's Quarter-staff: a practical manual (1883) ..............................25

W. Moore, *Weapons of the American Revolution*, 8 (1967)...................................26

Zachary Wylde's The English Master of Defence (1711)......................................25

**Rules**

Fed. R. Civ. Pro. 56(a) ...........................................................................................9

Fed. R. Civ. Pro. 25(d) ...........................................................................................4

U.S.S.G. §2D1.1(b)(1) ..........................................................................................17

# INTRODUCTION

Russell Fouts and Tan Miguel Tolentino ("Plaintiffs" or "Appellees") answer Defendant Rob Bonta, in his Official Capacity as the Attorney General for the State of California ("California"), appeal of the from the district court's grant of summary judgement to Plaintiffs in their challenge to the State of California's ban on the possession of billies/batons. Plaintiffs are both military veterans. 7_ER_1201, 7_ER_1202. Both have received training in the use of batons. *Id.* Plaintiffs Fouts received training while working as a security guard. 7_ER_1201. And Plaintiff Tolentino received training while serving as a military police officer and through his martial arts training. 7_ER_1202.

Plaintiffs wish to purchase collapsible batons as well as any other batons typically issued to police officer. 7_ER_1201, 7_ER_1202. They wish to own them for self-defense and other lawful purposes in their home and would acquire, possess, carry, and where appropriate, use a baton/billy to protect themselves. 7_ER_1202, 7_ER_1203. Thus, they have raised both an as-applied challenge and a facial challenge to California Penal Code § 22210 and all other relevant statutes which restrict the ownership of batons.[1] *See* 7_ER_1204. (Prayer for Relief).

---

[1] California Penal Code section 16590(m) designates a billy as a "generally prohibited weapon." A billy is also designated as a "nuisance," subject to confiscation and summary destruction by law enforcement under California Penal Code section 18010(b) pursuant to Cal. Penal Code § 22290.

1

The Supreme Court, in *District of Columbia v. Heller*, expressly found that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. 570, 582 (2008). Nothing in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022) disturbs that holding. "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess." *Bruen*, 597 U.S. 1, 72. (Alito, J., concurring).

The trial court correctly found that batons are arms. It then correctly found that California had failed to rebut the presumption that batons are constitutionally protected arms. As such it conducted a historical inquiry to determine whether there is a historical tradition of prohibiting the possession of batons. California's assertion that the trial court erred in doing so is meritless.

*Bruen* was emphatic: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. And nothing in the Second Amendment's plain text — "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed"—says anything about common use. To be sure, whether arms are in common use for lawful purposes like self-defense matters to the *historical tradition* inquiry, which looks to "whether modern

2

and historical regulations impose a comparable burden on the right of armed self-defense." *Bruen*, 597 U.S. at 29. But considerations that find no purchase in the plain text are not part of the plain text inquiry. That is precisely why the Supreme Court has instructed *twice* that whether a class of arms is "in common use" (or instead is "highly unusual in society at large") is part of *the "historical tradition" inquiry*. *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). The trial correctly heeded the Court's unambiguous teachings and then correctly found that there is no historical tradition of prohibiting the mere possession of batons.

As will be fully argued below, billies/batons are constitutionally protected arms. There is no historical tradition of prohibiting their possession. California law essentially prohibits the possession of sticks for self-defense. It strains credulity to argue that there is an American tradition of prohibiting the possession of billies in one's own home for self-defense. California cannot justify a ban on an arm which is much less deadly than the handguns that the Supreme Court found could not be banned in *Heller*. The trial court's decision should be upheld.

## STATEMENT OF THE CASE

### I.     California Law Bans the Ownership and Possession of Batons in the Home

California Penal Code § 22210, in relevant part, prohibits the ownership of billy clubs. Under California law a billy is essentially any club shaped item that

could conceivably be used as a weapon. *See People v. Mercer*, 49 Cal. Rptr. 2d 728, 730 (Cal. Super. App. Dept. 1995) ("Accordingly the statute would encompass the possession of a table leg"). Even a baseball bat can fall under the purvey of the term billy. *See Id.* ("we find the possession of the altered baseball bat...clearly not transported for the purpose of playing baseball, violates the statute."). "The definition [of a billy] is purposely broad." *People v. Canales*, 55 P.2d 289, 290 (Cal. App. 3d Dist. 1936). Thus, even normal household goods such as table legs, axe handles and baseball bats fall under California's billy club prohibition when possessed for self-defense. This law amounts to an unconstitutional infringement on Plaintiffs' Second Amendment rights. It is challenged in this lawsuit.

## II.    Procedural History

### A. Plaintiffs' Constitutional Challenge to California's Baton Ban

Plaintiffs filed their Complaint for Declaratory and Injunctive Relief on September 1, 2019 against Defendant-Appellant Xavier Becerra, in his Official Capacity as the Attorney General of the State of California.[2] 7_ER_1192 to 7_ER_1205. The Complaint asserted that California's ban on billies violates Plaintiffs' Second Amendment rights and sought an Order declaring Cal. Penal Code §§ 22210 and all other relevant statutes unconstitutional and violative of the Second

---

[2] The Defendant was automatically substituted under Fed. R. Civ. Pro. 25(d) to the current Attorney General, Rob Bonta.

Amendment, facially and as-applied. 7_ER_1204. The Complaint also sought injunctive relief via an Order, preliminarily and permanently enjoining the Defendant and all those in concert with Defendant, from enforcing the offending statutes. *Id*.

### B. The District Court's Grant of Defendant's Motion for Summary Judgment and Entry of Judgment

On August 11, 2020, Plaintiffs filed their Motion for Summary Judgment on all claims (ECF# 21). Defendant filed his Motion for Summary Judgment on all claims on August 11, 2020 (ECF# 22). After briefing, but without oral argument, on September 22, 2021, the district court issued an Order Denying Plaintiffs' Motion for Summary Judgement and granting Defendant's Motion for Summary Judgment and entered judgment in favor of Defendant. *See Fouts v. Bonta*, 561 F. Supp. 3d 941 (S.D. Cal. 2021), vacated by, remanded by *Fouts v. Bonta*, 2022 U.S. App. LEXIS 26648 (9th Cir. Cal., Sept. 22, 2022).

Plaintiffs appealed, but after *Bruen* was decided, this Court vacated and remanded the appeal to the district court "for further proceedings consistent with the United States Supreme Court's decision in [*Bruen*]." *Fouts v. Bonta*, 2022 U.S. App. LEXIS 26648, at *1 (9th Cir. Sep. 22, 2022).

After being remanded, the district court ordered the Defendant to "file any additional briefing that is necessary to decide this case in light of Bruen within 45 days of this Order" and then for "Plaintiffs [to] file any responsive briefing within

21 days thereafter. This Court will then decide the case on the briefs and the prior record or schedule additional hearings." *See* ECF #47. On December 12, 2022, the district court held a status conference, where it ordered the Defendant "create, and the plaintiffs shall meet and confer regarding, a survey or spreadsheet of relevant statutes, laws, or regulations in chronological order. The listing shall begin at the time of the adoption of the Second Amendment and continue through twenty years after the Fourteenth Amendment." *See* ECF #57.

Defendant's "survey" was filed with the district court (ECF #60) and multiple briefs were filed by both parties. On February 23, 2024, the district court granted Plaintiffs' Motion for Summary Judgment. The district court's opinion is reported at *Fouts v. Bonta*, 2024 U.S. Dist. LEXIS 31528 (S.D. Cal. Feb. 23, 2024).

## 1. Summary of the District Court's Order

The district court held that Plaintiffs are "law-abiding citizens who want to possess a commonly-owned billy or baton for lawful purposes[,]" that "a billy is not an unusual weapon" and that "both sides have previously agreed a billy is an 'arm.'" 1_ER_7. The district court entered summary judgment for Plaintiffs and entered a "permanent injunction … effective immediately" enjoining Defendant and others from "implementing or enforcing California Penal Code § 22210 as it applies to a billy." 1_ER_27.

## 2. The District Court's Judgment

The district court entered final judgment in favor of Plaintiffs on February 23, 2024.  1_ER_2.

## SUMMARY OF THE ARGUMENT

The Second Amendment's plain text covers "the right of the people to keep and bear arms," U.S. Const. amend. II, and because one cannot "keep" or "bear" something one may not possess, the plain-text question here was simply whether a billy fit the general definition of 'arms.'  *Heller* itself supplied that definition:  As used in the Second Amendment, the term "arms" means "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," and thus includes not only "armour of defence," but "[w]eapons of offence" as well. *Heller*, 554 U.S. at 581.  That definition clearly includes club-like instruments like a billy.  Thus, the Constitution "presumptively guarantees" keeping and bearing such instruments. *Bruen*, 597 U.S. at 17.

Plaintiffs wish to possess collapsible batons and other batons typically issued to law enforcement for purposes of lawful self-defense. The State of California bans their possession, and this ban violates the Second Amendment. The Second Amendment protects the possession of arms which are typically used for lawful purposes and bearable arms are presumptively protected by the Second Amendment. It is true that "the presumptive protections of the Second Amendment may be

rebutted as to arms not 'in common use' today for self-defense.'" *U.S. v. Perez-Garcia*, 96 F.4th 1166, 1180–81 (9th Cir. 2024).

California was unable to rebut that presumption. Nor could they because the term billy applies to commonly owned household items. And the policeman batons Plaintiffs wish to own are commonly sold throughout the vast majority of the United States to both civilians and police. Therefore, the arms which Plaintiffs wish to obtain are constitutionally protected. Thus, the burden is on California to establish a historical tradition of regulating their possession.

California's own historical support are citations to various nineteenth-century concealed carry laws, laws that regulated only the carry of arms are not proper historical analogues to a law like California's that categorically bans the possession of any baton. That is because they regulate different types of conduct and thus do not "impose a comparable burden on the right of armed self-defense." *Bruen*, at 8. California has failed to produce a historical tradition on the prohibition of billies. Thus, California law violates the Second Amendment.

## ARGUMENT

### I.    Legal Standard

This Circuit "review[s] a district court's grant of summary judgment *de novo*, and may affirm on any basis supported by the record." *Cadena v. Customer Connexx LLC*, 51 F.4th 831, 835 (9th Cir. 2022) (citation omitted). And "review is governed

by the same standard used by the trial court under Federal Rule of Civil Procedure 56." *Id*. Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

### A. Controlling Principles

To determine whether a state's restriction is constitutional, the Supreme Court in *Bruen* explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen,* at 24. It is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 19; *see also id.* at 60 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). If the State fails to do so, then the State's restrictions must be enjoined.

If the Plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct." *Bruen*, at 17. The Supreme Court has defined all the Second Amendment's key terms. "The people" means "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; and, most relevant here, to bear simply means to "carry." *Heller*, at 570, 580–82, 584.

When a law or regulation falls within the plain text of the Second Amendment under *Bruen*'s unambiguous directions, "the burden falls on [the government] to show that [regulation] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. The government "must identify a historical analogue that curtails the right to peaceably carry handguns openly for self-defense to a comparable degree, with a comparable severity, and with a comparable blanket enforcement." *Baird v. Bonta*, 81 F.4th 1036, 1047 (9th Cir. 2023).

The relevant time period for the historical analogue must be the Founding, centering on 1791. *Bruen*, at 33-34; *see also* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022, https://bit.ly/3CMSKjw. That is because "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, at 34, quoting *Heller*, 554 U.S. at 634–35. Although the

Court in *Bruen* noted an academic debate surrounding whether courts should look to 1868 and Reconstruction (when the Fourteenth Amendment was adopted), the Court found no need to address the point as the result with respect to carry was the same. *Bruen*, at 47 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry." (emphasis added)). But there can be no doubt that the actual analysis of the Court is focused on l791. *See Worth v. Harrington,* 2023 WL 2745673 at *11 (D. Minn. Mar. 31, 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters"); *See also Firearms Policy Coalition, Inc. v. McCraw*, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022); *See also United States v. Harrison*, 2023 WL 1771138, at *8 (W.D. Okla. Feb. 3, 2023) (quoting *Bruen*, 597 U.S. at 83 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."). The Third Circuit agreed with this analysis and held "that the Second Amendment should be understood according to its public meaning in 1791." *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024) (footnotes omitted). Moreover, *Bruen* has already instructed that historical evidence from 1791 is relevant to understanding the scope of the Second Amendment as incorporated against the states. *Bruen*, at 39, 50. "The *Bruen* court also found post-

ratification practices from the late 18th and early 19th centuries as bearing on this question. *See id.* at 35-36... We focus on sources from those same historical time periods." *U.S. v. Perez-Garcia*, 96 F.4th 1166, 1182 (9th Cir. 2024).

In *Bruen*, the Court noted that its past precedents had "assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, at 37. *Bruen*'s characterization of the Court's precedents as assuming that 1791 is the proper answer is an understatement. In *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), for example, the Court held that "more than *30*" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions lacked grounding in Founding Era practice. *Id.* at 2258–59 (emphasis added). And even if modern laws alone could demonstrate a broad tradition of a regulation, there must at least be a strong showing that such laws are common in the states, i.e., many more than six states. *See Kennedy v. Louisiana*, 554 U.S. 407, 423–26 (2008) (only six states permitting death penalty for child rapists shows national consensus against it).

The historical analogues the State points to must be "representative." Historical "outlier" requirements of a few jurisdictions or of territorial governments are to be disregarded. *Bruen*, at 29, 64, 55 n.22 & 69. This means regulations from

only a handful of states, or those that cover only a small portion of the population, are not enough to demonstrate that modern regulations are consistent with the Second Amendment. *Id.* at 68 (rejecting regulations applying to only 1% of the American population); *see also Koons v. Platkin*, 673 F. Supp. 3d 515, 634 (D.N.J. 2023) (finding regulations covering 10% and 15% of American population insufficient). *Bruen* also categorically rejected reliance on laws enacted in the Territories, including expressly "Arizona, Idaho, New Mexico, Oklahoma," holding that such laws "are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'" *Bruen*, at 67 (quoting *Heller*, at 614).

The historical analogues must be "relevantly similar," which is to say that they must burden ordinary, law-abiding citizens' right to carry for self-defense in a similar manner and for similar reasons. *Bruen*, at 29. *Bruen* held that the inquiry into whether an analogue is proper is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era. *Id.* at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* (emphasis in original). In attempting to "affirmatively prove" that its restrictions on public carry are consistent with the Nation's historical tradition, California may refer to historical

13

analogues at the Founding and claim those meet *Bruen*'s "how" and "why" standard. *Bruen,* at 19, 29.

## II.    California's Ban on Billies Violates the Second Amendment

As *Bruen* explained, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.'" *Bruen*, at 17. *Bruen* later "reiterate[d] that" point: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. The Court went on to use the phrase "plain text" twice more to describe the threshold inquiry, i.e., the inquiry into whether conduct is presumptively protected. *Id.* at 32, 33. And the Court dispensed with the application of that threshold inquiry in just a few short paragraphs, which principally looked to "the Second Amendment's text" and the definitions that *Heller* supplied for its key words ("keep," "bear," "arms"). *Bruen,* at 32-33. Indeed, the Court's conclusion on the threshold textual inquiry boiled down to a single sentence: "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* at 32.

The plain text inquiry is equally clear here. The Supreme Court has already supplied the definition of arms: "[w]eapons of offence, or armour of defence" or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, at 581. Accordingly, so long as something fits

14

within that definition, the Constitution "presumptively guarantees" individuals the right to keep and bear it. *Bruen*, at 24. Indeed, that is what it means to say that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, at 28 (quoting *Heller*, at 582); *accord Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (per curiam); *and Baird v. Bonta*, 2023 U.S. App. LEXIS 23760, at *13 (9th Cir. Sep. 7, 2023) ("… if the Second Amendment's plain text covers the regulated conduct, the regulation will stand only if the government can 'affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms' in the United States.").

As a presumption, the government can rebut by showing that a prohibition on keeping and/or bearing a particular type of arm "is consistent with this Nation's historical tradition of firearm regulation." *Bruen,* at 17. But if the government succeeds in doing so, that does not make the instrument any less of an "arm," it only means it is the type of arm that may be prohibited consistent with this Nation's historical tradition.

None of that is particularly novel. Just as the plain text of the Second Amendment does not distinguish among different types of "Arms," the plain text of the First Amendment does not distinguish among different types of "speech." *See Bruen*, at 24-25 (drawing this analogy). That is why, in the speech context, "the government must generally point to *historical* evidence about the reach of the First

Amendment's protections" "to carry [its] burden" to show that "expressive conduct falls outside of the category of *protected* speech." *Bruen*, at 24 (emphasis added); *see id.* (noting that *United States v. Stevens*, 559 U.S. 460 (2010), "plac[ed] the burden on the government to show that a type of speech belongs to a 'historic and traditional categor[y]' of constitutionally unprotected speech"). *See also Brown v. Entm't Merchs. Ass'n,* 564 U.S. 786, 789 (2011). The government bears that burden precisely because speech that falls outside "the category of protected speech" is still speech within the plain meaning of that term. By the same token, arms that fall outside the category of *protected* arms are still arms within the plain meaning of that term. Thus, if the government wants to prohibit a class of arms, it must meet its burden of proving that they belong to a historic and traditional category of *unprotected* arms.

California agrees that billies are bearable "arms." Opening Brief at 17. But it disputes that the conduct in which Plaintiffs wish to engage—keeping and bearing a type of arm—is conduct covered by the Second Amendment's plain text and presumptively protected. Opening Brief at 20.

California argues that "[t]he district court's attempt to shoe-horn the common use for self-defense inquiry into the historical stage of the *Bruen* analysis" is inconsistent with this Court's opinion in *United States v. Alaniz*, 69 F.4th 1124,1128 (9th Cir. 2023). Opening Brief at 23. The issue in *Alaniz* was whether U.S.S.G.

16

§2D1.1(b)(1), which requires "an enhancement of the Guidelines calculation if a defendant possessed a dangerous weapon at the time of a felony drug offense, is constitutional under the Second Amendment following [*Bruen*]." 69 F.4th at 1126. In answering that question, the Court "assume[d], without deciding, that step one of the *Bruen* test"—i.e., whether "the Second Amendment's plain text covers an individual's conduct," *Bruen*, at 17—was "met." *Alaniz*, 69 F.4th at 1129. *Alaniz*, in other words, assumed that "lawfully possessing firearms" is conduct covered by the Second Amendment's plain text and is therefore presumptively protected. *Id.* The Court then moved to the historical tradition inquiry and held that §2D1.1(b)(1) "comports with a history and tradition of regulating the possession of firearms during the commission of felonies involving a risk of violence." *Id.*

None of that has anything to do with the matter before this Court which is whether California's ban on the possession of billy clubs is constitutional. Nor does anything about how *Alaniz* decide the question the question before this Court. To be sure, *Alaniz* contains one clause of dicta in one sentence of dicta that is in tension with Plaintiffs' position. *See Alaniz*, at 1129 (emphasis added) ("In alignment with *Heller*, [*Bruen*] requires a textual analysis, determining whether the challenger is part of the people whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed course of conduct falls within the Second Amendment." (cleaned up)). But *Alaniz* did not *hold*

17

otherwise. To the contrary, *Alaniz* explicitly "assume[d], *without deciding*, that step one of the *Bruen* test [was] met" there. *Alaniz*, at 1129 (emphasis added).

*Alaniz*'s drive-by summation of its understanding of *Bruen*'s plain text inquiry is thus quintessential dicta— "discussions that are 'unnecessary to the Court's holdings.'" *United States v. Pedregon*, 520 F.App'x 605, 608 (9th Cir. 2013) (quoting *Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581, 592 n.5 (1993)); *see also* Black's Law Dictionary 1102 (8th ed. 2004) ("A judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential."). This Court is "not bound by dicta in decisions from our court or any other circuit." *United States v. Pinjuv*, 218 F.3d 1125, 1129 (9th Cir. 2000). For the reasons laid out above, this Court should find that billies fall within the plain text of the Second Amendment.

California therefore bears the burden to prove that California law which imposes an outright ban on possessing a class of arms, "is consistent with the Nation's historical tradition." *Id.* at 17. *Bruen* instructs how a state may make that showing in the specific context of laws like California Penal Code § 22210 that ban the possession of arms outright. The key question is whether the arms a state wants to ban are "in common use today" for lawful purposes like self-defense, or rather "'are highly unusual in society at large.'" *Id.* at 47 (quoting *Heller*, at 627). California has not carried its burden. Rather it maintains that the burden is on

18

Plaintiffs to "demonstrate that billies are in common use for lawful self-defense, their claims fail at the threshold stage of the *Bruen* inquiry." But just as "[n]othing in the Second Amendment's text draws a home/public distinction," *id.* at 32, nor does anything in its text draws a common/uncommon distinction. As *Bruen* explained, the rule that "the Second Amendment protects the possession and use of weapons that are "'in common use at the time'" derives from "the *historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, at 21 (quoting *Heller*, at 627; emphasis added). Indeed, *Heller* itself made that clear. California notes that *Heller* the Second Amendment "is not a right to keep and carry any weapon whatsoever." Opening Brief at 20. However, that statement came *during the historical tradition analysis*, nearly 45 pages after the Court explained that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, at 582. Thus, it supports the proposition that the burden is on the government to rebut the presumption an arm is protected, i.e. in common use.

Thus, while handguns are *ultimately* protected not merely because they are bearable arms, but because they are "overwhelmingly chosen by American society" for lawful purposes like self-defense (*Heller*, at 628), they are *presumptively* protected simply and solely because they are "bearable arms." So too with billies: because they fit comfortably within the Second Amendment's definition of "arms," California may justify its anomalous ban only by proving that they are *not* "in

common use" for lawful purposes like self-defense. "*Heller* emphasizes that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms.' *Heller*, at 582. In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *See New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015). California has not rebutted that presumption. Thus, this Court must presume billy clubs are in common use.

California's second argument is that batons are not protected because they are dangerous and unusual. The notion that billies are "particularly dangerous weapons" borders on frivolous. Opening Brief at 29. While California claims batons are dangerous because "due to their concealability and striking power," handguns are *designed* to be easily concealable, yet the Supreme Court has deemed them "the quintessential self-defense weapon." *Heller*, at 629. Unable to carry its burden, California tries to eliminate it, insisting that common use belongs in the threshold textual inquiry.

California's failure to prove that billies are "dangerous and unusual" can and should end the historical tradition inquiry. But the trial court's conclusion that California's purported historical analogues do not justify its novel ban was also eminently correct.

As *Bruen* explained, in determining with a state has met its historical tradition burden, courts must focus on "how and why" historic regulations "burden[ed] a law-abiding citizen's right to armed self-defense," and then determine whether the how and why of the challenged law are "relevantly similar." *Bruen*, at 29. And how close of a fit is needed for historic laws to justify a modern law depends on whether the "challenged regulation addresses a general societal problem that has persisted since the 18th century," *id.* at 26, or instead "implicat[es] unprecedented societal concerns or dramatic technological changes," *id.* at 27. In the former case, only "a distinctly similar historical regulation addressing that problem" will suffice. *Id.* at 26. And a past law is not "distinctly similar" to a modern law, *Bruen* explained, if it "addressed the societal problem … through materially different means," such as by regulating different conduct. *Id.* at 26-27.

This makes the historical traditional analysis straightforward here. As the trial court explained "[t]his case concerns a technologically-simple weapon—in essence a wooden stick—and an age old social ill: criminally assaulting another with a stick." 1_ER_10.

That means only "a distinctly similar historical regulation addressing that problem" could suffice. *Bruen*, at 26. Yet no historical law addressed that problem through similar means, as *none* prohibited the possession of *any* class of arms outright, let alone arms that were not "dangerous and unusual" at the time.

To be sure, historical laws regulated these and other arms in *other* ways, such as by prohibiting the concealed carry of certain arms. But a concealed carry law deprives citizens of (at most) one-half of one-half of the Second Amendment "right to armed self-defense" with respect to the covered arms; the people retain the right to openly carry those arms, and they of course remain free to keep them as well. A law that regulates by banning the possession of a class of arms outright, by contrast, deprives citizens of the entire "right to armed self-defense" with respect to the banned arms; keeping and bearing are now off the table. Concealed carry laws thus do not begin to justify possession bans. Indeed, *Bruen* deemed concealed carry laws insufficiently analogous to support *carry* bans; *a fortiori* they are insufficient to justify possession bans. *See Bruen*, at 46-47. California's insistence otherwise defies not just *Bruen*, but *Heller*. After all, if the mere existence of historical laws regulating concealed carry, or gunpowder storage, or other facets of keeping and bearing arms sufficed to justify a modern law banning a class of arms, then *Heller* should have come out the other way.

In sum, while California is certainly correct that prohibitions on carrying weapons are relevant when analyzing bans, that unremarkable principle simply does not get it anywhere in this case. That is because the "historical tradition" in this country is one of "prohibit[ing] the carrying of '*dangerous and unusual* weapons.'" *Bruen*, at 21 (quoting *Heller*, at 627; emphasis added). If an arm is not "dangerous

22

and unusual," then that tradition does not and cannot justify a prohibition on carrying it, let alone a prohibition on even possessing it. Simply put, the historical tradition of bans on dangerous and unusual weapons is relevant if and only if the state meets its burden of proving that the weapons it has banned are dangerous and unusual. That California has failed to do.

California cites back to pre-*Bruen* cases upholding its restrictions, explaining that the 1965 case *People v. Grubb*, 63 Cal. 2d 614, 620 (1965), "obviously sought to condemn weapons common to the criminal's arsenal." Opening Brief at 31. But California could have made it unlawful for *criminals* to carry or use billies, like the purported "analogues" it cited for various other weapons. Instead, it is a flat ban even for those who have Second Amendment rights like the Plaintiffs in this case.

### III.  There is No Historical Tradition of Banning Clubs

There is no historical tradition of banning billies or other club-like weapons. There have been sticks shaped like batons all throughout human history. The club is considered the first personal weapon fashioned by humans. O. Hogg, Clubs to Cannon 19 (1968). Batons were issued to Roman officers and this tradition continued throughout European history.[3, 4] The police baton can trace its origins to

---

[3] Available at https://bit.ly/3oy4hwR (The first use of a baton to symbolize military power was by the Roman Legate, who wielded a white baton to represent his ultimate authority).

[4] Available at https://bit.ly/34jc8rg.

the 27BC Roman Empire during the reign of Augustus (Gaius Octavious – Great nephew to Julius Caesar). During this era, the first non-military civilian police force was formed known as the "Vigiles Urbani" (Watchmen of the City), or "Cohortes Vigilum" (Cohorts of the Watchmen). They were typically armed with the fustis which was a type of club similar to the traditional policeman baton. *See* Speidel, Michael (1993), The fustis as a soldier's weapon. Antiquités africaines. 29. 137-149. 10.3406/antaf.1993.1216.[5]

Modern day policing, and with it the use of the baton, has its origins in the Assize of Arms of 1181, a proclamation of King Henry II of England, concerning the obligation of all freemen of England to possess and bear arms in the service of King. The Assize of Arms of 1252 was a proclamation of King Henry III of England concerning the enforcement of the Assize of Arms of 1181, and the appointment of constables to summon men to arms, quell breaches of the peace, and to deliver offenders to the sheriff. The Statute of Winchester of 1285 (13 Edw. I, St. 2) reformed the system of Watch and Ward (watchmen) of the Assize of Arms of 1252, and revived the jurisdiction of the local courts. This "Watch and Ward" system of law enforcement remained in effect until the formation of the modern police with the passage of the Metropolitan Police Act 1829 (10 Geo.4, c.44).[6] Citizens were

---

[5] Available at https://bit.ly/3GxQwUU.
[6] Available at https://bit.ly/3LeozFb.

expected to provide their own weapons when assisting law enforcement. This included clubs and other precursors to the modern baton due to stick fighting's prevalence in Common Law era England.

The English Common Law, from which our Second Amendment is derived, has a rich history of stick fighting. The English method of staff combat was recorded in several fencing manuals. The primary ones are George Silver's Paradoxes of Defence (1599),[7] Brief Instructions on my Paradoxes of Defence (c.1605 ), Joseph Swetnam's The Schoole of the Noble and Worthy Science of Defence (1617)[8] and Zachary Wylde's The English Master of Defence (1711),[9] with Donald MacBane's The Expert Swordsman's Companion (1728)[10] and Archibald MacGregor's Lecture upon the Art of Defence (1791)[11] providing some additional information. Even earlier is the Cotton Titus Ms. (British Museum, MS Titus A. xxv, f. 105)[12] from the late 15th century, which comes in two parts, the "Strokez off ij hand swerde" and "Strokes atte þe ij hande staffe." In addition, there are several later sporting staff manuals, including Thomas McCarthy's Quarter-staff: a practical manual (1883),[13]

---

[7] Available at https://bit.ly/3GwZ52s.
[8] Available at https://bit.ly/3HB4Cq3.
[9] Available at https://bit.ly/3uxT0jR.
[10] *See* https://bit.ly/3B6Ls8N. Available at https://books.google.com/books?id=rmUxtwAACAAJ&dq (last visited May 27, 2024).
[11] Available at https://bit.ly/3LiXu3S.
[12] *See* https://bit.ly/34oBPqf.
[13] Available at https://bit.ly/3LcqYjX.

R. G. Allanson-Winn and C. Phillipps-Wolley Broadsword and Singlestick with chapters on Quarterstaff, Bayonet, Shillalah, Walking-Stick, Umbrella and Other Weapons of Self Defence (1890).[14]

The use of clubs continued during the Founding Era in America. On the annual commemoration of the Boston Massacre in 1772, Bostonians attended Dr. Joseph Warren's stirring oration. Expecting the speech to upset the Redcoats in attendance, "almost every man [in the audience] had a short stick, or bludgeon, in his hand; and . . . many of them were privately armed." Frederick MacKenzie, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON 37 (Allen French ed., 1926). "The colonists suffered a severe shortage of firearms in the early years of the war, so many soldiers had to rely primarily on swords, hatchets, knives, and pikes (long staffs with a spear head). W. Moore, *Weapons of the American Revolution*, 8 (1967)." *State v. Kessler*, 289 Or. 359, 368 (1980). And as Samuel Adams observed, "[i]t may be supposed that he had as good right, by the law of the land, to carry a stick for his own and his neighbor's defence, in a time of danger, as the Soldier who shot him had, to be arm'd with musquet and ball, for the defence of himself and his friend the Centinel." Stephen P. Halbrook, The Founders' Second Amendment 25 (2008) (quoting 2 The Writings of Samuel Adams 119 (1904)).

---

[14] Available at https://bit.ly/3rtQhWK.

In what would be known as New York, during its Dutch era from 1625 to 1664, the first professional police department was created in New Amsterdam.[15] Police officers used hand rattles (the precursor to the modern police whistle) as they patrolled the streets to discourage crime and apprehend criminals.[16] Under British rule from 1664 to 1783, constables were charged with keeping the peace. They focused on such offenses as excessive drinking, gambling, prostitution, and church service disturbances.[17, 18] Full uniforms were finally adopted in 1853.[19] Each officer was equipped with a baton that was 22 inches long and three-quarters of an inch thick.[20] And in the 1630s, Boston formed a watch that consisted of one constable

---

[15] For a comprehensive history of New York's police department, see The History of New York City Police Department 145539 (1993) available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/history-new-york-city-police-department.

[16] Available at https://bit.ly/3JcIF0C. (last visited 6/4/2024).

[17] *See* N.Y.C.P.D. (1993). History of the New York City Police Department at *3. Available at https://bit.ly/3ow0LTB.

[18] In the South law enforcement began as slave patrols which later encompassed traditional law enforcement functions. For a comprehensive discussion of this history, see Southern Slave Patrols as a Transitional Police Type by Philip L. Reichel available at https://www.sagepub.com/sites/default/files/upm-binaries/50819_ch_1.pdf (starting at page 16).

[19] The History of New York City Police Department 145539 (1993) at *6. Available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/history-new-york-city-police-department.

[20] *Id.*

and six watchman.[21, 22, 23] In 1854, Boston officers began to carry a 14-inch club.[24] The above shows that club ownership was common throughout history.

This history has been confirmed in judicial opinions as well. *See Kessler*, at 371–72 ("The club is considered the first personal weapon fashioned by humans.") (citing O. Hogg, Clubs to Cannon 19 (1968)). "Furthermore, the widespread use of the baton by the police, who currently perform functions that were historically the province of the militia; *see*, *e.g.*, D. Kopel, 'The Second Amendment in the Nineteenth Century,' 1998 BYU L. Rev. 1359, 1534 demonstrates the weapon's traditional military utility." *State v. Deciccio,* 315 Conn. 79, 133 (2014). This is especially true regarding Plaintiffs' as-applied challenge because Plaintiffs wish to own "expandable baton[s]." 7_ER_1201, 7_ER_1202. Arms which were not in existence during the historical era. Therefore, it is not possible that there is a longstanding tradition of prohibiting these arms.

Plaintiffs have shown that batons are less dangerous than arms which are legal to own. They have shown that there was no colonial era tradition of banning batons. And they have shown that the modern era batons, especially the baton Plaintiffs state

---

[21] *See* https://bit.ly/3ov4Wz6. at page 3.
[22] Available at https://bit.ly/3Jd2LIu (page 10).
[23] In July 1700, the Philadelphia Common Council established the night watch, a person who carried a bell to alert the constable about criminal activity. *See* https://philadelphiaencyclopedia.org/essays/police-department-philadelphia/.
[24] *See* https://bit.ly/3L9r0ZE.

they wish to own in their declarations, are arms used for lawful self-defense and other traditional militia functions. 7_ER_1209, 7_ER_1211.

## A. Billies are not Dangerous and Unusual

Billies are not "dangerous and unusual" weapons as the term has been used under this Circuit's precedent. In *United States v. Henry*, the Ninth Circuit held that:

> An object is "dangerous" when it is "likely to cause serious bodily harm." *Black's Law Dictionary* 451 (9th ed. 2009)… A machine gun is "unusual" because private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of § 922(o), has been unlawful since 1986. Outside of a few government-related uses, machine guns largely exist on the black market.

*United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012).

An arm being merely dangerous "cannot be used to identify arms that fall outside the Second Amendment." *Caetano*, 577 U.S. at 418 (Alito, J., concurring). "As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.* Thus, if it can be demonstrated that an arm is either usual or not dangerous it receives Second Amendment protection. As shown below, batons are neither dangerous nor unusual.

Arms such as billies are typically owned for lawful purposes and receive constitutional protection. Billies/batons are widely owned in almost every state in the Union. Unlike the machine guns at issue in *Henry*, they are legal to own in the home in almost every state and the District of Columbia. Billies are a subset of clubs

and are themselves typically used for lawful purposes. And the record demonstrates that they are possessed for self-defense. *See generally*, 6_ER_979, 6_ER_988-989. While the record does not provide numerical data, the widespread legality and lawful typical use of batons are sufficient to establish they are in common use.[25] This is especially true here where numerical data simply does not exist because unlike firearms[26] and magazines, there is no single trade group that keeps track of baton sales.[27]

More to the point, the burden was on California to demonstrate that batons are not constitutionally protected, and California has never done so. *Heller* holds there is a presumption that arms are constitutionally protected, and the burden is on the government to rebut that presumption. "*Heller* emphasizes that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms.'

---

[25] S*ee* COMMENT: SECOND AMENDMENT DECISION RULES, NON-LETHAL WEAPONS, AND SELF-DEFENSE, 97 Marq. L. Rev. 853, 862 (Spring 2014): "The most common and easy-to-use weapons for self-defense purposes are batons. With the exception of some projectiles, blunt force objects are some of the oldest and most predominantly used non-lethal weapons because they can be easily manipulated and are inexpensive."

[26] Firearm sales are aggregated by the National Shooting Sports Foundation (NSSF). For example, *see* https://www.nssf.org/nssf-releases-firearms-production-figures/.

[27] *See also* Symposium: The Second Amendment and the Right to Bear Arms After *D.C. v. Heller*: Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1480 ("… we're even more in the dark about the prevalence of nearly all weapons other than guns, such as fighting knives and billy clubs.").

*Heller*, at 582. In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *See Cuomo*, 804 F.3d at 257.

There is no dispute that batons are bearable arms because they can be held by a person to attack another person or to defend against an attack. Thus, the burden is on the government to show that they are "dangerous and unusual" arms. Whether a billy is a "dangerous and unusual" arm is a contention as to which California bears the burden of proof in the second prong of the *Bruen* analysis.

There is evidence that billies are "usual" arms. "[P]eace officers employed by the California Department of Justice are generally issued the ASP expandable baton … [and] peace officers employed by other California law enforcement agencies may be issued different police batons…" *See* 3:19-cv-01662-BEN-JLB, ECF #21-2, PageID.161. Historically, policing was a militia function. "Furthermore, the widespread use of the baton by the police, who currently perform functions that were historically the province of the militia; *see e.g*., D. Kopel, 'The Second Amendment in the Nineteenth Century,' 1998 BYU L. Rev. 1359, 1534 demonstrates the weapon's traditional military utility." *Deciccio,* 315 Conn. at 133. The Constitution as originally adopted granted to Congress the power – "[t]o provide for calling forth the Militia to **execute the Laws of the Union**, suppress Insurrections and repel Invasions." *United States v. Miller*, 307 U.S. 174, 178 (1939) (emphasis added).

Batons are "'[a]rms' within the meaning of the second amendment because they are weapons with traditional military utility that are typically possessed by law-abiding citizens for lawful purposes, and they are neither especially dangerous nor unusual." *Deciccio*, 315 Conn. at 129.

Even if this Court were to find that batons are unusual, they still receive Second Amendment protection because an arm must be dangerous <u>and</u> unusual to lose its Second Amendment protection. And within the context of the dangerous and unusual analysis, batons are not "dangerous." That is because *Heller* established that handguns are not dangerous enough to be considered "dangerous" for this analysis. And the State even conceded that a "billy is a weighted club, capable of being carried on the body and deployed as a less-than-lethal impact weapon." Opening Brief at 1.

Because billies are less dangerous than handguns which the *Heller* court found to be the "quintessential self-defense weapon," they are not dangerous and unusual. *See Heller,* at 629. Billies cannot therefore be legally "dangerous" and lose Second Amendment protection. Handguns are both concealable in the pocket and are much more dangerous than any type of billy. Billies do not have the devastating power of machineguns and simply are not dangerous pursuant to this Court's precedent in *Henry*.

The Connecticut Supreme Court has already found that batons are protected

32

by the Second Amendment. In *Deciccio*, at 117, the court found that the baton is protected by the Second Amendment and a complete ban on its possession is unconstitutional ("For these reasons, we are persuaded that the police baton that the defendant had in his vehicle is the kind of weapon traditionally used by the state for public safety purposes and is neither so dangerous nor so unusual as to fall outside the purview of the second amendment's right to keep and bear arms"). *Deciccio,* at 133-134.

The Oregon Supreme Court's right to arms analysis "mirrors the model employed by the United States Supreme Court in *District of Columbia v. Heller*, supra, 554 U.S. 624-25". *See Deciccio,* at 117. In *State v. Kessler*, 289 Ore. 359, 371 (1980), the Oregon Supreme Court held that:

> [t]he club is still used today as a personal weapon, commonly carried by the police. ORS 166.510 prohibits possession of a "billy;" … The statute in this case, ORS 166.510, prohibits the mere possession of a club. The defendant concedes that the legislature could prohibit carrying a club in a public place in a concealed manner, but the defendant maintains that the legislature cannot prohibit all persons from possessing a club in the home… Our historical analysis of Article I, section 27, indicates that the drafters intended "arms" to include the hand-carried weapons commonly used by individuals for personal defense. The club is an effective, hand-carried weapon which cannot logically be excluded from this term. We hold that the defendant's possession of a billy club in his home is protected by Article I, section 27, of the Oregon Constitution.

In *State v. Blocker*, 291 Ore. 255 (1981), the Oregon Supreme Court extended this ruling to find private citizens have a right to possess billy clubs outside the home.

33

Even prior to *Bruen*, federal courts found other self-defense arms are protected by the Second Amendment. *See e.g. Maloney v. Singas*, 351 F. Supp. 3d 222 (S.D.N.Y. 2018) (nunchucks); *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) (electric guns);[28] *O'Neil v. Neronha*, 594 F. Supp. 3d 463 (D.R.I. 2022) (electric guns); *People v. Webb,* 2019 IL 122951 (Tasers); *Ramirez v. Cmmw.*, 94 N.E.3d 809 (Mass. 2018) (electric guns).[29]

## IV. The District Court's Opinion is Not "Deeply Flawed"

California attempts to style the district court's opinion as "deeply flawed" (Opening Brief at 47) because it faithfully followed Supreme Court precedent.

---

[28] That term includes Tasers and stun guns.

[29] Knives designed for self-defense are also weapons protected by the Second Amendment. *See State v. Herrmann*, 873 N.W.2d 257 (Wis. Ct. App. 2015) (finding switchblades are protected by the Second Amendment and that Wisconsin's complete ban on their possession was unconstitutional); *Deciccio*, 315 Conn. 79 (dirks and batons protected by the Second Amendment as "typically possessed by law-abiding citizens for lawful purposes" and not "dangerous and unusual weapons"); *State v. Montalvo*, 162 A.3d 270 (2017) (in-the-home possession of machete-type knives protected by the Second Amendment); *State v Griffin*, 2011 Del Super LEXIS 193, *26 n.62 (Del Super Ct, May 16, 2011) (reversed and remanded on other grounds by *Griffin v. State*, 47 A.3d 487, 2012 Del. LEXIS 319 (Del., June 18, 2012) (the "right to keep and bear arms" under the Delaware Constitution extends to knives, and concluding that the Second Amendment right does the same); *City of Akron v Rasdan*, 663 NE2d 947 (Ohio Ct. App., 1995) (concluding that the "right to keep and bear arms" under the Ohio Constitution extends to knives); *State v. Delgado*, 692 P.2d 610 (1984) (ban on the possession of switchblades violated the Oregon Constitution's right to arms). *See also Zaitzeff v. City of Seattle*, 484 P.3d 470, 478 (Wash. App. Div. 1 2021) (applying intermediate scrutiny to sword possession ban and thus finding swords are within the scope of the Second Amendment right).

California claims that the district court erred by requiring it to identify a "national historical tradition of prohibiting the simple possession, or the open carrying, of a billy." Opening Brief at 48. A "billy" is basically a stick, which has been around since the beginning of time. A "billy" is not some technological invention that would have boggled the minds of the Founders, but one can pick up a stick in a forest or find in a neighborhood on a lawn.

California claims that it "did identify restrictions on the carrying of a billy (concealed or otherwise), *see, e.g.*, 1882 W. Va. Acts 421-422, § 1…" Opening Brief at 48. But an 1882 law proves nothing. First, it comes way too late to prove any type of historical tradition from the founding. Secondly, even if it was "carrying," California's law bans not only the "carrying," but also the mere "possession."[30]

To the extent California has found any laws which are comparable, they are outliers. "We have already explained that we will not stake our interpretation of the Second Amendment upon a law in effect in a single State, or a single city, 'that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms' in public for self-defense." *Bruen,* at 67. And as can be seen throughout Defendant's alleged analogues, bans on concealed carry of pistols,

---

[30] It should also be noted that California did not ask either this Court or the district court for a stay of the injunction. If, as California claims, billies are so dangerous, then why did California not seek a stay of the judgment?

handguns, or revolvers is evident throughout, yet *Bruen* specifically held that individuals have a right to public carry and these laws did not change *Bruen*'s holding. And "relevantly similar" to California's billy restrictions would be an outright ban, rather than prohibition on concealed carry, or seeking permission (like a permitting system) from the Mayor. The vast majority of the "analogues" deal with concealed carry of a billy (and pistols) or carry of a billy (and pistols).

To the extent California's analogues come after the ratification of the 2nd Amendment in 1791 and even the ratification of the 14th Amendment in 1868, they cannot change how the Second Amendment was understood in 1791. *Bruen*, at 37 ("we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.").

The Supreme Court has consistently used 1791 as the focal point for constitutional analysis, second only to "the text," with preceding or subsequent history serving a merely confirmatory role. *See, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) (noting the "special significance" of the "interpretation of the Establishment Clause by Congress in 1789"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *Gamble v. United States*, 139 S. Ct. 1960, 1965, 1966 (2019) ("start[ing] with the text of the Fifth

36

Amendment," and then looking to how it "was commonly understood in 1791," before turning to "antebellum case[s]" which "reflect the same reading"); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (noting that "[i]nfluential, postadoption treatises confirm" the "backdrop" of the Sixth Amendment's drafting and ratification); *Timbs v. Indiana*, 586 U.S. 146, 152 (2019) (looking at "colonial-era provisions" and the "constitutions of eight States" to determine the original meaning of the Eighth Amendment, before finding further confirmation in "[a]n even broader consensus … in 1868").

Third, never has the Supreme Court looked to 1868 incorporation, or beyond, as the primary historical period for determining the meaning of an enumerated right originally adopted in 1791.[31]  Rather, subsequent history can only "confirm[] … what the Court thought had already been established." *Bruen*, at 37. *See also Espinoza*, 140 S. Ct. at 2258-59 ("a tradition [that] arose in the second half of the 19th century … cannot by itself establish an early American tradition.").[32]

---

[31] The one exception, *Apodaca v. Oregon*, 406 U.S. 404 (1972), "was the result of an unusual division among the Justices, not an endorsement of the two-track approach to incorporation." *McDonald*, at 766 n.14.  Ultimately, this Court overruled that "badly fractured set of opinions." *Ramos*, at 1397.

[32] Nor may courts rely on pre-American sources to manufacture a tradition that was not adopted by the Founding generation.  *Bruen*, at 39 ("this Court has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'"); *Powell v. Alabama*, 287 U.S. 45, 64 (1932) ("in at least twelve of

There is little question that this uniform 1791-centric approach should apply to Second Amendment cases, as the Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chi*., 561 U.S. 742, 780 (2010).  The above principles apply to the Second Amendment with equal force, regardless of the entirely academic "ongoing scholarly debate" as to 1791 or 1868.  *Bruen*, at 37.  Indeed, such academic debate has long been laid to rest.  *Id.* at 82. (Barrett, J., concurring).

### A. The Trial Court's Analysis is in Line With this Circuit's Precedent

California complains that the trial court's analysis is not in line with this Court's precedent, claiming the trial court "identified 1791 as 'the most significant historical evidence.'" Opening Brief at 50. However, this is in line with this Court's precedent in *Perez-Garcia*.  "The *Bruen* court also found post-ratification practices from the late 18th and early 19th centuries as bearing on this question. *See id*. at 35-36... We focus on sources from those same historical time periods." *Perez-Garcia*, 96 F.4th at 1182.

Similarly, this Court in *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) engaged in very similar analysis as the trial court. "Most colonial enactments

───────────────

the thirteen colonies the rule of the English common law … had been definitely rejected").  Thus, as with Reconstruction-era sources, to the extent that pre-Founding sources are to be used at all, they must confirm (not create or contradict) a tradition that existed at the Founding.

targeting Indians regulated a different type of conduct. *See Bruen*, 597 U.S. at 47...
Rather than ban Indians from *possessing* firearms, the laws prohibited the *sale* of
arms to them by colonial residents." *Duarte*, at *61. Similarly, the trial court
distinguished historical restrictions on concealed carry from the possession ban at
issue in this case. The trial court's reasoning is on all fours with this Court's
precedent. California law is the type of regulation the Ninth Circuit warned would
violate the Second Amendment because it "prevent[s] law-abiding citizens with
ordinary self-defense needs from exercising their right to keep and bear arms."
*Perez-Garcia,* at 1189.

## V.    California's Reliance on Bowie Knife Laws is Deeply Flawed

California cannot rely on 19th century concealed carry bans on bowie knives
because they only restrict the manner of carry of a subset of a class of arms. Whereas
here, California completely bans the possession of an entire class of arms.  These
historical laws did not burden the right to arms in a comparable manner as California
law. This issue was already discussed in *Heller. See e.g. Aymette v. State*, 21 Tenn.
154 (1840) (upholding a conviction on the concealed carry of a bowie knife); *See
also State v. Reid*, 1 Ala. 612 (1840). "*Aymette* held that the state constitutional
guarantee of the right to 'bear' arms did not prohibit the banning of concealed
weapons." *Heller*, at 613.  *Nunn v. State*, 1 Ga. 243, 246 (1846) was another case
discussed by the Supreme Court in *Heller. Heller,* at 629. The Georgia law at issue

in *Nunn* had an exemption for the open carry of bowie knives. "It then declares, *that no person or persons shall be found guilty of violating the before-recited act, who shall openly wear, externally, bowie-knives, dirks, tooth-picks, spears, and which shall be exposed plainly* to view." *Nunn,* at 246. The general rule from the line of 19th Century cases *Heller* discusses is that the carry of arms such as bowie knives could be regulated but not banned. *See also Reid*, at 616-617 ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional"). These cases only stand for the proposition that concealed carry can be banned when the government allows for the open carry of arms.[33]

The only complete ban on carrying a type of knife mentioned in *Bruen*'s dissent is from New Mexico. "[T]he Territory of New Mexico appears to have banned all carriage whatsoever of "any class of pistols whatever," as well as "bowie kni[ves,] . . .Arkansas toothpick[s], Spanish dagger[s], slung-shot[s], or any other deadly weapon." 1860 Terr. of N. M. Laws §§1-2, p. 94. *Bruen*, at 124 (Breyer, J., dissenting). "And Texas made it a misdemeanor to carry in public 'any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other

---

[33] Similarly, Alabama had a ban on the concealed carry of bowie knives but allowed for their open carry. *See Acts Passed at the Annual Session of the General Assembly of the State of Alabama* (Tuscaloosa: Hale & Eaton, 1838 [1839]), chap. 77, 67-68.

kind of knife manufactured or sold for the purpose of offense or defense' absent 'reasonable grounds for fearing an [immediate and pressing] unlawful attack.' 1871 Tex. Gen. Laws ch. 34, §1." *Bruen*, at 128 (Breyer, J., dissenting).

However, *Bruen* already found these outlier laws to not have persuasive value. The Supreme Court acknowledged two Texas cases—*English v. State*, 35 Tex. 473 and *State v. Duke*, 42 Tex. 455—that operated as a "reasonable grounds" standard for public carry analogous to New York's proper-cause requirement. *Bruen*, at 65. But, the Supreme Court stated that these "decisions therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public." *Id.* Clearly, if bans on pistol carry were not legally relevant in *Bruen*, then neither would bowie knife carry restrictions. Even if this Court relies upon 19th Century laws, there is no historical law that burdened the Second Amendment right in a comparable manner.

## A. California's Other Historical Evidence Is Not Analogous

California's historical evidence is inapplicable. That is because unlike historical laws, California's law is a restriction on all club-like objects that can be used for self-defense. No historical law is so encompassing. Thus, California law is not a comparable burden to any of the historical laws discussed below. Moreover, most of the laws discussed by California were restrictions on particular conduct with

an arm, rather than mere possession of the arm. Thus, those laws are not relevantly similar.

California begins its historical analysis with a series of English laws which restricted the ownership of certain weapons. The use of English law was addressed in Judge O'Scannlain's now vindicated opinion in *Young v. Hawaii*: "While English law is certainly relevant to our historical inquiry because the Second Amendment 'codified a preexisting right,' *Heller*, 554 U.S. at 592… our aim here is not merely to discover the rights of the English." *Young v. Hawaii*, 896 F.3d 1044, 1065 (9th Cir. 2018), on reh'g en banc, 992 F.3d 765 (9th Cir. 2021), cert. granted, judgment vacated, 142 S. Ct. 2895 (2022). "[T]here is a scholarly consensus that the 1689 English right to have arms was less protective than its American counterpart." *Id.* "Thus, instead of stitching into the Second Amendment every odd law that hemmed in the rights of fourteenth century Englishmen, we consider those English laws only to the extent they inform the original public understanding of the Second Amendment." *Id.*

The laws California cites to are not relevant to the analysis this Court must engage in because English law as interpreted by California contradicts American practice at the time of the Founding. By the Colonial Era, America had no prohibitions on the ownership of any arm. Thus, they are not probative of the meaning of the Second Amendment.

42

Furthermore, even taken at face value, these prohibitions do not justify California's modern ban on billies because the "how" and "why" of these prohibitions are different. And they are not a comparable burden to California's law. First, this law only applied to the poor. It did not apply to those who "have lands, tenements, fees, annuities or office to the yearly value of one hundred pounds." 33 Hen. 8, ch. 6, §§ 1-2, 18 (1541).[34] Thus it was a class-based law which is irrelevant in deciding the scope of the American right to arms.

Furthermore, the primary purpose behind England's ban on crossbows and handguns was to aid in the national defense. The express rationale of 33 Hen. 8, ch. 6, §§ 1-2, 18 (1541) was to promote the use of the longbow. "[S]erving men now of late have laid apart the good and laudable exercise of the long bow, which always heretofore hath been the surest safeguard and continual defense of this Realm of England, and an inestimable dread and terror to the enemies of the same." *Id.* The traditional arm of the English commoner was the English longbow,[35] which was instrumental in winning many of its wars.[36] As such, Englishman were encouraged, and often required, to own them. Edward III of England's declaration of 1363 expressly encouraged their use:

---

[34] Available at https://firearmslaw.duke.edu/laws/33-hen-8-c-6-c2a7-1-an-act-concernin-crossbows-and-handguns-1541.

[35] https://en.wikipedia.org/wiki/English_longbow.

[36] *Id*.

43

> Whereas the people of our realm, rich and poor alike, were accustomed formerly in their games to practise archery – whence by God's help, it is well known that high honour and profit came to our realm, and no small advantage to ourselves in our warlike enterprises... that every man in the same country, if he be able-bodied, shall, upon holidays, make use, in his games, of bows and arrows... and so learn and practise archery.[37]

Henry VIII ordered that all men under the age of 60 practice shooting regularly, and that fathers be responsible for providing their sons and young male servants with archery equipment and training. Statutes of the Realm, 3rd Henry VIII, c. 3, p. 25.[38] England even banned other sports to promote the practice of archery. The Unlawful Games Act 1541 (33 Hen. 8. c. 9) was an Act of the Parliament of England, designed to prohibit "Several new devised Games" that caused "the Decay of Archery."[39] All Men under the Age of sixty Years "shall have Bows and Arrows for shooting." Men-Children between seven "Years and Seventeen shall have a Bow and 2 Shafts." Men above seventeen "Years of Age shall keep a Bow and 4 Arrows."[40] This law remained in effect until Section 1 of the Gaming Act 1845 repealed much of the Unlawful Games Act 1541. *See* The Gaming Act 1845 (8 & 9 Vict. c. 109).[41]

---

[37] *Id.*

[38] https://en.wikisource.org/wiki/An_Act_concerning_shooting_in_long_bows#:~:text=In%20this%20statute%2C%20Henry%20VIII,25.

[39] https://en.wikipedia.org/wiki/Unlawful_Games_Act_1541.

[40] *Id.*

[41] https://en.wikipedia.org/wiki/Gaming_Act_1845.

The 16th Century saw the advent of crossbows and early firearms. "Henry VIII worried that handguns threatened Englishmen's proficiency with the longbow—a weapon many believed was crucial to English military victories in the 1300s and 1400s, including the legendary English victories at Crécy and Agincourt." *Bruen*, at 42. That concern catalyzed the law which California cites, whereas here, California alleges its ban on billies prevents crime. Thus, the "how" (a ban on possession just for the poor) and the "why" (national defense) of the ban is different from California law. The ban on crossbows and certain firearms simply was not relevantly similar to California's ban on billies.

Furthermore, the early English law was not a comparable burden to the right to arms as California's laws. English law only banned a small subset of projectile weapons. Most firearms and all bows were still legal to own. Thus, an Englishman's ability to direct force against a long-range target in lawful self-defense was not hindered by this law. In fact, the express purpose of this law appears to have been to encourage the use of the longbow. Here, California law prohibits an entire category of self-defense weapons. As demonstrated by their issuance to police officers in conjunction with a variety of other arms, bludgeon weapons allow for a unique form of close quarters less lethal self-defense which other legal weapons do not allow. Thus, their prohibition is not comparable to early England's restrictions on a small subset of projectile weapons for lower income individuals.

45

The second English law which California relies on is even less relevantly similar because, contrary to California's claim, the law did not ban the possession of the lancegay. California relies on an Act of Parliament (7 Richard II 1383 cp. 13), which prohibited the ***carrying of lancegays while riding*** but it did not ban mere possession of the lancegay. *See* 7 Rich. 2, ch. 13 (1383).[42] It reads:

> … no Man shall ride in Harness within the Realm, contrary to the Form of the Statute of Northampton thereupon made, neither with Launcegay within the Realm, the which Launcegays be clearly put out within the said Realm, as a Thing prohibited by our Lord the King, upon Pain of Forfeiture of the said Launcegays, Armours, and other Harness, in whose hands or Possession they be found that bear them within the Realm, contrary to the Statutes and Ordinances aforesaid without the King's special license.

*Id.*

Properly constructed, the law banned possessing a lancegay while engaged in the aforementioned conduct, i.e. while riding. Thus, this law banned the ***carrying*** of lancegays unless one had a special license to do so from the King. This interpretation has been endorsed by historians. "Richard II's statute of October 1383, proclaimed in every county, banned it from the realm, declaring that 'no man should ride about the kingdom in armor, *chivache deinz le roame*, nor carry a lancegay.'"[43] Richard II

---

[42] Available at https://firearmslaw.duke.edu/laws/7-ric-2-35-ch-13-1383-2.

[43] *See* Harbinson, Michael John. "7. The Lancegay and Associated Weapons." Journal of Medieval Military History: Volume XX, edited by Kelly DeVries, Clifford J. Rogers, John France, David S. Bachrach, Daniel Bertrand, Peter Burkholder, Ekaitz Etxeberria Gallastegi, Michael John Harbinson, Steven Isaac,

later "affirmed the validity of his 1383 legislation" in 1397 and "ordained and assented that no man shall ride armed within the realm, against the form of the Statute of Northampton thereupon made, nor with launcegays."[44] English law did not ban possession of a lancegay in one's home thus it is not comparable to California law.

But what is a lancegay? "The lancegay was a light lance made of stiff ash, around ten to twelve feet in length, although later versions could be longer."[45] Other sources agree with this definition. The lancegay was "a type of spear or lance, but that it was probably considerably lighter than a full-length war lance." *See* Scott-Macnab, David: Sir John Fastolf and the Diverse Affinities of the Medieval Lancegay, S.A. Journal of Medieval and Renaissance Studies, 19 (2009), pp.97–116.[46][47] "Among the myriad items recorded in an inventory of the possessions of the

---

Donald J. Kagay, Tomaž Lazar and Mamuka Tsurtsumia, Boydell and Brewer: Boydell and Brewer, 2022, pp. 137-184. https://doi.org/10.1515/9781800106178-008  Available at https://ebin.pub/qdownload/journal-of-medieval-military-history-volume-xx-20-1783277181-9781783277186-9781800106178.html.

[44] Scott-Macnab, David. 'Sir Thopas and his Lancegay'. Chaucer in Context. Ed. Gerald Morgan. Turnhout, 2011 (Citing Statutes of the Realm, II. 92–4, esp. pp. 92–3, c.1.) available at https://www.academia.edu/44224217/Thopas_and_his_Lancegay.

[45] *Id.*

[46] Available at https://www.researchgate.net/publication/236870083_Sir_John_Fastolf_and_the_Diverse_Affinities_of_the_Medieval_Lancegay.

[47] It appears lancegays may have been targeted rather than full sized lances because as a light lance they were better tools to attack a lightly armored person. *See*

English gentleman-soldier and landowner Sir John Fastolf Caister Castle, Norfolk, we find that his magna aula, or great hall, contained an assortment of weapons…a 'Launce gay'". *Id* at *1. "[W]e find that Sir John Fastolfe was far from alone in owning such a weapon Brother Hugh Middleton, commander of the English contingent of the Knights Hospitaler at Rhodes, owned one too." *Id* at *10. Court records show "[e]ven common folk with no military associations seem to have possessed the weapon, as we learn from a legal action brought by John Melburn of Nottingham, a weaver, for the return of a lancegay-shaft." *See Id.* (citing Records of the Borough of Nottingham, 9 vols (London, 1882–1956), II (1883), item LXXIX, pp. 158–9.)[48][49] If the lancegay was illegal to possess, then Mr. Melburn would not have been able to bring a judicial action to compel its return. This action was successful.[50] And "John Scrope" "bequeathed his 'launchgay cum uno batillaxe' to his brother in 1452" via a will which was legally registered. *Id.*[51] If the lancegay was

---

https://www.academia.edu/37372446/The_Lancegay_a_serious_weapon_of_war
(also agreeing that the 1383 act of parliament (7 Richard II 1383 cp. 13), merely "prohibited the carrying of them."); *see also* "7. The Lancegay and Associated Weapons" at pg. 178 detailing how the lancegay was effective against infantry.
[48] Available at
https://archive.org/details/recordsofborough02nott/page/412/mode/2up?q=lance.
[49] This lawsuit occurred December 19, 1436. *Id.*
[50] "John Dyrry and William should have re-delivered the aforesaid gowns, clocher, and lancegay-shaft to the aforesaid John Melburn, on Monday next after the feast of Saint Mark the Evangelist, in the 13th year of the reign of the aforesaid King." *Id.*
[51] Citing James Raine (ed.), Testamenta Eboracensia: A Selection of Wills from the Registry at York, II, Surtees Society, 30 (Durham, 1855), p. 161. Available at

illegal to possess then Mr. Scrope would not have been able to legally bequeath his lancegay to his brother. Further evidence that Englishmen were not prohibited from possessing lancegays comes from a "stern edict issued by Henry VI to the sheriff of Worcester in 1457, instructing him to announce publicly and widely that the king would not tolerate a variety of unlawful acts, including riding about armed with lancegays and other weapons." *Id*. "The King to the Sheriff of Worcester, greeting. . . . We instruct you . . . to proclaim in public that no-one . . . ride on horseback armed with lances, lancegays, swords and other weapons, contrary to the laws and statutes promulgated and published on this issue . . . .')." *Id.* If there was a ban on possession of the lancegay, then this edict would not have included the lancegay in a ban on the carrying of weapons which were legal to own. In fact, Englishman were required to own many of the weapons in this list. The Assize of Arms required all British men to own arms corresponding with the financial ability to purchase many of these arms. *See* Assize of Arms of 1181.[52] As the law California cited to did not prohibit mere possession of lancegays, it is not relevantly similar to California's ban on billies.

---

https://play.google.com/store/books/details?id=lkNjAAAAcAAJ&rdid=book-lkNjAAAAcAAJ&rdot=1 (This document is in Latin and the pertinent part reads "Item lego Thomæ fratri meo sorellum curser meum , unum par de breganders et unum launch- gay cum uno batillaxe" but translated through Google Translate, it reads "Also I bequeath to my brother Thomas my curser, one pair of briganders and one launch-gay with one batillaxe.")

[52] Available at https://en.wikipedia.org/wiki/Assize_of_Arms_of_1181.

Furthermore, even if the law cited by California was a possession ban, it would not have imposed a comparable burden to California's ban on billies because it only banned a subset of lances. Spears and heavy lances are not included in the definition of a lancegay. Thus, an Englishman's ability to defend himself while on horseback was largely unscathed.

### B. California's Colonial History

California has not identified a single restriction on the possession of an arm during the Colonial Era, probably because there were none. "No colonial law banned any particular arm." Kopel, David B. and Greenlee, Joseph, This History of Bans on Types of Arms Before 1900 (April 25, 2023). Journal of Legislation, Vol. 50, No. 2, 2024, U Denver Legal Studies Research Paper, Available at SSRN: https://ssrn.com/abstract=4393197 at 226. This paper lists all the arms bans that existed during this time and it could find none during the Colonial Era. Furthermore, "[d]uring Reconstruction, no government in the United States attempted to prohibit the possession of any particular type of firearm." *Id.* at 280. California relies primarily on the Declaration of Robert Spitzer and a trial court decision in *Bevis v. City of Naperville, Illinois*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023), aff'd, 85 F.4th 1175 (7th Cir. 2023).

*Bevis* claims that "[t]he colony of New York enacted the first 'anti-club' law in 1664." *Id*. at 1070. It cites "The Colonial Laws of New York from the Year 1664

to the Revolution (1894)" to justify that statement. *Id.* at fn. 24.[53] And it does so without a pin cite or other page number. This document is 1,098 pages long. It is unclear what law is being referenced by the court here, and it is California's duty to affirmatively prove that a law existed. *Bevis* claims that "sixteen states following suit, the latest being Indiana in 1905, which proscribed the use of clubs in sensitive places of transportation." *Id.* However, it does not provide a citation for any of the laws other than the 20th Century Indiana law. California cannot rely on *Bevis* because that decision does not provide citations to justify its statements. And presumably any historical law referenced are restrictions on concealed carry which as discussed below simply are not comparably similar to the possession ban at issue here.

Mr. Spitzer claims that "at least 15 states barred bludgeon *carrying*." 6_ER_ 825 (emphasis added). Thus, even on its own terms, California has failed to identity a ban on the *possession* of any weapons. And the trial court already dissected California's evidence. "During the time the Founders were alive and all of the way up to the end of the Civil War in 1865, there were no state restrictions in any of the states or territories on possessing or carrying a billy. This is the most persuasive evidence that the original understanding of the Second Amendment protects a person's right to keep and carry a billy." 1_ER_14. "Having reviewed each of the

---

[53] Available here
https://books.google.com/books?id=d3U4AAAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.

250 laws listed by Defendant, it is quite clear that there is no national historical tradition of prohibiting the simple possession, or the open carrying, of a billy evident during the important period of history when lawmakers still had an unmolested conception of the original meaning of the Second Amendment." 1_ER_19. The laws attached to Spitzer's Declaration from the Colonial Era typically are laws which discriminated against enslaved people. For example,

> 1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6. Race and Slavery Based | Delaware | 1797 And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

6_ER_900.

Or expressly target racial minorities:

> 1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

6_ER_922.

Or prohibited carrying weapons while committing a crime such as:

> Carrying Weapons | Georgia | 1816 Offences Against the Public Peace, (1816) § 19. If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent

52

feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

6_ER_903.

Or deal with the concealed carrying of arms:

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1. Carrying Weapons | Louisiana | 1813 Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

6_ER_913.

Or deal with preventing riots:

1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1. If any persons to the number of twelve or more, being armed with clubs or other weapons. . . shall be unlawfully, riotously, or tumultuously assembled . . . (Read riot act, if don't disperse) . . . It shall be lawful for every officer . . . to seize such persons, and carry them before a justice of the peace; and if such persons shall be killed or hurt by reason of their resisting . . . officers and their assistants shall be indemnified and held guiltless.

6_ER_918.

California has compiled a list of restrictions that deal with something other than the conduct at issue here. Furthermore, they often deal with weapons other than billies. Thus, the laws they rely on are not relevantly similar to a ban on the possession of billies. Thus, the historical laws relied upon by California did not "impose a comparable burden on the right of armed self-defense" (*Bruen*'s "how") that was "comparably justified" (*Bruen*'s "why"). *Duarte*, at *39.

California also attempts to rely upon regulations dealing with the storage of black powder and trap guns to justify its ban on billies. However, this Circuit has already rejected the use of gun powder regulations to justify weapons regulations. "[A]s noted by *Heller*, such laws are best described as 'fire-safety' regulations. 554 U.S. at 632... The fact that states historically imposed modest restrictions on the storage of gunpowder, a dangerous and highly flammable substance, does not raise the inference that the Second Amendment is inapplicable to regulations imposing restrictions on the storage of handguns." *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014). Similarly, this Court should find that colonial fire safety regulations are inapposite to the possession of billies.

Through 1899, "American bans on possession or sale to adults of particular arms were uncommon." Kopel, David B. and Greenlee, Joseph, This History of Bans on Types of Arms Before 1900 (April 25, 2023) (cataloguing all these restrictions).

The handful of bans on billies were far too late in time to be relevant (1881 and onward). While there were a handful of bans on other types of arms, they are not relevant to deciding whether there is a historical tradition of banning billies. Billies already existed and historical societies that wished to regulate did so with carry restrictions. Furthermore, restrictions on arms such as slungshots are not a comparable burden to California's ban on all club-like weapons under a label of "billies." Historically, a slungshot was a maritime tool consisting of a weight, or "shot," affixed to the end of a long cord often by being wound into the center of a knot called a "monkey's fist."[54] Under California law, a slungshot is "a small mass of metal or stone fixed on a flexible handle, strap or the like, used as a weapon." *People v. Fannin*, 91 Cal. App. 4th 1399, 1402 (2001) (citing *People v. Williams*, 100 Cal. App. 149, 151 (1929)). Under either definition, a prohibition on slungshots does not prohibit a form of self-defense because there are other weapons available that allow for a comparable form of self-defense. Whereas California's billy law prohibits the use of all bludgeon-type weapons. The same reasoning applies to metal knuckles and all other historical restrictions cited too.

Similarly, regulations on trap guns are not a comparable burden to California's ban on billies. A trap gun is a firearm tied to a "string or wire so that a loaded firearm would discharge automatically when a trap was sprung." Opening

---

[54] https://en.wikipedia.org/wiki/Slungshot.

55

Brief at 34 n.16. A prohibition on setting booby traps with firearms is not the same as banning the possession of an arm. Rather it is a prohibition on the manner of use of a firearm.

## CONCLUSION

This Court should find that California's ban on the possession of billies/batons is unconstitutional both facially and as-applied to Plaintiffs.

Respectfully submitted,

*s/ Alan Alexander Beck*
ALAN ALEXANDER BECK
2692 Harcourt Drive
San Diego, California 92123
Telephone: (619) 905-9105
Email: alan.alexander.beck@gmail.com

*s/ Stephen D. Stamboulieh*
STEPHEN D. STAMBOULIEH
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
Email: stephen@sdslaw.us

## <u>STATEMENT OF RELATED CASES</u>

Appellees are not aware of any related cases.


Dated: June 7, 2024                          *<u>/s/ Alan Alexander Beck</u>*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-1039

I am the attorney or self-represented party.

**This brief contains** 13,926 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Alan Alexander Beck **Date** June 7, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2024, I filed the foregoing Appellants' Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Case Management System (ACMS).

I certify that all participants in the case are registered ACMS users and that service will be accomplished by ACMS.


*/s/ Alan Alexander Beck*
Alan Alexander Beck