## No. 24-1039

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

RUSSELL FOUTS; TAN MIGUEL TOLENTINO

*Plaintiffs-Appellees,*

v.

ROB BONTA, in his official capacity as Attorney General
of the State of California

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Southern District of California
Case No. 3:19-cv-01662
Senior District Judge Roger T. Benitez

**BRIEF OF AMICUS CURIAE STATE OF MONTANA AND
15 OTHER STATES SUPPORTING PLAINTIFFS-APPELLEES
AND AFFIRMANCE**

AUSTIN KNUDSEN
  *Attorney General of Montana*

CHRISTIAN B. CORRIGAN
  *Solicitor General*

PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*

MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for Amicus Curiae*
*State of Montana*

TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................ii

INTERESTS OF AMICI CURIAE......................................................1

SUMMARY OF ARGUMENT ...........................................................3

ARGUMENT...................................................................................6

I. The Second Amendment's plain text covers possessing a non-lethal, billy club for self-defense. ...............................................................7

II. California fails to show that its billy-club ban aligns with this Nation's historical tradition of arms regulations..............................13

    A. California's billy-club ban addresses a societal problem that has persisted since the founding, so it must identify close historical analogues. ...................................................................14

        1. California fails to identify any "relevantly similar" billy-club bans between 1791 and 1868. .......................................................16

        2. California's post-1868 laws fail to establish an enduring tradition of similar billy-club bans. .............................................21

CONCLUSION ...............................................................................30

ADDITIONAL COUNSEL ...............................................................34

CERTIFICATE OF COMPLIANCE ....................................................34

## TABLE OF AUTHORITIES

*Atkinson v. Garland,*
70 F.4th 1018 (7th Cir. 2023) ........................................................... 14

*Bevis v. City of Naperville,*
85 F.4th 1175 (7th Cir. 2023) ........................................................... 15

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) ........................................................................... 1

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .................................................................. *passim*

*Drummond v. Robinson Twp.,*
9 F.4th 217 (3d Cir. 2021) ................................................................ 15

*Fouts v. Bonta,*
561 F. Supp. 3d 941 (S.D. Cal. 2021) ................................................ 1

*Gamble v. United States,*
587 U.S. 678 (2019) .................................................................. 22, 30

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011) ........................................................ 22

*Konigsberg v. State Bar of Cal.,*
36 U.S. 36 (1961) ............................................................................... 7

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ...................................................................... *passim*

*United States v. Alaniz,*
69 F.4th 1124 (9th Cir. 2023) ....................................................... 9-10

*United States v. Daniels,*
77 F.4th 337 (5th Cir. 2023) ............................................................ 18

*United States v. Perez-Garcia,*
96 F.4th 1166 (9th Cir. 2024) ............................................................ 8

ii

## Statutes

Md. Code, art. 27, ch. 375, § 30 (1886) ............................... 23

Fla. Rev. Stat. 783, tit. 2, ch. 3, art. 5, § 2425 (1868) ....................... 27

1837 Ga. Acts 90, § 1 ...................................................... 29

1837 Ala. Acts 7, No. 11 § 2 ................................................ 29

1837-1838 Tenn. Pub. Acts 200, ch. 137, § 1 .................................. 29

1839 Ala. Acts 67, § 1 ..................................................... 29

1849 N.Y. Laws 403-04, ch. 278, §§ 1-2 ...................................... 27

1849 Vt. Acts & Resolves 26, N. 36, §§ 1-2 ................................... 27

1850 Mass. Gen. Stat. ch. 194, § 2 .......................................... 27

1855 Ky. Acts 96, ch. 636, § 1 .............................................. 27

1866 N.Y. Rev. Stat. ch. 716, §§ 1-2 ........................................ 17

1868 Fla. Stat. tit. 2, art. 5, ch. 1637, § 2423 ................................. 17

1872 Md. Laws 57, § 246 ................................................... 24

1875 Pa. Laws 33, ch. 38, § 1 ............................................... 23

1877 N.D. Laws 794, § 455 ................................................. 28

1881 Ill. Laws 73, § 1 ...................................................... 28

1882 W. Va. Acts 421-22, ch. 135, § 7 ....................................... 24

1887 Mich. Pub. Acts 144, No. 129, § 1 ...................................... 23

1890 Okla. Laws 495, art. 47, § 2 ........................................... 24

1893 R.I. Pub Laws 231, ch. 1180, § 1 ....................................... 23

1917 Cal. Stat. 221, ch. 145, § 2 ............................................. 4

1923 Cal. Stat. 695, ch. 339, § 1 ............................................. 4

Cal. Penal Code § 22210 .................................................... 4

C.B. Pierce, *Charter and Ordinances of the City of Leavenworth, with an Appendix* (1863), § 23 .................................... 18

Charter of Or. City, Or. 259 (1898), An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2 .................................... 24

Laws, Ordinances and Rules of Nebraska City, Otoe Cnty., Neb., Ordinance No. 7, § 1 .................................... 24

Ordinances of Jersey City, An Ordinance to Prevent the Carrying of Loaded or Concealed Weapons Within the Limits of Jersey City, § 1 .................................... 24

Ordinances of the City of Sioux City, Iowa (1882), Public Safety § 4 .................................... 24

Ordinances of the City of St. Louis, Misdemeanors, § 9 .................................... 24

## Publications

1 Blackstone's Commentaries (1803) .................................... 31

2 Collected Works of James Wilson, (Kermit L. Hall & Mark David Hall, eds., 2007) .................................... 11

Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741 (1993) .................................... 23

Gun Law Scorecard, *California Gun Laws*, GIFFORDS LAW CTR. (2024) .................................... 3

Press Release, *Gun Laws in California*, EVERYTOWN FOR GUN SAFETY (Jan. 4, 2024) .................................... 3

William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1 (2019) .................................... 22

iv

## Other Authorities

Br. Amicus Curiae State of Montana, et al., *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec'y*,
    Nos. 23-1633, 23-1634 & 23-1641 (3d Cir. July 10, 2023) ............... 20

## INTERESTS OF AMICI CURIAE

Americans have a "preexisting right" to keep and bear arms "rooted in 'the natural right of resistance and self-preservation.'" *N.Y. State Rifle & Pistol Ass'n, 59*7 U.S. at 71 (Alito, J., concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 594 (2008)). That right extends to the use of lethal arms carried "for offensive or defensive action in a case of conflict." *Id.* at 582, 584. Yet some individuals prefer non-lethal options for self-defense, like stun guns or so-called "billy clubs." *See Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (per curiam) (stun guns); *Fouts v. Bonta*, 561 F. Supp. 3d 941, 943-44 (S.D. Cal. 2021) (billy clubs). Rather than respect that choice—a choice that furthers California's professed interest in reducing gun violence—California instead makes it a crime to even possess a "billy" club.

Too often, district courts defer to legislative "judgments regarding firearm regulations" despite *Bruen*'s declaration that "judicial deference to legislative interest balancing … is not [the] deference that the [Second Amendment] demands." *See* 597 U.S. at 26. But not here: the district court deferred instead to the balance struck by the American people—"'the right of law-abiding, responsible citizens to use arms' for self-

defense." *Id.* (quoting *Heller*, 554 U.S. at 635). To ensure that courts properly employ *Bruen*'s analytical inquiry, as the district court did here, the States of Montana, Alabama, Alaska, Arkansas, Idaho, Indiana, Iowa, Kansas, Mississippi, Missouri, Nebraska, South Carolina, South Dakota, Texas, Utah, and Virginia ("Amici States") submit this amicus brief in support of Plaintiffs-Appellees. Amici States urge this Court to affirm the decision below.

### SUMMARY OF ARGUMENT

California has adopted some of the most burdensome gun restrictions in the country,[1] which it routinely defends based on its interest in reducing gun violence and preserving public safety.[2]  Fouts,[3] in line with California's professed interest, seeks to exercise his preexisting right to defend himself with a non-lethal weapon: a police officer's baton or "billy club."  But a 107-year-old California law stands in his way.

That century-old law "prohibits any person from manufacturing, importing, *keeping*, selling, transferring, or *possessing* 'any leaded cane, or any instrument or weapon of the kind commonly known as a *billy*, blackjack, sandbag, sandclub, sap, or slungshot.'"  Appellant's Opening

---

[1] Everytown for Gun Safety and the Giffords Law Center both rate California's gun restrictions as the most restrictive in the country.  Press Release, *Gun Laws in California*, EVERYTOWN FOR GUN SAFETY (Jan. 4, 2024), https://perma.cc/DQZ6-UVSN; Gun Law Scorecard, *California Gun Laws*, GIFFORDS LAW CTR. (2024), https://perma.cc/AQ46-NTXB.

[2] *See, e.g.*, Appellants' Opening Br. at 58, *May v. Bonta*, Nos. 23-4354 & 23-4356 (9th Cir. Jan. 19, 2024), Dkt. 17.1 (arguing that California's "sensitive-place" restrictions further its interest in reducing gun violence); Appellant's Opening Br. at 44-45, *Miller v. Bonta*, No. 23-2979 (9th Cir. Dec. 2, 2023), Dkt. 25.1 (arguing that California's so-called "assault weapons ban" was supported by its interest in reducing access to dangerous weapons used by those causing violence).

[3] For ease of reference, this brief refers to Appellees Russell Fouts and Tan Miguel Tolentino as "Fouts" and Appellant as "California."

Br. ("Cal.Br.") at 10-11 (quoting Cal. Penal Code § 22210) (emphases added).[4]

Billy clubs have been around for much longer than a century. *See* 1-ER-14–15 (even before England's invention of modern policing in 1829, billy clubs and batons "were symbols of authority in Europe for centuries prior to the establishment of the United States" (citing 5-ER-817 ¶ 34)). They were instantly associated with law enforcement and quickly became "the signature tool of early police officers." Cal.Br.4-5 (quoting 6-ER-993–994). But by the 1850s, billy clubs also became popular with criminals, so they were linked to both police and criminal activity. Cal.Br.6. Billy clubs can be fashioned from various materials, but they are usually stout wooden sticks or clubs, Cal.Br.5 (citation omitted), and they can also "be improvised from common wood sticks, table legs, broom handles, or dowel rods," 1-ER-23. Today, many police departments use batons made from metal or synthetic materials. Cal.Br.7.

---

[4] California enacted the Dangerous Weapons Control Act in 1917, and it prohibited the manufacture, sale, or possession of "any instrument or weapon of the kind commonly known as a blackjack, slungshot, *billy*, sandclub, sandbag, bludgeon, metal knuckles, a dirk or a dagger." 1917 Cal. Stat. 221, ch. 145, § 2 (emphasis added). California reenacted that ban in 1923, *see* 1923 Cal. Stat. 695, ch. 339, § 1, and ultimately recodified it in its current form in 2010. Cal.Br.10-11.

Fouts seeks to acquire and possess metal or synthetic batons for self-defense. He sued California in 2019, claiming that California's billy-club ban violated the Second Amendment on its face and as-applied to him. 7-ER-1192, -1203–05. The district court granted California's motion for summary judgment in September 2021 based on pre-*Bruen* Ninth Circuit precedent, and Fouts appealed. 1-ER-6. *Bruen* was decided while Fouts' appeal was pending, and California sought (and received) vacatur of the prior judgment and remand to develop a record responsive to *Bruen*'s framework. Cal.Br.15; *see also* 1-ER-6–7.

The district court correctly held that billy clubs are arms covered by the Second Amendment's plain text and rejected California's argument that it only covers arms "in common use for self-defense." 1-ER-7–8. At step two, it rightly found that because California's billy-club ban addressed a longstanding social ill, *Bruen*'s nuanced analogical inquiry was unnecessary—"[o]nly straightforward historical prohibitions on possessing billy clubs are relevant." 1-ER-10–11. And the district court correctly found that California's proffered evidence fell woefully short of establishing a historical tradition of regulations supporting its billy-club ban. 1-ER-10–11.

5

California's arguments are backwards. First, to try to shift its step-two burden to Fouts, California conjures two new threshold inquiries found nowhere in *Bruen*'s text or logic: Billy clubs only receive protection if Fouts shows they are "in common use for self-defense" and are not "dangerous and unusual." Cal.Br.21-31. Second, despite recognizing that the dangers attendant to billy clubs existed before the founding, *see* Cal.Br.32, California claims that it need not identify "a historical *twin*" or "a dead ringer," *see* Cal.Br.31 (quoting *Bruen*, 597 U.S. at 29-30)—even though that's precisely what *Bruen* requires in these "straightforward [cases]," *see* 597 U.S. at 26. And third, California argues that its billy-club ban falls within a historical tradition of banning weapons that pose "a substantial threat to public safety." Cal.Br.32. Relying on this broadly asserted "tradition," it tries to supplement the dearth of relevant historical evidence supporting its ban with analogous regulations of arms with little resemblance to billy clubs—slungshots and Bowie knives. Cal.Br.39-41. This Court should reject California's gambit and affirm.

## ARGUMENT

After *Bruen*, courts must determine whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. If it

6

does, "the Constitution presumptively protects that conduct." *Id.* And here, the Amendment's plain text "protects [Fouts'] proposed course of conduct—[possessing a billy club] for self-defense." *Id.* at 32.

To justify its billy-club ban, California "must demonstrate that [its] regulation is consistent with this Nation's historical tradition of firearm regulation"—only then "may a court conclude that [Fouts'] conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

## I. The Second Amendment's plain text covers possessing a non-lethal, billy club for self-defense.

Without question, billy clubs are "arms" within the Second Amendment's plain text. 1-ER-7; *see also* Cal.Br.21-22 ("The meaning of the term 'Arms' is broad."). Second Amendment coverage "extends, prima facie, to *all instruments* that constitute *bearable arms*," which are weapons possessed or carried for "offensive or defensive action in case of conflict." *Heller*, 554 U.S. at 582, 584 (emphases added). *Heller* didn't exclude any bearable weapons from its definition of "Arms," *see also id.* at 581 (relying on founding era "source stat[ing] that all firearms constituted 'arms'"), and *Bruen* adopted *Heller*'s definition, clarifying that "Arms" broadly "covers modern instruments that facilitate armed self-

7

defense," 597 U.S. at 28. California's ban regulates conduct covered by the Second Amendment's "plain text"—possessing a billy club—and is thus presumptively unconstitutional. *Id.* at 17. So it must show that its billy-club ban satisfies *Bruen*'s history-and-tradition framework. *Id.*

California tries to duck its burden by conjuring two threshold inquiries Fouts must satisfy before a court can conclude that a billy club is covered under the Second Amendment. First, it claims that the only weapons eligible for protection are those "'in common use' today for self-defense." Cal.Br.22 (quoting *Bruen*, 597 U.S. at 32). Second, it claims that "dangerous and unusual weapons" aren't eligible for protection "because the Second Amendment does not guarantee an individual an unlimited right to possess every kind of weapon." Cal.Br.22 (quoting *United States v. Perez-Garcia*, 96 F.4th 1166, 1177 (9th Cir. 2024)). But *Bruen* doesn't require either inquiry at step one. *See* 597 U.S. at 17.

*Bruen*'s analysis on this score confirms that neither of California's purported threshold inquiries are required. To start, *Bruen* "had little difficulty concluding" that the Second Amendment protected the right to carry all types of handguns publicly for self-defense. *Id.* at 32. And it didn't consider whether the arms at issue were "suitable for ordinary self-

8

defense needs," Cal.Br.26, or whether criminals used them. 597 U.S. at 32. It just observed that the "textual elements" of the Second Amendment "guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* Beyond being "bearable," the class, type, or "common use" of a weapon played no part in the step-one analysis.

California ignores this analysis entirely. It instead claims that "[t]he district court's attempt to shoe-horn the common use for self-defense inquiry into the historical stage of the *Bruen* analysis … is inconsistent with" this Court's decision in *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023). *See* Cal.Br.23. But that's wrong several times over.

*Bruen* never held that courts must determine whether an arm is "in common use today for self-defense" as part of the step-one inquiry, it simply observed that petitioners' proposed course of conduct—carrying handguns publicly *for self-defense*—was covered by the Second Amendment's plain text. *See* 597 U.S. at 32.

Nor did *Alaniz* say anything to the contrary—in fact, *Alaniz* merely summarized *Bruen*'s step-one inquiry (quoting this same language), "assume[d] without deciding that step one of the *Bruen* test [wa]s met," and analyzed the challenged sentencing guideline under step two. 69 F.4th

9

at 1129.  So *Alaniz*'s passing reference to "whether the weapon at issue is 'in common use' today for self-defense" was dicta, as it had no bearing on its resolution of Alaniz's Second Amendment defense.  *See id.* at 1128.

California instead distorts and mischaracterizes language from *Bruen* and *Heller* to create its made-up test.  On one hand, *Bruen* simply observed that no party disputed that handguns were "weapons 'in common use' today for self-defense"—likely because petitioners' proposed course of conduct was "carrying handguns publicly for self-defense."  *See* 597 U.S. at 32.  But when evaluating "common use," *Bruen* did so during its step-two analysis.  *See, e.g.*, *id.* at 47 (finding that colonial laws restricting handguns in the 1690s because they were "dangerous and unusual weapons" provided "no justification for laws restricting the public carry of weapons that are unquestionably in common use today").

On the other hand, *Heller* just said that the handgun is "the quintessential self-defense weapon."  554 U.S. at 629 (explaining that many citizens prefer handguns for self-defense because they are easier to store and access, require less strength to use, and are easier to aim).  But *Heller*'s description of the reasons "handguns are the most popular weapon chosen by Americans for self-defense," *see id.*, was not a holding, as

10

California claims, that only arms suitable for self-defense are presumptively covered at step one. *See* Cal.Br.23-25.

Neither of these statements supports California's necessary-condition test that "arms" must be "'in common use' today for self-defense"—particularly at *Bruen*'s first step. *See* Cal.Br.22-25. At most, the "common use" language supports a sufficient condition for finding "arms" protected at step two.

There is no threshold requirement that an arm achieve "common use" status before it merits Second Amendment protection—arms need only be "bearable" to fall within the Amendment's scope. *Heller*, 554 U.S. at 582; *Bruen*, 597 U.S. at 28. Under California's view, a government could ban any firearm if it acts quickly enough. But that, of course, renders the arms-bearing right contingent on the State, rather than a natural and preexisting right serving as a moral check on the State. *See Heller*, 554 U.S. at 585; 2 Collected Works of James Wilson 1142 (Kermit L. Hall & Mark David Hall, eds., 2007) (right to bear arms "cannot be repealed, or superseded, or suspended by any human institution").

California's test is a poorly disguised attempt to transfer its step-two burden to Fouts. A plaintiff challenging an arms regulation need

11

only show that "the Second Amendment's plain text covers [his] conduct." *Bruen*, 597 U.S. at 17. That's all. The burden then shifts to the government at step two to justify its regulation, which it may do by showing that the regulated firearms are "dangerous and unusual." *See id.* at 47 ("At most, [California] can show that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons.'"). In other words, whether a firearm is "in 'common use' for self-defense" or "dangerous and unusual" is a step-two consideration. *See id.*

California is no doubt correct that *Heller* and *Bruen* recognized that "dangerous and unusual weapons" fall outside the scope of the Second Amendment's protection. *See* Cal.Br.27-28 (quoting *Heller*, 554 U.S. at 627, and citing *Bruen*, 597 U.S. at 21). But it veers off course when it claims that Fouts bears the burden at step one to show that a billy club is not a dangerous and unusual weapon. *See* Cal.Br.28. Indeed, *Bruen* considered whether the colonial legislatures' historical prohibitions on "dangerous and unusual weapons" supported modern public-carry restrictions *in its step two inquiry*. *See* 597 U.S. at 47 ("[E]ven if these colonial laws prohibit the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no

12

justification for laws restricting the public carry of weapons that are unquestionably in common use today."). California, not Fouts, bears the burden to show that billy clubs are "dangerous and unusual," and this Court should ensure it stays there.

All that matters at *Bruen*'s first step is that California bans possession of "bearable arms," which makes its billy-club ban presumptively unconstitutional.

## II. California fails to show that its billy-club ban aligns with this Nation's historical tradition of arms regulations.

Because the billy club is an "arm" presumptively protected by the Second Amendment, the burden shifts to California to "affirmatively prove" that its ban satisfies *Bruen*'s history-and-tradition framework. 597 U.S. at 19. And *Heller* and *Bruen* chart the course for determining whether a modern restriction aligns with our Nation's tradition of weapons regulations. That course requires courts to compare California's historical evidence with the "'historical precedent' from before, during, and even after the founding" to see if those historical materials show "a comparable tradition of regulation." *Id.* at 27.

California must show that its billy-club ban is "relevantly similar" to representative historical analogues—that is, the "[billy-club ban] and

13

historical regulations impose a comparable burden on the right of armed self-defense and … [are] comparably justified." *Id.* at 29. And the guiding light of *Bruen*'s inquiry is to discern "the *original meaning* of the Constitution." *Id.* at 81 (Barrett, J., concurring); *see also Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) ("[T]he pertinent question … is what the Founders understood the Second Amendment to mean.").

### A. California's billy-club ban addresses a societal problem that has persisted since the founding, so it must identify close historical analogues.

When a modern regulation addresses an issue that has persisted since the founding era, *Bruen* requires a close fit between the modern and historical regulations. 597 U.S. at 26-27 (in "straightforward" cases, the "lack of … distinctly similar historical regulation[s]," or regulations addressing it "through materially different means," strongly suggests the modern regulation is unconstitutional). But if a modern regulation addresses "unprecedented societal concerns or dramatic technological changes" "that were unimaginable at the founding," courts employ "a more nuanced approach." *See id.* at 27. In these cases, the fit need not be so close: the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30.

14

California argues that its billy-club ban falls in a long line of regulations banning weapons that are "particularly dangerous or susceptible to criminal misuse" and thus pose "a substantial threat to public safety."[5] Cal.Br.32. But it also observed that "[d]uring the colonial and founding era, most violent crimes were committed with weapons such as clubs, dirks, and daggers." Cal.Br.34 (citing 2-ER-41–52). Even if "billy clubs" weren't used as a reference to weapons until the 1840s, *see* Cal.Br.4 (citing 5-ER-767), the societal concerns related to the violent use of clubs date back at least as far as the founding era. *See* 1-ER-14–15 (One of California's experts argued that by the 1840s "the general public was already familiar with the term [billy club]" and that it existed "in Europe [from] centuries prior to the establishment of the United States."). So

---

[5] At this level of generality, it's hard to imagine what historical regulations wouldn't be a historical analogue, as nearly any weapon—including those unquestionably possessed by law-abiding citizens for lawful purposes—can be "susceptible to criminal misuse" and pose "a substantial threat to public safety." That's why it's vital that courts "fly at the right level of generality" when conducting *Bruen*'s analogical inquiry. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1210 (7th Cir. 2023) (Brennan, J., dissenting) (citing *Bruen*, 597 U.S. at 30), *cert. docketed*, *Nat'l Ass'n for Gun Rts. v. City of Naperville*, No. 23-880 (U.S. Feb. 15, 2024). Otherwise, courts "risk[] endorsing outliers that our ancestors would never have accepted." *Bruen*, 597 U.S. at 30 (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)).

instead of "well-established and representative historical *analogue[s]*," California must come forward with analogues closer to "historical *twin[s]*." *See Bruen*, 597 U.S. at 30.

### 1. California fails to identify any "relevantly similar" billy-club bans between 1791 and 1868.

Even though California's obligation to respect Fouts' right to keep and bear arms flows from the Fourteenth Amendment, not the Second, the rights enumerated in the Bill of Rights and incorporated against the states after the Fourteenth Amendment's adoption "have the same scope as against the Federal Government." *Id.* at 37. The scope of that right is "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*; *see also id.* at 34 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." (internal quotations omitted) (emphasis in original)).

*Billy-Club Regulations.* Before the district court, California offered 71 state laws from this period (1791-1868),[6] but only two of them specifically restricted billy clubs and both were enacted after the Civil War. 1-ER-13, -15–16. New York enacted the first restriction in 1866, criminalizing concealed or furtive carry of several weapons, including a billy club, when done so with the intent to use the weapon against a person. *See* A-60 (1866 N.Y. Rev. Stat. ch. 716, §§ 1-2). But the New York law didn't ban open carry of a billy club. Two years later, in 1868, Florida enacted a sentencing enhancement for possessing a billy club while committing a criminal offense, but it imposed no other restrictions on billy club possession. A-63–64 (1868 Fla. Stat. tit. 2, art. 5, ch. 1637, § 2423). Not only are these two statutes—passed at the end of this important historical period—less restrictive than California's ban, but they fail to show the existence of a national tradition of comparable billy-club regulations.

---

[6] California also points to evidence of historical British regulations that pre-date the founding, including regulations banning the possession of "launcegays, pocket pistols, and crossbows." *See* Cal.Br.33-34 (citing *Bruen*, 597 U.S. at 41-42). But the district court rightly gave this evidence little weight because "British sources pre-dating the Constitution are not particularly instructive because the American Revolution was a rejection of British rule." 1-ER-12. This Court should do the same.

California seeks to bolster its sparse historical record with a local restriction passed in Leavenworth, Kansas in 1862. *See* Cal.Br.37 (citing C.B. Pierce, *Charter and Ordinances of the City of Leavenworth, with an Appendix* 45 (1863), § 23). But again, the restriction only prohibited the *concealed* carry of a billy club. *See id.* Even if this bolsters California's historical record, it's little more than a drop in an empty bucket—far from the evidence necessary to satisfy *Bruen*'s history-and-tradition standard. *See Bruen*, 597 U.S. at 19; *see also United States v. Daniels*, 77 F.4th 337, 344 (5th Cir. 2023) (*Bruen* requires courts to construe "silence" in the historical record "as evidence that the public did not approve of such a regulation" so long as "the public experienced the harm the modern-day regulation attempts to address").

**Melee Weapons Regulations.** Rather than pointing to close analogues, as *Bruen* requires, California relies on the regulation of other so-called "melee weapons" during this period to fill in the gaps. *See* Cal.Br.39-41 (collecting historical regulations of slungshots and Bowie knives). California argues that these loosely similar regulations satisfy *Bruen*'s "analogical inquiry" because it doesn't have to "identify 'a historical *twin*' or 'a dead ringer,'" it only has to identify "relevantly similar"

analogues. Cal.Br.31-32 (quoting *Bruen*, 597 U.S. at 29-30). But as the district court rightly found, "[t]his case concerns a technologically-simple weapon—in essence a wooden stick—and an age old social ill: criminally assaulting another with a stick." *See* 1-ER-10. So *Bruen*'s "nuanced approach" isn't appropriate here, *see* 597 U.S. at 27, and despite California's claim to contrary, it must point to something like 'a historical *twin*' or 'a dead ringer.'" Cal.Br.31-32 (quoting *Bruen*, 597 U.S. at 29-30).

Even if the historical regulations of "melee weapons" could be appropriate analogues, the weapons California identifies—the slungshot and the Bowie knife—are not. Cal.Br.39-41. Both the slungshot and the Bowie knife have features, missing from the billy club, that made them particularly dangerous and susceptible to criminal misuse.

Start with the slungshot. It's "a hand-held impact weapon with a weighted object at the end of a flexible strap," and soon after its emergence in the 1840s, it was "widely used by criminals and street gang members." Cal.Br.39 (citing 3-ER-287 and quoting 6-ER-826). Slungshots "were widely used by criminals and street gang members in the

19

19th Century" because they "were easy to make, silent, and very effective, particularly against an unsuspecting opponent."[7]

And consider the "Bowie knife"—so named because it was famously used by Jim Bowie in an 1827 duel. Cal.Br.40. The Bowie knife was "designed expressly for fighting," had "longer blades than ordinary knives," "crossguards to protect the combatants' hands," and "clip points to make it easier to cut or stab opponents," *see* 2-ER-50–51—naturally, it "gained notoriety as a fighting knife," *see* Cal.Br.40 (citation omitted).

Neither the slungshot nor the Bowie knife are similar enough to the billy club to serve as analogues. Unlike the billy club, both the slungshot and the Bowie knife were always closely associated with criminal activity. Mont.Br.11-14. Even though the billy club was eventually linked with criminal activity, it started off as the "signature tool of early police officers" and "a symbol of the peace officer's government authority." *See* Cal.Br.5-6. And today, police departments still use what are effectively modern billy clubs—metal and synthetic batons.

---

[7] Br. Amicus Curiae State of Montana, et al. ("Mont.Br."), at 13, *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec'y*, Nos. 23-1633, 23-1634 & 23-1641 (3d Cir. July 10, 2023), Dkt. 46.

But their association with criminal activity isn't the only difference. Both the slungshot and the Bowie knife had features or enhancements that made them more dangerous and likely to inflict substantial harm than the billy club, so the need to regulate those weapons was more urgent (and the historical record bears that out). *See* Cal.Br.36-37, 39-41 (more than 20-year delay in regulating billy clubs, while slungshots and Bowie knives regulated almost immediately). To say that these weapons are analogous because they're all "handheld melee weapons," adjusts the level of generality too high.

### 2. California's post-1868 laws fail to establish an enduring tradition of similar billy-club bans.

*Bruen* cautioned courts "against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35. Indeed, "post-Civil war discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment," so they provide less "insight into its original meaning [than] other sources." *Id.* at 36 (quoting *Heller*, 554 U.S. at 614). Even though a regular course of conduct *can* sometimes "liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution," *id.* at 35-36 (cleaned up), "postratification adoption or acceptance of laws that are *inconsistent* with the original

21

meaning of the constitutional text obviously cannot overcome or alter that text," *id.* at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)); *see also* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13-14 (2019) ("If first-order interpretive principles make the meaning clear in a given context, there is no need to resort to liquidation.").

Beyond the trio of pre-1868 billy-club regulations it identified, *see supra* Sect.II.A.1, California points to a handful of post-1868 restrictions to bolster its historical record. Cal.Br.37-39 (five state regulations, one territorial regulation, and six municipal regulations). These post-1868 regulations are relevant only if they confirm what the historical record "already … established." *Bruen*, 597 U.S. at 37 (quoting *Gamble v. United States*, 587 U.S. 678, 702 (2019)). But California's historical evidence falls short.

Even if the historical billy-club regulations California identifies—regulations that post-date ratification of the Constitution by 71 years or more and Reconstruction by up to 30 years—*could* settle the original meaning of the Second Amendment, *see* Baude, *supra*, at 50–51, those regulations are not "relevantly similar" to California's billy-club ban. *See*

22

*Bruen*, 597 U.S. at 29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). *Bruen* explains that *Heller* and *McDonald* point "toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* At a minimum, *Bruen* requires courts to consider "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is *comparably justified*." *Id.* (emphases added). But the burden § 22210 imposes on Fouts' self-defense right is neither comparable nor comparably justified.

**Billy-Club Regulations.** California identified five statewide billy-club regulations, enacted between 1875 and 1893, in Pennsylvania, Maryland, Michigan, West Virginia, and Rhode Island. Cal.Br.37-38 & nn.19-20. It also identified a territorial restriction from Oklahoma. Cal.Br.38 & n.20. Of these, the Pennsylvania, Maryland, Michigan, and Rhode Island statutes prohibited only the concealed carry of a billy club,[8] while the West Virginia and Oklahoma statutes banned concealed and

---

[8] *See* A-75 (1875 Pa. Laws 33, ch. 38, § 1) (banning concealed carry with intent to injure); A-94–95 (Md. Code, art. 27, ch. 375, § 30 (1886)) (banning concealed carry and open carry with intent to injure another); A-91 (1887 Mich. Pub. Acts 144, No. 129, § 1 (banning concealed carry); A-102–03 (1893 R.I. Pub Laws 231, ch. 1180, § 1) (same).

open carry.[9]  Finally, it pointed to five municipal billy-club regulations, enacted between 1871 and 1898, that prohibited the concealed carry of a billy club,[10] and one municipal regulation that banned concealed and open carry.[11]  Cal.Br.38-39 & nn.21-22.  All told, California identified four statewide concealed-carry regulations, a statewide ban, a territorial ban, five municipal concealed-carry regulations, and a municipal ban. Cal.Br.37-42 & nn.19-22.

California's historical evidence fails to meet its burden for at least three reasons.  First, three billy-club bans passed between 1872 and 1890—including a territorial and a municipal ban—shed little light on whether California's billy-club ban aligns with the Second Amendment's

---

[9] *See* A-86–87 (1882 W. Va. Acts 421-22, ch. 135, § 7) (banning all carry but providing affirmative defense for carrying for self-defense); A-98 (1890 Okla. Laws 495, art. 47, § 2)) (banning all carry).

[10] *See* A-67 (Ordinances of Jersey City, An Ordinance to Prevent the Carrying of Loaded or Concealed Weapons Within the Limits of Jersey City, § 1) (banning concealed carry); A-65 (Ordinances of the City of St. Louis, Misdemeanors, § 9) (same); A-71 (1872 Md. Laws 57, § 246) (banning concealed carry in Annapolis); A-82 (Ordinances of the City of Sioux City, Iowa 62 (1882), Public Safety § 4) (banning concealed carry); A-104 (Charter of Or. City, Or. 259 (1898), An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2) (same).

[11] *See* A-72 (Laws, Ordinances and Rules of Nebraska City, Otoe Cnty., Neb., Ordinance No. 7, § 1) (banning all carry).

original meaning.[12] *Bruen*, 597 U.S. at 35 (cautioning courts "against giving postenactment history more weight than it can rightly bear"). Second Amendment protection presumptively extends to all "bearable arms" carried for self-defense, *see Heller*, 554 U.S. at 582, so "the bare existence of [some] localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting" the possession of bearable arms for self-defense, *see Bruen*, 597 U.S. at 67.

Second, Oklahoma's ban lends even less support because it was a territorial law. *Bruen* found territorial laws to be of little instructive value because they "were rarely subject to judicial scrutiny" and they were often short-lived and thus not "part of an enduring American tradition of state regulation." *Id.* at 68-69.

Third, California's remaining regulations—four statewide and five municipal regulations passed between 1871 and 1898—only prohibited concealed carry of billy clubs and thus imposed less of a burden on the

---

[12] The West Virginia statute, the Oklahoma territorial law, and the Nebraska City municipal ordinance each banned open and concealed carry of billy clubs. *See supra* notes 9, 11.

25

self-defense right than § 22210's outright ban.[13]  *See id.* at 29 (analogues must impose "comparable burden on the right of armed self-defense").  So most of the regulations California identifies didn't impose a comparable burden, *id.* at 29, and those that did—one statewide, one territorial, and one municipal ban—represented a small portion of the country and thus cannot establish a national tradition of similar regulations.  *See id.* at 67-68.

*Melee Weapons Regulations.*  Given the dearth of relevantly similar billy-club regulations, it's understandable that California tries to use slungshots and Bowie knives as analogues.  Even if they were appropriate analogues (they aren't), California fails to point to a tradition of relevantly similar slungshot or Bowie knife regulations that support its billy-club ban.

Start with the slungshot.  California identifies five statewide slungshot regulations, enacted between 1849 and 1868, in New York, Vermont, Massachusetts, Kentucky, and Florida.  Cal.Br.39-40.  New York and

---

[13] The Pennsylvania, Maryland, Michigan, and Rhode Island statutes, as well as the New Jersey City, St. Louis, Annapolis, Sioux City, and Oregon City municipal regulations, all banned only concealed carry.  *See supra* notes 8, 10.

26

Vermont prohibited the manufacture, sale, and possession of slung-shots,[14] while Massachusetts, Kentucky, and Florida prohibited only the manufacture and sale of slungshots (leaving possession unregulated).[15]

Even though the New York and Vermont laws lend some historical support to a ban on possession, the remaining laws only prohibit the manufacture and sale of slungshots (*i.e.*, dealing in slungshots) and not mere possession. But the "bare existence of" two similar historical regulations between 1791 and 1868 "cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting" the possession of bearable arms for self-defense. *See Bruen*, 597 U.S. at 67. The three remaining laws banning the manufacture and sale of slungshots—in Massachusetts, Kentucky, and Florida—weren't designed to address the same issue that § 22210's ban targets, which diminishes the weight of this evidence. *See id*. at 29 (burden must be "comparably justified").

---

[14] *See* A-51–52 (1849 N.Y. Laws 403-04, ch. 278, §§ 1-2) (banning manufacture, sale, and possession of slungshots); A-53 (1849 Vt. Acts & Resolves 26, N. 36, §§ 1-2) (same).

[15] *See* A-54 (1850 Mass. Gen. Stat. ch. 194, § 2) (banning manufacture and sale of slungshots); A-55 (1855 Ky. Acts 96, ch. 636, § 1) (same); A-64 (Fla. Rev. Stat. 783, tit. 2, ch. 3, art. 5, § 2425 (1868)) (same).

California also identifies a statewide and territorial law, enacted between 1877 and 1881, in Illinois and the Dakota territory. Cal.Br.40. Illinois, like New York and Vermont laws, prohibited the sale and possession of slungshots,[16] and the Dakota territory banned the open and concealed carry of slungshots.[17] Even if these regulations reinforce California's billy-club ban—despite post-dating ratification of the Constitution by 86 years or more and Reconstruction by up to 13 years—they still fail to establish a national tradition of similar regulations. *See Bruen*, 597 U.S. at 67-68.

In sum, California points to three relevantly similar statewide bans, enacted between 1849 and 1881, in New York, Vermont, and Illinois. *See supra* notes 14, 16. It also points to a similar ban in the Dakota territory, *see supra* note 17, which provides less support in *Bruen*'s inquiry. *See* 597 U.S. 68-69. And it points to three bans on the manufacture and sale of slungshots, which left possession of slungshots unregulated. *See supra* note 15. Even though California's slungshot evidence is

---

[16] *See* A-80 (1881 Ill. Laws 73, § 1) (banning manufacture, sale, and possession of slungshots).

[17] *See* A-78 (1877 N.D. Laws 794, § 455) (banning manufacture and sale of slungshots).

28

closer to the mark than its billy-cub evidence, three similar statewide bans and one similar territorial ban fail to establish a historical tradition of similar regulations. *See Bruen*, 597 U.S. at 68-69.

Turn to the Bowie knife. California identifies four Bowie knife regulations, enacted between 1837 and 1839, in Alabama, Georgia, and Tennessee. Cal.Br.40-41. But only one of these regulations, in Georgia, banned the simple possession of a Bowie knife.[18] One Alabama statute prohibitively taxed the sale or disposition of Bowie knives and another banned their concealed carry.[19] And finally, Tennessee banned the sale of Bowie knives.[20]

Simply put, a single similar restriction, even when combined with the few similar slungshot restrictions, *see supra* notes 14, 16, is not enough to establish a national tradition of regulation. *See Bruen*, 597 U.S. at 68-69. That's especially so because the three remaining laws California identified—the Alabama laws taxing the sale of Bowie knives

---

[18] *See* A-47 (1837 Ga. Acts 90, § 1) (banning possession of Bowie knives).

[19] *See* 6-ER-887 (1839 Ala. Acts 67, § 1) (banning concealed carry of Bowie knives); A-45 (1837 Ala. Acts 7, No. 11 § 2) (imposing "one hundred dollar" tax for selling Bowie knives).

[20] *See* A-49 (1837-1838 Tenn. Pub. Acts 200, ch. 137, § 1) (banning sale of Bowie knives).

29

and banning their concealed carry and the Georgia law banning their sale—targeted different issues than § 22210's ban.

From top to bottom, California fails to show that its billy-club ban aligns with this Nation's history of arms regulations, so this Court should affirm the district court.

## CONCLUSION

*Bruen* explained that "when it comes to interpreting the Constitution, not all history is created equal." 597 U.S. at 34. Rather, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (quoting *Heller*, 554 U.S. at 634–35 (emphasis in original)). So historical evidence closer in time to the Second Amendment's adoption is most relevant for understanding the Amendment's scope, but nineteenth century historical regulations *could* be relevant if they confirm what prior evidence "already … established." *Id.* at 37 (quoting *Gamble*, 597 U. S. at 702). Even though California put forward an impressive array of potential historical analogues before the district court—some 250 historical laws, *see* 1-ER-13—its evidence falters on closer examination. Sweeping aside California's irrelevant evidence—either because it's too late, involves different weapons, imposes different

30

burdens, or relies on distinct justifications—yields only a handful of arguably relevant evidence supporting California's billy-club ban. That's "surely too slender a reed on which to hang a historical tradition of restricting [Fouts'] right" to possess a billy club for self-defense. *See Bruen*, 597 U.S. at 58.

Among other things, the Second Amendment safeguards citizens' self-preservation right to "'repel force by force' when 'the intervention of society in his behalf may be too late to prevent an injury.'" *Heller*, 554 U.S. at 595 (cleaned up) (quoting 1 Blackstone's Commentaries 145-46 n.42 (1803)). While that right includes the right to use lethal force when necessary, *see id.* at 584 (extends to "offensive … action in a case of conflict"), some prefer to carry or use less lethal weapons. But California's billy-club ban prevents citizens, like Fouts here, from making that life-preserving decision, even though it furthers California's professed interest in reducing gun violence. If California won't respect that choice, this Court should. The district court's decision should be affirmed.

31

DATED this 10th day of June, 2024.

AUSTIN KNUDSEN
  *Montana Attorney General*
CHRISTIAN B. CORRIGAN
  *Solicitor General*

*/s/Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444.2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for Amicus Curiae*
*State of Montana*

## ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of
Alabama*

TREG TAYLOR
*Attorney General of
Alaska*

TIM GRIFFIN
*Attorney General of
Arkansas*

RAÚL R. LABRADOR
*Attorney General of
Idaho*

THEODORE E. ROKITA
*Attorney General of
Indiana*

BRENNA BIRD
*Attorney General of
Iowa*

KRIS KOBACH
*Attorney General of
Kansas*

LYNN FITCH
*Attorney General of
Mississippi*

ANDREW BAILEY
*Attorney General of
Missouri*

MICHAEL T. HILGERS
*Attorney General of
Nebraska*

ALAN WILSON
*Attorney General of
South Carolina*

MARTY J. JACKLEY
*Attorney General of
South Dakota*

KEN PAXTON
*Attorney General of
Texas*

SEAN D. REYES
*Attorney General of
Utah*

JASON MIYARES
*Attorney General of
Virginia*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Peter M. Torstensen, Jr., an employee in the Office of the Attorney General of the Montana, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,210 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)–(7), and Circuit Rule 29-2(c)(3).

/s/ *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.