**No. 24-1039**

## In the United States Court of Appeals
## for the Ninth Circuit

◆

RUSSELL FOUTS, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant-Appellant.*

◆

Appeal from the United States District Court
for the Southern District of California
No. 19-cv-1662-BEN-JLB
(Hon. Roger T. Benitez)

◆

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION
OF AMERICA AS *AMICUS CURIAE* IN SUPPORT
OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

◆

ERIN M. ERHARDT
  *Counsel of Record*
JOSEPH G.S. GREENLEE
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The National Rifle Association of America has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF *AMICUS CURIAE* ....................................................... 1

CONSENT TO FILE ............................................................................... 1

SUMMARY OF ARGUMENT .................................................................. 2

ARGUMENT ........................................................................................ 4

    I.   *Heller* held that the Second Amendment extends, prima facie, to all bearable arms—including billy clubs. ................................... 4

    II.  California failed to prove that billy clubs are either dangerous or unusual, and it must prove both to justify its ban. ................... 6

        A.   Whether a weapon is "in common use" is a historical question on which the state bears the burden. ........................... 6

        B.   Billy clubs are not "dangerous and unusual." ........................... 9

    III. There is no historical tradition of banning mere possession of billy clubs. ................................................................................. 12

        A.   No state regulated billy clubs before the Civil War. ................ 14

        B.   Most regulations on billy clubs during the mid-to-late 19th century prohibited only concealed carry. .......................... 16

        C.   By the end of the nineteenth century, only three jurisdictions banned the carriage of billy clubs outright. ......... 19

CONCLUSION .................................................................................... 22

CERTIFICATE OF COMPLIANCE ....................................................... 23

CERTIFICATE OF SERVICE .............................................................. 24

# TABLE OF AUTHORITIES

## Cases

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ....................................................................... 9, 11

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................................. *passim*

*Fouts v. Bonta,*
  No. 19-cv-1662-BEN-JLB, 2024 WL 751001
  (S.D. Cal. Feb. 23, 2024) ........................................................ 10, 14

*Fyock v. Sunnyvale,*
  779 F.3d 991 (9th Cir. 2015) ............................................................ 11

*Gamble v. United States,*
  587 U.S. 678 (2019) ......................................................................... 16

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) ..................................................................... *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
  804 F.3d 242 (2d Cir. 2015) ............................................................... 5

*State v. Workman,*
  35 W. Va. 367, 14 S.E. 9 (W. Va. 1891) ......................................... 20

*Teter v. Lopez,*
  76 F.4th 938 (9th Cir. 2023) .............................................................. 8

*United States v. Alaniz,*
  69 F.4th 1124 (9th Cir. 2023) ........................................................ 7, 8

*United States v. Henry,*
  688 F.3d 637 (9th Cir. 2012) ........................................................... 10

*United States v. Miller,*
  307 U.S. 174 (1939) ........................................................................... 6

*United States v. Perez-Garcia,*
  96 F.4th 1166 (9th Cir. 2024) ................................................................8

*Virginia v. Black,*
  538 U.S. 343 (2003) ..................................................................................5

## Constitutional Provisions

U.S. CONST. amend. II..............................................................*passim*

U.S. CONST. amend. XIV ......................................................................15

## Statutes

1797 Del. Laws 104 ................................................................................13

1799 Miss. Laws 113 ..............................................................................14

1866 N.Y. Laws 1523..............................................................................15

1868 Fla. Laws 2538...............................................................................18

1872 Md. Laws 56–57.............................................................................17

1874 Md. Laws 366–67...........................................................................18

1881 N.Y. Laws 102................................................................................19

1882 W. Va. Acts 421–22..................................................................19, 20

1884 Md. Laws 249–50...........................................................................18

1884 N.Y. Laws 3330........................................................................18, 19

1886 Md. Laws 315.................................................................................18

1886 Md. Laws 602..........................................................................17, 18

1887 Mich. Pub. Acts 144......................................................................17

1888 Fla. Rev. Stat. 2423.......................................................................18

iv

1889 N.Y. Laws 167.................................................................19

1890 Md. Laws 606–07............................................................18

1890 Okla. Laws 495 .........................................................19, 20

1891 Mich. Pub. Acts 409 .......................................................17

1891 W. Va. Code 915 .............................................................19

1893 Okla. Laws 503–04 ....................................................19, 20

1893 R.I. Pub. Laws 231–32...................................................17

1894 Md. Laws 834...........................................................17, 18

1895 Neb. Laws 209–10 .........................................................17

1897 Mich. Pub. Acts 1030 ....................................................17

1899 N.Y. Laws 1341........................................................17, 19

California Penal Code § 22210 ...............................................12

## Other Authorities

Adams, John, LEGAL PAPERS OF JOHN ADAMS, vol. 3
   (L. Kinvin Wroth & Hiller B. Zobel eds., 1965)..................13

Amick, William K., THE GENERAL ORDINANCES OF
   THE CITY OF SAINT JOSEPH (1897) .......................................17

BLACK'S LAW DICTIONARY (6th ed. 1990) ...................................5

CHARTER AND ORDINANCES OF THE CITY OF SYRACUSE (1885) ................18

Colfield, Gilbert B., LAWS, ORDINANCES AND RULES OF
   NEBRASKA CITY, OTOE COUNTY, NEBRASKA (1872).............................19

COMPILED ORDINANCES OF THE CITY OF FAIRFIELD,
   CLAY COUNTY, NEBRASKA (1899) ..........................................17

Connell, W.J., THE REVISED ORDINANCE OF THE CITY OF
OMAHA, NEBRASKA (1890) .................................................................... 17

Ergenbright, O.P. et al., REVISED ORDINANCES OF THE CITY OF
INDEPENDENCE, KANSAS (1887) ........................................................ 17

GENERAL LAWS OF THE STATE OF RHODE ISLAND AND
PROVIDENCE PLANTATIONS (1896) .............................................. 17, 18

LAWS OF THE CITY OF JOHNSTOWN, PA. (1897) ........................................ 17

MacKenzie, Frederick, A BRITISH FUSILIER IN REVOLUTIONARY
BOSTON (Allen French ed., 1926) ........................................................ 13

ORDINANCES OF JERSEY CITY, PASSED BY THE BOARD OF
ALDERMEN SINCE MAY 1, 1871 (1874) ............................................ 17

Pierce, C.B., CHARTER AND ORDINANCES OF THE CITY OF
LEAVENWORTH, WITH AN APPENDIX (1863) .......................................... 15

Randall, Willard Sterne, ETHAN ALLEN: HIS LIFE AND
TIMES (2011) ...................................................................................... 13

REVISED GENERAL ORDINANCES OF THE CITY OF
SIOUX CITY (1889) .............................................................................. 17

THE CHARTER OF OREGON CITY, OREGON, TOGETHER WITH THE
ORDINANCES AND RULES OF ORDER (1898) .......................................... 18

THE REVISED ORDINANCE OF THE CITY OF ST. LOUIS
(E. W. Pattison ed., 1871) ................................................................ 17

THE STATUTE LAW OF THE STATE OF NEW YORK, vol. 1
(George S. Diossy ed., 1881) ............................................................ 17

## STATEMENT OF *AMICUS CURIAE*[1]

The National Rifle Association of America (NRA) is America's oldest civil rights organization and America's foremost defender of Second Amendment rights. It was founded in 1871 by Union generals who, based on their Civil War experiences, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has approximately 4.2 million members, and its programs reach millions more.

The NRA has an interest in this case because the right to possess one's preferred arms for self-defense—including billy clubs—is essential to the right to keep and bear arms.

## CONSENT TO FILE

All parties consent to the filing of this brief.

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *Amicus* and its members contributed money intended to fund its preparation or submission.

## SUMMARY OF ARGUMENT

The Second Amendment's plain text covers all instruments that constitute bearable arms. Because billy clubs are bearable arms, California can justify its prohibition on the possession of billy clubs only by demonstrating that the prohibition is consistent with our nation's historical tradition of regulation.

Under our nation's historical tradition, a weapon may not be banned unless it is both "dangerous and unusual." There are two important considerations in determining whether a weapon is "dangerous and unusual." First, the determination must occur in a court's historical analysis, not in the plain text analysis. Second, the government shoulders the burden of proving that a banned weapon is *both* dangerous *and* unusual. In other words, it is not enough for the State to claim that a weapon is not "in common use" (*i.e.* "unusual"); the State must also demonstrate that the weapon has uniquely dangerous characteristics.

California has not demonstrated that billy clubs have uniquely dangerous characteristics, nor has it provided any information regarding their possession or use by law-abiding citizens. Thus,

California has failed to prove that billy clubs are either exceptionally dangerous or unusual, let alone both.

The unconstitutionality of California's ban is further supported by the absence of billy club regulations throughout American history. The Founders were very familiar with clubs, but restricted their use only by slaves and freedmen. Billy clubs in particular have existed for centuries and have been in the American zeitgeist since at least the 1840s. Yet no jurisdiction enacted any regulation on billy clubs until 1862—and that was a municipal ordinance which prohibited only concealed carry, not mere possession. By the end of the nineteenth century, only three jurisdictions outlawed all carriage—but not possession—of billy clubs: one state, one territory, and one city. The Supreme Court has made clear that these three regulations cannot establish a tradition. Therefore, California's ban on billy clubs contradicts our nation's tradition of regulation and violates the Second Amendment.

## ARGUMENT

### I. *Heller* held that the Second Amendment extends, prima facie, to all bearable arms—including billy clubs.

The Supreme Court set forth "the standard for applying the Second Amendment" in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. 1, 24 (2022).

The initial inquiry under *Bruen*, therefore, is a plain text analysis. The Court conducted the plain text analysis in *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008).

As for "Arms" in the Second Amendment's text, the *Heller* Court concluded that "the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*, even those that were not in existence at the time of the founding." *Id.* at 582 (emphasis added).

Thus, "[*Heller*] identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d

4

242, 257 n.73 (2d Cir. 2015); *see also Virginia v. Black*, 538 U.S. 343, 369 (2003) (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part) (defining "prima facie evidence" as "sufficient to establish a given fact" and "if unexplained or uncontradicted . . . sufficient to sustain a judgment in favor of the issue which it supports") (quoting BLACK'S LAW DICTIONARY 1190 (6th ed. 1990)).[2] California has not rebutted the fact that billy clubs are bearable arms.

Because billy clubs are bearable arms, they are protected by the Second Amendment, and California can justify its ban only "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

---

[2] In *Cuomo*, the Second Circuit held unconstitutional a ban on a pump-action rifle because the state focused exclusively on semiautomatic weapons and "the presumption that the Amendment applies remain[ed] unrebutted." 804 F.3d at 257 n.73.

**II.   California failed to prove that billy clubs are either dangerous or unusual, and it must prove both to justify its ban.**

    **A.   Whether a weapon is "in common use" is a historical question on which the state bears the burden.**

The State disputes that billy clubs are presumptively protected arms because "there is no evidence that they are in common use for self-defense." Opening Br. at 35 n.8. The State attempts to place the burden on Plaintiffs under *Bruen*'s plain text inquiry to demonstrate that billy clubs are "in common use" before allowing them presumptive Second Amendment protection. But the common use analysis—as a corollary to the historical prohibition on "dangerous and unusual" weapons—properly belongs under the historical prong, where the government bears the burden.

The "common use" standard first appeared in *United States v. Miller*: "ordinarily when called for service [militiamen] were expected to appear bearing arms supplied by themselves and of the kind *in common use* at the time." 307 U.S. 174, 179 (1939) (emphasis added). *Heller* expounded on that standard, clarifying that it is historically—not textually—grounded: "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically

6

possessed by law-abiding citizens for lawful purposes. . . . That accords with the *historical understanding* of the scope of the right." 554 U.S. at 625 (emphasis added).

*Bruen* reiterated that the "common use" limitation to the Second Amendment's protections is "fairly supported by the *historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons.'" 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627) (emphasis added); *id.* at 81 (Kavanaugh, J., concurring) (same). In other words, whether a weapon is "in common use"—as part of the inquiry into whether it is sufficiently "dangerous and unusual" to be prohibited—is a question of history, not text.

In recent cases, this Court has provided disparate opinions regarding whether "common use" is a textual or historical question. On June 13, 2023, the Court stated that "[*Bruen*] requires a textual analysis, determining . . . whether the weapon at issue is 'in common use' today for self-defense." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (citations omitted). Conversely, on August 7, 2023, the Court "reject[ed] Hawaii's argument that the purported 'dangerous and unusual' nature of butterfly knives means that they are not 'arms' as

7

that term is used in the Second Amendment." *Teter v. Lopez*, 76 F.4th 938, 949 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024). Rather the unusualness—or commonness—of a weapon is a historical consideration under which the State "bears the burden of proof in the second prong of the *Bruen* analysis." *Id.* at 950.

Finally, on March 18, 2024, the Court noted that "[t]he Second Amendment may not protect . . . 'dangerous and unusual weapons'" because "the *presumptive protections* of the Second Amendment may be *rebutted* as to arms not 'in common use' today for self-defense." *United States v. Perez-Garcia*, 96 F.4th 1166, 1180–81 (9th Cir. 2024) (emphases added). Thus, while *Alaniz* places the "common use" question under the threshold analysis, *Teter* and *Perez-Garcia* both properly recognize that bearable arms are presumptively protected under the Second Amendment; that presumption may be rebutted under the historical prong of *Bruen* by showing that a certain weapon is sufficiently dangerous and unusual.

## B. Billy clubs are not "dangerous and unusual."

"[T]he historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" is the *only* historical tradition the Supreme Court has identified that supports banning a particular weapon. *Heller*, 554 U.S. at 627. And that standard is conjunctive: "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., joined by Thomas, J., concurring). California has not demonstrated that billy clubs are sufficiently dangerous or unusual, let alone both.

First, the State has not shown that billy clubs are unusual. They are an old and simple weapon—essentially a heavy, traditionally wooden club. Billy clubs came to prominence in the 1800s, concurrent with the rise of modern police departments, but they had "existed for centuries prior to the establishment of police." Declaration of Robert Escobar, 5_ER_817, at ¶ 34. Indeed, the State's own expert notes that billy clubs appeared by name "in English sources and American newspapers at least as early as the 1840s, and opines that this indicates the general public was already familiar with the term." *Fouts v. Bonta*,

No. 19-cv-1662-BEN-JLB, 2024 WL 751001, at *6 (S.D. Cal. Feb. 23, 2024) (citing Declaration of Dennis Baron, 5_ER_771–72, at ¶¶ 34–39).

True, billy clubs have been used by criminals. *See* Opening Br. at 48–49. But this is true of nearly any weapon; it is not unique to billy clubs. *See Heller*, 554 U.S. at 682 (Breyer, J., dissenting) (emphasizing that handguns "are the overwhelming favorite weapon of armed criminals"). And testimony regarding the criminal misuse of a weapon— which is all the State has provided—says nothing about the use of that weapon by law-abiding citizens for self-defense and other lawful purposes.

But even if billy clubs were sufficiently unusual (or uncommon), they must also be sufficiently dangerous. They are not. California claims that billy clubs are "particularly dangerous weapons" because they are "'likely to cause serious bodily harm' when deployed against a human target." Opening Br. at 41 (quoting *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012)). California further cites the "concealability and striking power" of billy clubs. *Id.* But to be banned under *Heller*'s "dangerous and unusual standard," a weapon must have "uniquely dangerous propensities." *Fyock v. Sunnyvale*, 779 F.3d 991,

997 (9th Cir. 2015*); see also Caetano*, 577 U.S. at 417–18 (Alito, J., joined by Thomas, J., concurring) ("If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous."). Concealability and the ability to cause serious bodily harm are not uniquely dangerous characteristics of billy clubs—rather, they are basic, definitional characteristics of a multitude of small weapons including pocketknives, handguns, and myriad blunt objects.

In fact, California's claim that billy clubs are particularly dangerous is belied by the State's own expert. In his report, Robert Escobar notes that "billies are classified as non-lethal." Declaration of Robert Escobar, 5_ER_811, at ¶ 18. They were issued to police officers even after firearms became standard equipment so that "an officer could diffuse a threat and apprehend an aggressive suspect or attacker while *lowering the risk of serious injury or death* to the suspect." *Id.* (emphasis added). "*A fortiori*, [weapons] that the [State]'s own witness described as 'non-lethal force,' cannot be banned on th[e] basis" of dangerousness. *Caetano*, 557 U.S. at 418 (Alito, J., joined by Thomas, J., concurring) (citation omitted).

Thus, California has not carried its burden of demonstrating that billy clubs are either uniquely dangerous or unusual, let alone both.

### III. There is no historical tradition of banning mere possession of billy clubs.

Because billy clubs are bearable arms which are presumptively protected under the plain text of the Second Amendment, and because California has failed to show that billy clubs are uniquely dangerous and unusual, California's billy club ban violates the Second Amendment. This is further supported by the absence of billy club regulations throughout American history.

California's law bans, inter alia, the mere possession of billy clubs. California Penal Code § 22210. There is no historical tradition of such a wholesale ban on billy clubs. At most, the State may be able to show a tradition of regulating the manner in which billy clubs may be carried—but California has not and cannot show a tradition of prohibiting carry altogether or the mere possession of billy clubs.

The Founders were certainly familiar with clubs. The prosecution at the Boston Massacre trial explained that because of the Redcoats' behavior in Boston, even "the most peaceable" Bostonians "found it necessary to arm themselves with heavy Walking Sticks or Weapons of

12

Defence when they went abroad," 3 John Adams, LEGAL PAPERS OF JOHN ADAMS 274 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965), which was justified because "every man . . . had a right . . . to defend himself if attacked," *id.* at 149. When Joseph Warren presented a speech commemorating the Boston Massacre in 1772, "almost every man" in attendance "had a short stick, or bludgeon, in his hand" in anticipation of a violent reaction from the Redcoats. Frederick MacKenzie, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON 37 (Allen French ed., 1926). Around that same time, in Vermont, Ethan Allen engaged in a series of confrontations with George Caldwell over a property sale gone wrong. In the second fight, according to court records, Allen "with a club struck . . . Caldwell on the head." Willard Sterne Randall, ETHAN ALLEN: HIS LIFE AND TIMES 156 (2011).

The only Founding Era laws restricting clubs were explicitly discriminatory. A 1797 Delaware law provided that no "Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same." 1797 Del. Laws 104. And a 1799 law from the Mississippi Territory provided that "No negro or mulatto

shall keep or carry any gun, powder, shot, club or other weapon[.]" 1799 Miss. Laws 113.

No jurisdiction enacted a single billy club restriction that applied to free citizens until 1862. And early restrictions on billy clubs only prohibited concealed carry—not open carry or mere possession. Indeed, by the end of the 1800s, only three jurisdictions (one state, one territory, and one city) enacted wholesale bans on the carry—but not possession—of billy clubs. No pre-1900 law banned their mere possession.

### A. No state regulated billy clubs before the Civil War.

As explained *supra*, the American public was familiar with clubs since before the Founding and with billy clubs "at least as early as the 1840s." *Fouts v. Bonta*, 2024 WL 751001, at *6 (citing Declaration of Dennis Baron, 5_ER_771–72, at ¶¶ 34–39). However, no jurisdiction enacted a single billy club restriction until the Civil War. By the State's own admission, in 1862, "Leavenworth, Kansas became the first jurisdiction to regulate billies by name, prohibiting their concealed carry." Opening Br. at 49. This was not a state law but a municipal ordinance in the city of Leavenworth, Kansas. C.B. Pierce, CHARTER AND ORDINANCES OF THE CITY OF LEAVENWORTH, WITH AN APPENDIX 45

14

(1863). The ordinance prohibited "carrying or having on his or her person in a concealed manner" certain weapons, including billy clubs. *Id.*

The only other billy club regulation enacted before the ratification of the Fourteenth Amendment was in New York in 1866. 1866 N.Y. Laws 1523. That law banned "knowingly and secretly conceal[ing]" a billy club "with intent to use against any other person." *Id.* Concealed carry of a billy club created a presumption of ill intent, but that presumption could be overcome. *Id.*

These two laws are the only regulations on billy clubs enacted before the ratification of the Fourteenth Amendment. They clearly cannot establish a tradition of billy club regulation. *Bruen*, 597 U.S. at 46 (three colonial regulations are insufficient to establish a tradition); *id.* at 55 n.22 (1860 New Mexico pistol carry ban's "value in discerning the original meaning of the Second Amendment is insubstantial" because it was not a state law, an outlier, and enacted "nearly 70 years after the ratification of the Bill of Rights"). Moreover, California's law goes much further than either Leavenworth's or New York's, prohibiting not just one manner of carry but all possession. Thus, there

15

is no American tradition of billy club regulation analogous to California's.

**B.    Most regulations on billy clubs during the mid-to-late 19th century prohibited only concealed carry.**

Some billy club regulations began to appear in the late-19th-century, but these regulations do not evince a tradition of prohibiting billy clubs outright. First, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66. Rather, late-19th-century evidence is "secondary" and can only be "treated as mere confirmation of what" has "already been established." *Id.* at 37 (quoting *Gamble v. United States*, 587 U.S. 678, 702 (2019)). Second, most were enacted by towns rather than states, and restrictions applying only to a small percentage of the population carry little weight. *See id.* at 67–68 ("we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also contradict the overwhelming weight of other, more contemporaneous historical evidence") (brackets and quotation omitted). Third, no late-19th-century restriction prohibited the possession of billy

16

clubs, as California's does: the vast majority restricted only concealed carry, they did not affect possession or open carry.[3]

Some jurisdictions went slightly further, banning not just concealed carry but also open carry "with the intent or purpose of injuring any person." *See*, *e.g.*, 1886 Md. Laws 602. Eight years later, Maryland amended its law to further clarify that the open carry ban applied only to those open carrying with intent to injure "and not for

---

[3] Laws that banned concealed carry of billy clubs: THE REVISED ORDINANCE OF THE CITY OF ST. LOUIS 491–92 (E. W. Pattison ed., 1871) (St. Louis); ORDINANCES OF JERSEY CITY, PASSED BY THE BOARD OF ALDERMEN SINCE MAY 1, 1871, at 41 (1874) (Jersey City); 1872 Md. Laws 56–57 (Annapolis); 1 THE STATUTE LAW OF THE STATE OF NEW YORK 321 (George S. Diossy ed., 1881) (concealed carry "with intent to use"); O.P. Ergenbright et al., REVISED ORDINANCES OF THE CITY OF INDEPENDENCE, KANSAS 162 (1887) (Independence); 1887 Mich. Pub. Acts 144; REVISED GENERAL ORDINANCES OF THE CITY OF SIOUX CITY 109 (1889) (Sioux City); W.J. Connell, THE REVISED ORDINANCE OF THE CITY OF OMAHA, NEBRASKA 344 (1890) (Omaha); 1891 Mich. Pub. Acts 409 (Saginaw); 1893 R.I. Pub. Laws 231–32; 1894 Md. Laws 834 (unless reasonable cause); 1895 Neb. Laws 209–10 (Lincoln); GENERAL LAWS OF THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS 1010 (1896); William K. Amick, THE GENERAL ORDINANCES OF THE CITY OF SAINT JOSEPH 508 (1897) (St. Joseph); LAWS OF THE CITY OF JOHNSTOWN, PA. 86 (1897) (Johnstown); 1897 Mich. Pub. Acts 1030 (Saginaw); 1899 N.Y. Laws 1341; COMPILED ORDINANCES OF THE CITY OF FAIRFIELD, CLAY COUNTY, NEBRASKA 34 (1899) (Fairfield).

17

any proper purpose of self-protection." 1894 Md. Laws 834.[4] Similarly, Oregon City, Oregon, in 1898 banned all carry "unless in self-defense, in protection of property or an officer in the discharge of his duty." THE CHARTER OF OREGON CITY, OREGON, TOGETHER WITH THE ORDINANCES AND RULES OF ORDER 259 (1898). In other words, neither possessing nor openly carrying billy clubs for self-defense were prohibited.[5]

Two Maryland counties enacted ordinances regulating carry only on election days.[6] Finally, two jurisdictions enacted regulations unrelated to possession or carry: New York regulated the manufacture

---

[4] Additionally, a few jurisdictions passed sentencing enhancements for carrying a billy club while committing a crime. 1868 Fla. Laws 2538; 1884 Md. Laws 249–50 (Baltimore); 1888 Fla. Rev. Stat. 2423; GENERAL LAWS OF THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS 1010 (1896). Again, these laws did not ban possession or carrying a billy club while not committing a crime.

[5] Laws that banned concealed carry and open carry with intent to injure: 1884 N.Y. Laws 3330 (also banned possession by minors); CHARTER AND ORDINANCES OF THE CITY OF SYRACUSE 215 (1885) (Syracuse); 1886 Md. Laws 602; 1890 Md. Laws 606–07 (Baltimore); 1894 Md. Laws 834.

[6] Laws regulating carry on election days: 1874 Md. Laws 366–67 (Kent County); 1886 Md. Laws 315 (Calver County).

18

and sale of billy clubs[7] and Oklahoma regulated their dispossession to minors.[8]

### C. By the end of the nineteenth century, only three jurisdictions banned the carriage of billy clubs outright.

Before 1900, only three jurisdictions enacted bans on carrying billy clubs: one state, one territory, and one city. The first carry ban— and the only one passed within the Reconstruction Era—was enacted in Nebraska City, Nebraska, in 1872. Gilbert B. Colfield, LAWS, ORDINANCES AND RULES OF NEBRASKA CITY, OTOE COUNTY, NEBRASKA 36 (1872). That law banned both concealed and open carry within the corporate limits of the city. *Id.* Notably, the law did not ban possession of billy clubs.

Next, the state of West Virginia enacted a ban on carrying billy clubs and other weapons in 1882 and again in 1891. 1882 W. Va. Acts 421–22; 1891 W. Va. Code 915. Again, these laws did not ban possession of billy clubs. And, these laws allowed for someone on trial for unlawful

---

[7] New York laws banning manufacture and sale: 1881 N.Y. Laws 102; 1884 N.Y. Laws 3330; 1889 N.Y. Laws 167; 1899 N.Y. Laws 1341.

[8] Oklahoma laws banning dispossession to minors: 1890 Okla. Laws 495; 1893 Okla. Laws 503–04.

carry to assert an affirmative defense that he feared for his life and "that he was, in good faith, carrying such weapon for self-defense and for no other purpose." 1882 W. Va. Acts 421–22. While the language of the law suggests this defense was applicable only to certain weapons (a "pistol, dirk, razor or bowie knife," *id*.), the first court to consider the law suggested the defense applied to any weapon listed in the statute, including billy clubs. *State v. Workman*, 35 W. Va. 367, 14 S.E. 9, 10–11 (W. Va. 1891).[9]

Finally, the Oklahoma Territory banned all carry—but not possession—of billy clubs in 1890 and 1893. 1890 Okla. Laws 495; 1893 Okla. Laws 503–04. As both a territorial and late-19th-century law, it adds little to the historical tradition. *See Bruen*, 597 U.S. at 67–68.

Regulations in three jurisdictions—the town of Nebraska City, the state of West Virginia, and the territory of Oklahoma—cannot constitute a tradition. But even if they could, California's law goes much

---

[9] The *Workman* court upheld West Virginia's carry ban, holding that "the kind of arms referred to in the [Second] amendment" were limited to "weapons of warfare to be used by the militia." *Workman*, 35 W. Va. 367, 14 S.E at 11. But this holding clearly contradicts *Heller* and *Bruen*, and even at the time the *Workman* decision was an outlier, adopting "a rationale endorsed by no other court during this time period." *Bruen*, 597 U.S. at 65.

further by banning possession in addition to carry—something not done by any pre-1900 law.

At most, the record shows a historical tradition of regulating the manner in which billy clubs may be carried—not banning carry altogether or possession. *Bruen* drew a sharp distinction between complete carry prohibitions and lesser carry restrictions by dismissing as analogs surety laws, statutes regulating the manner of carry, and the common-law offenses of affray or going armed to the terror of the public. 597 U.S. at 60 ("None of these historical limitations on the right to bear arms approach New York's . . . because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms."); *see also id.* at 59 ("States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly."). Certainly, then, restrictions on the manner of carry cannot justify a prohibition on possession.

Because there is no tradition of prohibiting the mere possession of billy clubs, California's ban thereon contradicts our nation's tradition of regulation and violates the Second Amendment.

***

21

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Erin M. Erhardt*
ERIN M. ERHARDT
  *Counsel of Record*
JOSEPH G.S. GREENLEE
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Cir. R. 29-2(c)(3) because this brief contains 4,127 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*

23

## CERTIFICATE OF SERVICE

I certify that on June 14, 2024, I served the foregoing with the Clerk of the Court using the ACMS System, which will send notice of such filing to all registered ACMS users.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*