**No. 24-1039**

**In the**
**United States Court of Appeals for the Ninth Circuit**
_____

RUSSELL FOUTS, *ET AL.*,
*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellant*.
_____

**On Appeal from the**
**United States District Court for**
**the Southern District of California**
_____

**Brief *Amicus Curiae* of**
**Gun Owners of California, Inc.,**
**Gun Owners of America, Inc., Gun Owners Foundation,**
**Heller Foundation,**
**Tennessee Firearms Association, Tennessee Firearms Foundation,**
**America's Future, Inc.,**
**U.S. Constitutional Rights Legal Defense Fund, and**
**Conservative Legal Defense and Education Fund**
**in Support of Plaintiffs-Appellees and Affirmance**
_____

JOHN I. HARRIS III
  SCHULMAN, LEROY & BENNETT, P.C.
3310 West End Avenue
Suite 460
Nashville, TN 37203

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070
*Attorneys for Amici Curiae*

June 14, 2024
*Attorney of Record

## DISCLOSURE STATEMENT

The *amici curiae* herein, Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, America's Future, Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A). These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them.

*s/Jeremiah L. Morgan*
Jeremiah L. Morgan

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.  CALIFORNIA SEEKS TO OVERTURN THE DISTRICT COURT'S FAITHFUL APPLICATION OF THE *BRUEN* METHODOLOGY WHICH CONCLUDED BILLY CLUBS ARE PROTECTED ARMS . . . . . . . . . . . . . . . . . . . . . 3

II. A BILLY IS AN "ARM" AND IS THUS "COVERED" BY THE SECOND AMENDMENT'S "PLAIN TEXT" UNDER *BRUEN* . . . . . . . . . . . . . . . . . 8

    A.  Under *Heller's* Definition, a Billy Is an "Arm" . . . . . . . . . . . 9

    B.  California's Argument that a Weapon Must Be in Common Use to Be an "Arm" Is Groundless. . . . . . . . . . . . . . . . . . . 11

        1.  *Heller* Did Not Require an "Arm" to Be in Common Use to Be an "Arm" . . . . . . . . . . . . . . . . . . . . . . . . 11

        2.  California's Claim that Billies Are Not in Common Use for Self-Defense Is Incorrect. . . . . . . . . . . . . . . . . . . 12

III. THERE ARE NO "UNPRECEDENTED SOCIETAL CONCERNS" OR "DRAMATIC TECHNOLOGICAL CHANGES" SURROUNDING BILLIES BETWEEN 1791 AND TODAY.  THUS, LATE HISTORICAL ANALOGUES ARE IRRELEVANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ii

IV.    CALIFORNIA'S PROFFERED HISTORICAL "ANALOGUES" ARE AN
IRRELEVANT COLLECTION OF UNRELATED RESTRICTIONS . . . . . . . . . 19

     A.    California Cannot Define a Relevant Time Period, Nor
Proffer a Ban on Possession of Billies before the Civil War . . . . 20

     B.    California Cannot Define Types of Weapons that Are
Relevantly Analogous to Billies . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

iii

# TABLE OF AUTHORITIES

Page

**HOLY BIBLE**
*I Chronicles* 11:23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**UNITED STATES CONSTITUTION**
Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

**STATUTES**
California Penal Code § 22210 . . . . . . . . . . . . . . . . . . . . . . 1, 24, 26

**CASES**
*B&L Productions, Inc. v. Newsom*, 2024 U.S. App. LEXIS 14144 (9th
    Cir. June 11, 2024). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
*Baker v. Kealoha,* 2012 U.S. Dist. LEXIS 197730 (D. Haw. 2012). . . . . . . . 4
*Bezet v. United States*, 714 Fed. Appx. 336 (5th Cir. 2017) . . . . . . . . . . . . 4
*Caetano v. Massachusetts*, 577 U.S. 411 (2016) . . . . . . . . . . . . . . . . 5, 15
*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . 3, *passim*
*Knight v. City of New York*, 2024 U.S. Dist. LEXIS 8820
    (S.D.N.Y. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
*McRorey v. Garland*, 2024 U.S. App. LEXIS 10247 (5th Cir. 2024) . . . . . . . 8
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). . . . . . . 2, *passim*
*State v. Kessler*, 289 Ore. 359 (Ore. 1980). . . . . . . . . . . . . . . . . . . . . 12
*State v. Deciccio*, 315 Conn. 79 (Conn. 2014) . . . . . . . . . . . . . . . 13, 14
*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) . . . . . . . . . . . . . 4
*United States v. Miller*, 307 U.S. 174 (1939) . . . . . . . . . . . . . . . . 11, 12
*United States v. Tilotta*, 2022 U.S. Dist. LEXIS 156715 (S.D. Cal. 2022) . . . 8

**MISCELLANEOUS**
G. DeMar, "Does the Second Amendment only apply to muskets?" *Gary
    DeMar.com* (Oct. 6, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . 16
W. Eison, 2 <u>History of the American Revolution</u> (The MacMillan
    Co.: 1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
J. Hamilton, <u>Weapons of the American Revolution</u> (Abdo Publishing:
    2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. McDermott, "Did a Snowball Fight Start the American Revolution?"
  *History.com* (June 13, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
E. Ruben, "Law of the Gun: Unrepresentative Cases and Distorted
  Doctrine," 107 Iowa L. Rev. 173 (Nov. 2021) . . . . . . . . . . . . . . 15
C. Taylor, Native American Weapons (Univ. of Okla. Press: 2001) . . . . 17
E. Volokh, "Nonlethal Self-Defense, (Almost Entirely) Nonlethal
  Weapons, and the Rights to Keep and Bear Arms and Defend Life,"
  62 Stan. L. Rev. 199 (Dec. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 12

v

## INTEREST OF *AMICI CURIAE*[1]

Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, America's Future, Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

## STATEMENT OF THE CASE

In 1917, for the first time, California enacted a statute banning private citizens from possessing, *inter alia*, what are colloquially known as "billy" clubs. As now codified, California criminalizes the manufacture, importation, sale, or possession of "any leaded cane, or any instrument or weapon of the kind commonly known as a billy, blackjack, sandbag, sandclub, sap, or slungshot." California Penal Code § 22210. Violation is punishable by imprisonment of not exceeding one year.

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

Plaintiffs challenged the prohibition against billies as a violation of the Second Amendment right to keep and bear "arms." The challenge was first heard by the district court before the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). At that time, relying on Ninth Circuit precedent, the district court ruled that since the prohibition on billies had been in effect since 1917, it qualifies as "longstanding," and therefore falls outside the protection of the Second Amendment. The court granted summary judgment for defendants. *See Fouts v. Bonta*, 561 F. Supp. 3d 941 (S.D. Cal. 2021) ("*Fouts I*").

The plaintiffs appealed and, after the Supreme Court decided *Bruen*, this Court remanded the matter to the district court for further consideration in light of *Bruen*. *Fouts v. Bonta*, 2024 U.S. Dist. LEXIS 31528 at *5 (S.D. Cal. 2024) ("*Fouts II*"). On remand, the district court applied the *Bruen* analysis and reversed its earlier decision, finding that a billy is an "arm" and therefore is covered by the plain text of the Second Amendment. *Id*. at *6. The district court ruled that, "[b]ecause both the weapon and the societal ill existed in early America, analogical reasoning is not necessary." *Id*. at *11. However, looking at history, the court found that, "up to the end of the Civil War in 1865, there

2

were no state restrictions in any of the states or territories on possessing or carrying a billy." *Id*. at *14. Thus, the court concluded that, even if analogical reasoning were necessary, the state had failed to carry its burden to show a historical tradition of regulating billies. Therefore, the law failed Second Amendment scrutiny under *Bruen* (*id*. at *14) and the court granted summary judgment to plaintiffs (*id*. at *32).

**ARGUMENT**

## I. CALIFORNIA SEEKS TO OVERTURN THE DISTRICT COURT'S FAITHFUL APPLICATION OF THE *BRUEN* METHODOLOGY WHICH CONCLUDED BILLY CLUBS ARE PROTECTED ARMS.

In its *Heller* decision in 2008, the Supreme Court ruled that the Second Amendment protects an individual right of the People to bear arms, not a collective right, a decision which most federal courts found shocking. *See District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). With that predicate established, the *Heller* Court then struck down a District of Columbia law prohibiting residents from even owning a handgun in the home. *Id*. at 573. The methodology that the Court used was based on the Amendment's "text and history." *Id*. at 595.

3

Yet, for more than a decade, most federal courts used a judicially invented "two-step" test to evaluate Second Amendment challenges. Under the test, many courts found that restrictions on Second Amendment rights did not even "implicate" the text of the Second Amendment.[2] This Court, for instance, followed the example of several other circuits in adopting a "two-step test" for considering restrictions on firearms rights. This Court's prior formulation under *Chovan* "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Id.* at 1136. The appropriate level of scrutiny, this Court held, "should depend on (1) 'how close the law comes to the core of the Second Amendment right,' and (2) 'the severity of the law's burden on the right.'" *Id.* at 1138 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)). The "core of the right," this Court explained, was "the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense" and this Court

---

[2] *See, e.g., United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) (finding that a lifetime ban on firearms possession by a domestic violence misdemeanant did not even "implicate" the "core Second Amendment right"); *Baker v. Kealoha,* 2012 U.S. Dist. LEXIS 197730 (D. Haw. 2012) (finding that a "may issue" carry permit regulatory scheme did not implicate the Second Amendment right); *Bezet v. United States*, 714 Fed. Appx. 336, 340 (5th Cir. 2017) ("'longstanding, presumptively regulatory measure[s]' likely implicate no Second Amendment rights").

4

stated that, if a law places a "substantial burden" on the "core right," it is subject to intermediate scrutiny. *Id.* In this way, the circuit courts of appeals were able to administer a host of judicial balancing tests depending on how "close to the core" the restriction was and how severe the restriction was.

With the exception of the *Caetano v. Massachusetts*[3] decision, which has particular application here as discussed *infra*, it took 14 years for the Supreme Court to return to the Second Amendment, to reinvigorate the *Heller* decision, and to prohibit any use of the two-step test which it described as involving "one step too many." *See Bruen* at 19. The expanded *Heller*-based test which *Bruen* established for courts to use could not be more clear: "[i]n keeping with *Heller* … **when the Second Amendment's plain text covers** an individual's conduct, the Constitution **presumptively protects** that conduct." *Id.* at 17 (emphasis added). Thus, when a state regulates activity covered by the plain text, "[t]o justify its regulation, the government … must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* If not, the regulation violates the Second Amendment's "unqualified command." *Id.* This is the test faithfully applied by the district court in *Fouts II*.

---

[3] *Caetano v. Massachusetts*, 577 U.S. 411 (2016).

California tries mightily to prevent the Court's inquiry into its dearth of relevant historical analogues by denying that "the Second Amendment's plain text covers" the conduct prohibited by California. To avoid that inquiry, California argues:

> 1. certain weapons and instruments are not "arms" and thus not presumptively protected by the Second Amendment;
>
> 2. billies are not "arms" because the plaintiff did not establish they are in **common use** today for self defense; and
>
> 3. even assuming a weapon is an "arm" and presumptively protected by the Second Amendment, the California ban is consistent with the Nation's historical tradition of firearm regulation of dangerous weapons.[4] *See* California Brief at 2-3, 15, 17-18 ("Cal. Br.").

What the *Bruen* Court established as a minimal threshold inquiry into whether the "**plain text covers**" the prohibited conduct, California seeks to elevate into a high bar. Here, it asserts that no "dangerous weapon" or weapon not in "common use" could be an "arm" under the text. This approach finds no support in *Bruen*.

The district court, however, carefully and correctly followed the *Bruen* methodology. The court noted that a billy is an "arm," and is thus covered by

---

[4] The last issue of historical analogues is addressed in Sections III and IV, *infra*.

6

the Second Amendment's plain text. The court did not impose an atextual requirement that plaintiffs demonstrate the arm was not "dangerous" and "in common use." If California believed that the billy was not in common use or a dangerous weapon, it would need to demonstrate that contention through relevant historical analogues, where California bore the burden.

Rather, the district court noted that both parties had conceded that billies were covered by the text. *Fouts II* at *6. Yet, on appeal, California has changed its mind, seeking to "approbate and reprobate" its position. Its revised position is that billies are "not in common use" and thus not "arms" for Second Amendment purposes. Cal. Br. at 1. But as the district court quite properly noted, this would:

> only be an argument if the Second Amendment said, "the right of the people to keep and bear only those Arms that are commonly used for self-defense, shall not be infringed." Of course, that is not the case. Use is not required for Second Amendment protection. [*Fouts II* at *7.]

California's effort to read a series of requirements into the simple threshold textual inquiry in *Bruen* is remarkably similar to the way that circuit courts viewed the text under the repudiated "two-step." Under the "two-step" test, the prohibited conduct was often found not to **violate** (often using the word

"**implicate**") a Second Amendment right under *Heller*. *See* cases at note 1, *supra*. Now, the trend among some courts is to find that the prohibited conduct does not meet the minimal *Bruen* threshold, which requires only that the Second Amendment text "**cover**" the prohibited conduct.[5]

California is inviting this Court to defy *Bruen*, and these *amici* urge that this invitation be declined.

## II. A BILLY IS AN "ARM" AND IS THUS "COVERED" BY THE SECOND AMENDMENT'S "PLAIN TEXT" UNDER *BRUEN*.

As discussed in Section I, *supra*, California erroneously attempts to read a series of conditions into *Bruen*'s simple threshold consideration that the prohibited conduct be "covered" by the text. Here, those conditions are that the "arm" be in "common use," and that it is not "dangerous and unusual." On the

---

[5] *See, e.g., B&L Productions, Inc. v. Newsom*, 2024 U.S. App. LEXIS 14144, at *15 (9th Cir. June 11, 2024) ("the plain text of the Second Amendment does not cover" selling firearms) (emphasis added)); *Knight v. City of New York*, 2024 U.S. Dist. LEXIS 8820, at *17 (S.D.N.Y. 2024) ("The plain text of the Second Amendment … 'does not imply a further right to sell and transfer firearms'"); *United States v. Tilotta*, 2022 U.S. Dist. LEXIS 156715, at *13 (S.D. Cal. 2022) ("'Possess and carry weapons in case of confrontation' does not imply a further right to sell and transfer firearms"); *McRorey v. Garland*, 2024 U.S. App. LEXIS 10247, at *11 (5th Cir. 2024) ("an implication [of a right to purchase a firearm] is not the same thing as being covered by the plain text of the amendment").

8

contrary, Plaintiffs have established that a billy is an "arm" under the Second Amendment.

## A.    Under *Heller's* Definition, a Billy Is an "Arm."

At the outset, it should be noted that the challenged California law not only prohibits "bearing" billies, but also bans mere possession.  As the district court correctly noted, "[t]his case concerns a technologically-simple weapon — in essence a wooden stick."  *Fouts II* at *10.  California's legal position can be summarized as follows:  a homeowner can have a handgun in the home (under *Heller*), but cannot have a heavy stick.  This is an absurdity.[6]

*Heller* defined an "arm" with reference to two early American dictionaries:

> The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." … Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  [*Heller* at 581.]

---

[6]  Appellee cites a California state court decision for the proposition that "California's baton possession restrictions 'do[] not deprive persons of their ability to defend themselves or their homes, because there are alternative means to do so.'"  Cal. Br. at 44 (quoting *People v. Davis*, 214 Cal. App. 4th 1322 (Cal. Ct. App. 2013)).  The alternative means test was rejected by the Supreme Court in *Heller*.  *See Heller* at 629.

Consistently, *Bruen* makes clear that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen* at 28 (quoting *Heller* at 582).

California does not dispute that clubs were used as weapons of self-defense at the time of ratification and, indeed, for all of recorded history. Holy Writ describes a conflict between Benaiah, a commander of the Jewish King David's army, who confronted an invading Egyptian with a spear, "went down to him with a club and snatched the spear from the Egyptian's hand and killed him with his own spear." *I Chronicles* 11:23 (NASB). Revolutionary-era soldiers, resisting British troops and native recruits, were at times forced to use their muskets as clubs when ammunition ran out or when hand-to-hand combat occurred and there was no time to reload: "[t]he musket was heavy enough to use as a club when a person ran out of ammunition, or did not have time to reload it."[7]

The Founders were certainly aware of the usefulness of clubs as arms for purposes of self-defense. A billy clearly qualifies as something a person "takes into his hands, or useth in wrath to cast at or strike another." *Bruen* at 28.

---

[7] National Parks Service, "The Musket and Rifle."

10

Thus, it is an "arm," covered by the plain text of the Second Amendment's protection of "keep[ing] and bear[ing] arms."

### B. California's Argument that a Weapon Must Be in Common Use to Be an "Arm" Is Groundless.

#### 1. *Heller* Did Not Require an "Arm" to Be in Common Use to Be an "Arm."

In the court below, California conceded the obvious — that, under *Heller*'s definition, a billy is an "arm." *Fouts II* at *6 ("both sides have previously agreed that a billy is an 'arm'"). However, California now has changed its mind. Now, California ignores *Heller*'s controlling definition and argues that billies are not "arms" because they "are not commonly used for self-defense." California misrepresents the point of the court's discussion of weapons "in common use."

*Heller* did not determine that the Second Amendment protects arms only if they are possessed by large swaths of the population. Early on, the Court used the phrase "in common use" in its discussion of *United States v. Miller*, 307 U.S. 174 (1939). The *Heller* Court "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by

11

law-abiding citizens for lawful purposes." *Heller* at 625.[8]  California's attempt

to apply the "in common use" language to non-lethal weapons inverts *Heller* and

*Miller*.

**2.  California's Claim that Billies Are Not in Common Use for Self-Defense Is Incorrect.**

California repeatedly attempts to persuade both this Court and the court

below that "billies never came into common use among law-abiding citizens for

self-defense." Cal. Br. at 1.  But multiple courts have already considered and

rejected this argument.

The Oregon Supreme Court has noted that "[t]he club is considered the

first personal weapon fashioned by humans.…  The club is still used today as a

personal weapon, commonly carried by the police." *State v. Kessler*, 289 Ore.

359, 371 (Ore. 1980).  That court expressly found, contrary to California's

claims here, that billies are in fact "in common use" for self-defense, and found

that "'arms' … include the hand-carried weapons **commonly used by**

**individuals for personal defense**.  The club is an effective, hand-carried weapon

which cannot logically be excluded from this term ['arm']." *Id.* at 372.

_____

[8]  E. Volokh, "Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life," 62 STAN. L. REV. 199 (Dec. 2009).

Likewise, the Connecticut Supreme Court has found that "police batons are '[a]rms' within the meaning of the second amendment...." *State v. Deciccio*, 315 Conn. 79, 129 (Conn. 2014). The Connecticut court, in its 2014 decision, offered several rationales for finding that a billy is an "arm," all of which are closely consistent with *Heller* (and now *Bruen*). The Connecticut court found that billies are "weapons with traditional military utility." *Deciccio* at 129. The court noted that "the widespread use of the baton by the police, who currently perform functions that were historically the province of the militia; *see, e.g.,* D. Kopel, 'The Second Amendment in the Nineteenth Century,' 1998 BYU L. REV. 1359, 1534; demonstrates the weapon's traditional military utility." *Deciccio* at 133.

*Bruen* and *Heller* further reminded lower courts that the Second Amendment protects weapons that are useful for military service, "to secure to the people the ability to oppose themselves in military force against the usurpations of government" (*Heller* at 618), and that "the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* at 599.

13

For the police who use them, billies are defensive weapons, not offensive. As Haven Gear, a supplier of police "safety batons," notes, when police officers use batons, "[t]he goal is not to break a person's bones or strike lethally, but to stop them from making an aggressive attack with the potential for deadly force with a lethal weapon such as a gun or knife."[9] "Our safety batons are proven innovative defense technology at its finest," Haven Gear notes. Like the Second Amendment protects the right of individuals to use firearms for self-defense, it also protects the right of individuals to use non-lethal weapons for self-defense.

The Connecticut court also rejected California's proposition that billies are primarily weapons of gangsters. Rather, the court found that billies "are typically possessed by law-abiding citizens for lawful purposes." *Deciccio* at 129. Handguns, of course, are used by criminals too. But this has no effect on the Second Amendment's protection of the right to keep and bear arms by the law-abiding. Finally, the court rejected the contention that a billy is somehow an especially dangerous weapon, finding rather that "they are neither especially dangerous nor unusual." *Id.*

---

[9] "How Safety Batons Are Used for Defense," *HavenGear.com*.

As Professor Eric Ruben notes, "limiting arms to objects purposely designed as weapons would have the counter-intuitive effect of privileging certain extremely lethal weapons (like guns) over less lethal alternatives (like baseball bats)...."[10]  In his concurrence in *Caetano*, which upheld a victim's right to use a stun gun in self-defense, Justice Alito noted that "commendably, she did so by using a weapon that posed little, if any, danger of permanently harming either herself or the [attacker]." *Id*. at 213 (Alito, J., concurring).  *Caetano* makes clear that California's reasoning runs afoul of the Constitution:  "the right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Id*. at 421 (Alito, J, concurring) (citing *Heller* at 629).

## III.  THERE ARE NO "UNPRECEDENTED SOCIETAL CONCERNS" OR "DRAMATIC TECHNOLOGICAL CHANGES" SURROUNDING BILLIES BETWEEN 1791 AND TODAY.  THUS, LATE HISTORICAL ANALOGUES ARE IRRELEVANT.

California was unable to furnish a single historical analogue of a state law restricting billies during or near the Founding era.  The earliest law it could find restricting possession was after the Civil War.  *See Fouts II* at *13-14.  Realizing that this law would be irrelevant under *Bruen* unless this was a case "implicating

---

[10]  E. Ruben, "Law of the Gun: Unrepresentative Cases and Distorted Doctrine," 107 Iowa L. Rev. 173, 195 (Nov. 2021).

unprecedented societal concerns or dramatic technological changes [that] may require a more nuanced approach," California makes that contention, but strains credulity attempting to persuade this Court that "technological advances through the years," converting wooden billies to steel, and fixed billies to collapsible ones, somehow involved "dramatic technological changes" of the kind *Bruen* envisioned. The district court rejected such a plea. "This case concerns a technologically-simple weapon — in essence a wooden stick — and an age old social ill: criminally assaulting another with a stick." *Fouts II* at *10.

By California's logic, as one author has noted:

the freedoms of speech and press found in the First Amendment should be limited to a town crier, men on horseback and footmen to carry a communique, quill pens, and actual printing presses.... If the Second Amendment was only for muskets, then [the First Amendment] was also only for parchment and literal printing presses. Our founders knew better. Rights transcend technology and innovation. Rights are for the ages.[11]

The Supreme Court made this principle explicit in *Heller*:

Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications ... and the Fourth Amendment applies to modern forms of search, ... the Second

---

[11]  G. DeMar, "Does the Second Amendment only apply to muskets?" *Gary DeMar.com* (Oct. 6, 2017).

Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.  [*Heller* at 582.]

Nothing about the transition from a wooden billy to a metal one (as if metal rods did not exist during the Founding period), or from a fixed to an extendable billy, implicates "dramatic technological changes."  California's attempt to twist *Bruen*'s language fares no better than its attempted twisting of *Heller*'s.

Nor do billies involve "unprecedented societal concerns."  The Framers were well aware of the utility of clubs as weapons.  Native tribesmen regularly employed clubs as weapons against colonial and early American settlers.[12]  Bostonians used them against British soldiers during the "Boston Massacre" of 1770.[13]  American troops at the Battle of Bunker Hill resorted to fighting with clubbed muskets after running out of ammunition.[14]  With many muskets, indeed,

---

[12]  C. Taylor, Native American Weapons at 23 (UNIV. OF OKLA. PRESS: 2001).

[13]  A. McDermott, "Did a Snowball Fight Start the American Revolution?" *History*.com (June 13, 2023).

[14]  W. Eison, 2 History of the American Revolution at 246 (The MacMillan Co.: 1914).

17

"the stock was designed to be used as a club."[15]  The weapon served as both a firearm for long-distance self-defense and a club for hand-to-hand combat. Andrew Jackson, the seventh President and a Revolutionary War veteran, survived an assassination attempt by clubbing the would-be shooter with his cane.[16]

The court below noted that California's law banning billies could be read to "encompass a metal baton, a little league bat, a wooden table leg, or a broken golf club shaft, all of which are weapons that could be used for self-defense but are less lethal than a firearm." *Fouts II* at 2.  Nothing about the law limits its scope to metal billies or expandable billies.  Regardless, none of these relatively minor improvements even approaches a "dramatic technological upgrade."  Put simply:  if a modern rifle, despite vast technological improvements, is now an "arm" just as a musket was at the time of the American Revolution, then a stick which gets longer and stronger for being metal, is still an "arm."

California's attempt to invoke *Bruen's* "more nuanced approach" fails miserably.  As *Heller* made clear, and California admitted below, a billy is an

---

[15]  J. Hamilton, <u>Weapons of the American Revolution</u> at 6 (Abdo Publishing:  2013).

[16]  History.com, "<u>Andrew Jackson narrowly escapes assassination</u>."

18

"arm." Thus, it is covered by the plain text of the Second Amendment. Billies were in common use for self-defense in the Founding era and continue to be today. Yet there were no restrictions on possession of billies during the Founding era or until after the Civil War; the one or two statutes before the Civil bar banned only concealed carry. And modern billies are only marginally different from their Founding-era predecessors. No "nuanced" approach is required.

## IV. CALIFORNIA'S PROFFERED HISTORICAL "ANALOGUES" ARE AN IRRELEVANT COLLECTION OF UNRELATED RESTRICTIONS.

Plaintiffs should prevail because the prohibited conduct is protected by the text. Furthermore, Plaintiffs should prevail because California failed to demonstrate technological or social changes and thus the nuanced approach does not apply. And, by the standard approach, there is no relevantly similar historical analogue. Then as now, California could not point to a single law banning possession of billies until West Virginia in 1882 (*Fouts II* at *19) and Rhode Island in 1893. *Id.* at *17-18. The court found that a small handful of proffered restrictions on concealed carrying of billies and punishments for use of

billies in commission of crimes were not relevantly analogous to California's complete ban on possession. *Id*. at *17.

California offers as historical "analogues" only a slapdash collection of any unrelated restrictions on any weapon it can scrape together over many centuries. This amalgamation is entirely unhelpful in determining the meaning of the Second Amendment. The court below lamented what it called "the State's departure from precision in its briefing" (*id*. at *23) and noted that "[i]t makes it difficult to properly perform the *Bruen* analysis when … the State's briefing employs a mischaracterization." *Id*. at *24-25. Unfortunately, California performs no better in this Court.

### A. California Cannot Define a Relevant Time Period, Nor Proffer a Ban on Possession of Billies before the Civil War.

As the district court noted, and as stated in Section III, *supra*, California offers no analogous restrictions during the period surrounding 1791. *See Fouts II* at *22. Now, it references bans on crossbows and "launcegays in medieval England." Cal. Br. at 33. It references early colonial bans on bladed weapons such as "daggers or dirks." *Id*. at 35. It notes that "forty-two States and the District of Columbia enacted anti-slungshot laws by the end of the nineteenth

20

century." *Id.* at 40. But the challenge here is not to bans on launcegays, but rather billies.

California is forced to admit that the first state to restrict billies was New York in 1862, during the Civil War. At that time, New York did not ban possession, but merely concealment. *Id.* at 37; *Fouts II* at *24. The Supreme Court has been clear that, even if a ban on concealment of arms could be construed as constitutional, a ban on public carry cannot — let alone a ban on simple possession. "[H]istory reveals a consensus that States could not ban public carry altogether…. [C]ited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit open carry." *Bruen* at 53. Thus, a New York statute prohibiting concealed carry of a billy offers no support for California's complete ban.

Apparently attempting to establish its preferred time frame for consideration of *Bruen*'s historical analogues, California repeatedly discusses restrictions on weapons "during this period." Cal. Br. at 39-40. But it never defines which period and offers no analogues at all in the Founding era. California argues that: "[b]y the beginning of the twentieth century, almost half of all States and numerous municipalities had laws regulating billies…. Another

21

impact weapon regulated during this period was the slungshot." *Id*. at 39. The beginning of the Twentieth Century, as the Supreme Court has made clear, has no real relevance in determining the Second Amendment's meaning. Indeed, "[t]he belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]." *Bruen* at 36-37.

At another point, California argues, "forty-two States and the District of Columbia enacted anti-slungshot laws by the end of the nineteenth century. Another melee weapon that rose to prominence during this period was the 'Bowie knife,' a weapon used by Jim Bowie in a duel in 1827 that became widespread in the 1830s.... By 1840, at least five States or territories had enacted laws restricting the carrying of Bowie knives or other fighting knives.... Nearly every State enacted a law restricting Bowie knives by the end of the nineteenth century." Cal Br. at 40-41.

It is difficult to tell what California means by "this period." Does it mean 1830, when the Bowie knife became widespread? Perhaps it means 1840, by which a grand total of "five states or territories" had restricted public carry of Bowie knives. But *Bruen* is clear that "a few late-in-time outliers" do not undercut the general historical understanding when the Second Amendment was

22

adopted in 1791. *Bruen* at 70. Further, *Bruen* gave little weight to territorial restrictions, noting that "territorial 'legislative improvisations,' which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the [Second] Amendment' and we do not consider them 'instructive.'" *Id.* at 67 (quoting *Heller* at 614).

Or perhaps by "this period," California means "by the end of the nineteenth century." But *Bruen* is clear that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 34 (quoting *Heller* at 634-635). And, "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 36. Moreover, "to the extent later history contradicts what the text says, the text controls." *Id.* Despite 10 pages of confused briefing, in the end California cannot proffer a single state ban on possession or carrying of billies until after the Civil War. Not a single proposed "analogue" falls in the Founding "period," and thus the law cannot survive.

23

**B.     California Cannot Define Types of Weapons that Are Relevantly Analogous to Billies.**

California casts a vastly overbroad net, pulling in restrictions on any conceivable weapon, positing an amorphous category of "particular weapons that threaten public safety" (Cal. Br. at 32), then glibly asserting that "California's restrictions on billies are relevantly similar to these historical analogues." *Id.* at 43.  Perhaps intentionally, California's categories it argues may be banned are so broad and vague as to encompass any conceivable "bearable arm."  But a glance at the types of weapons California attempts to analogize undermines its argument.

In challenged Section 22210 itself, California creates a category of banned weapons, including billies, and described as any "leaded cane, or any instrument or weapon of the kind commonly known as a billy, blackjack, sandbag, sandclub, sap, or slungshot."  Cal. Penal Code § 22210.  However, in its brief, California goes on to create several other groupings of weapons it attempts to analogize to billies.  It argues that restrictions on billies are similar to restrictions on "launcegays, pocket pistols, and crossbows … in medieval England." *Id.* at 33. It then goes on to suggest that bans on billies are relevantly similar to bans on

"pocket pistol[s]" and bladed weapons such as "skeins, stilladers, daggers or dirks." *Id.* at 35.

Finally, California creates a category it calls "melee weapons," and posits that "[a]mong other melee weapons regulated during the nineteenth century, States and localities began to regulate billies **during Reconstruction**." *Id.* at 36 (emphasis added). Creating a category called "melee weapons" (much like "weapons that threaten public safety") is transparently self-serving to California's position, as virtually any bearable arm could logically be used in a so-called "melee." (*See* discussion of using long guns as clubs in Section II, *supra*). If any "melee weapon" is subject to state bans on possession, the Second Amendment's protection for "bearable arms" vanishes entirely.

Indeed, when one wades through the confusion of time periods and groupings of unrelated weapons in California's brief, perhaps two themes stand out. First, California appears to believe that essentially every conceivable self-defense weapon is uniquely and unacceptably "dangerous," largely unique in its use to criminals and government agents, such as the military and law enforcement, and subject to state bans on possession by law-abiding civilians. Second, California utterly fails to offer a single historical state ban on public

25

carrying of billies before the Fourteenth Amendment's passage and only two (West Virginia and Rhode Island) before 1900 (along with the territory of Oklahoma). *See* Cal. Br. at 38. Only one other state is offered before Section 22210 itself was passed in 1917 — New York in 1908. *Id.* at 41.

## CONCLUSION

The district court was correct. "This case concerns a technologically-simple weapon — in essence a wooden stick — and an age old social ill: criminally assaulting another with a stick. So, the *Bruen* inquiry is straightforward." *Fouts II* at \*10. The district court's decision should be affirmed.

Respectfully submitted,

_/s/Jeremiah L. Morgan_

JOHN I. HARRIS III
  SCHULMAN, LEROY & BENNETT, P.C.
  3310 West End Avenue
  Suite 460
  Nashville, TN 37203

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070
  wjo@mindspring.com
  *Attorneys for Amici Curiae*
  *Attorney of Record
  June 14, 2024

26

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-1039

I am the attorney or self-represented party.

**This brief contains** | 5,390 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
　☐ it is a joint brief submitted by separately represented parties.
　☐ a party or parties are filing a single brief in response to multiple briefs.
　☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jeremiah L. Morgan | **Date** | 6/14/24

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**　　　　　　　　　　　　　　　　　　　　　　　　　　　*Rev. 12/01/22*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of California, Inc., *et al.*, in Support of Plaintiffs-Appellees and Affirmance, was made, this 14th day of June 2024, by the Court's Appellate Case Management System upon the attorneys for the parties.

 */s/Jeremiah L. Morgan*
Jeremiah L. Morgan
Attorney for *Amici Curiae*